## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QVC, INC. and QHEALTH, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No.  10 094 (UNA) |
| | ) | |
| v. | ) | |
| | ) | |
| YOUR VITAMINS, INC. d/b/a PROCAPS | ) | |
| LABORATORIES and ANDREW | ) | |
| LESSMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF QVC, INC.
## IN SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER
## PRELIMINARY INJUNCTION
## AND EXPEDITED DISCOVERY

Joseph Grey (ID 2358)
Sean T. O'Kelly (ID 4349)
Cross & Simon, LLC
913 North Market Street
Eleventh Floor
P.O. Box 1380
Wilmington, DE  19899-1380
Telephone: (302) 777-4200
Facsimile: (302) 777-4224 (fax)
Email: jgrey@crosslaw.com

and

Jonathan E. Moskin
Britton Payne
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229
Email:  jmoskin@foley.com

Attorneys for Plaintiffs

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................……………ii

I.      PRELIMINARY STATEMENT ................................................................ 1

II.     FACTUAL BACKGROUND ................................................................... 3

  A.  Defendants' Deceptive Promotion of ProCaps' Healthy Hair Skin & Nails ........................ 4

  B.  Defendants' Deceptive Promotion of Resveratrol-100 ......................................... 7

III.    ARGUMENT .............................................................................. 10

  A.  Under Applicable Standards, QVC Is Entitled to Injunctive Relief ................................. 10

     1.      QVC Is Likely to Succeed on the Merits of its False Advertising Claim ................. 10

        a.  Defendants' Claims Are Literally False ................................................. 12

        b.  Defendants' Claims Are False by Necessary Implication ......................................... 13

        c.  Defendants' Unsubstantiated Claims Are Literally False ....................................... 14

        d.  Defendants' Website Violates FTC Regulations ....................................... 16

        e.  Evidence of Actual Confusion Renders All of Defendants' Claims Unlawful ........ 16

     2.      QVC has Suffered and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief ....................................................................... 17

     3.      Defendants Will Not Be Harmed By The Grant Of A Preliminary Injunction ........ 20

     4.      The public interest supports an injunction ............................................. 21

  B.  There Exists Good Cause to Allow Expedited Discovery. .................................................. 22

IV.     CONCLUSION ............................................................................ 24

NYC_752646.4

## TABLE OF AUTHORITIES

CASES

*BAE Sys. Aircraft Controls Inc. v. Eclipse Aviation Corp.*,
    224 F.R.D. 581 (D. Del. 2004) ...................................................................................22

*Benham Jewelry Com. v. Aron Basha Corp.*,
    45 U.S.P.Q. 2d 1078, 1997 WL 639037 (S.D.N.Y. 1997)...........................................24

*Castrol Inc. v. Pennzoil Co.*,
    987 F.2d 939 (3d Cir. 1993).............................................................................12, 14, 17

*Castrol, Inc. v. Pennzoil Quaker State Co.*,
    169 F. Supp. 2d 332 (D. N.J. 2001) ....................................................................... 20-21

*Checkpoint Sys. v. Check Point Software Tech.*,
    269 F.3d 270 (3d Cir. 1991)........................................................................................18

*Church & Dwight Co. v. S.C. Johnson & Son, Inc.*,
    873 F. Supp. 893 (D.N.J. 1994) ..................................................................................21

*Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*,
    228 F.3d 24 (1st Cir. 2000)..........................................................................................13

*Commissariat a L'Energie Atomique v. Dell Computer Corp.*,
    No. Civ.A. 03-484-KAJ, 2004 WL 406351 (D. Del. Mar. 3, 2004).........................22

*Conopco, Inc. v. Campbell Soup Co.*,
    95 F.3d 187 .................................................................................................................21

*Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*,
    No. 81 Civ. 731-CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982)...........................13

*Donsco, Inc. v. Casper Corp.*,
    587 F.2d 602 (3d Cir. 1978).........................................................................................18

*Edudata Corp. v. Scientific Computers, Inc.*,
    599 F. Supp. 1084 (D. Minn. 1984) ............................................................................23

*Ellsworth Assocs., Inc. v. United States*,
    917 F. Supp 841 (D.D.C. 1996)..................................................................................22

*Entm't Tech. Corp. v. Walt Disney Imagineering*,
    No. Civ.A. 03-3546, 2003 WL 22519440 (E.D. Pa. Oct. 2, 2003).............................22

NYC_752646.4

*Facenda v. N.F.L. Films, Inc.*,
  448 F. Supp. 2d 491 ............................................................................................18

*Fed. Express Corp. v. Fed. Expresso, Inc.*,
  NO. 97 CV 1219 (RSP) (GJD), 1997 WL 736530 (N.D.N.Y. Nov. 24, 1997) ......................23

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
  276 F.3d 160 (3d Cir. 2001)............................................................................12, 16

*Instant Air Freight v. C.F. Air Freight, Inc.*,
  882 F.2d 797 (3d Cir. 1989)...............................................................................20

*Irish Lesbian & Gay Org. v. Giuliani*,
  918 F. Supp. 728 (S.D.N.Y. 1996)........................................................................23

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
  Civ. No. 01-55154, 2002 WL 1163624 (9th Cir. 2002) ........................................21

*Johnson & Johnson-Merck Consumer Pharms. Co. v. SmithKline Beecham*,
  960 F.2d 294 (2d Cir. 1992)...............................................................................19

*Johnson Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms. Inc.*,
  19 F.3d 125 (3d Cir. 1994)...........................................................................17, 19

*Kennedy Indus. Inc. v. Aparo*,
  41 F. Supp. 2d 311 (E.D. Pa. 2005) .....................................................................14

*Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
  290 F.3d 578 (3d Cir. 2002)........................................................................Passim

*Onan Corp. v. United States*,
  476 F. Supp. 428 (D. Minn. 1979)........................................................................23

*Optic-Electronic Corp. v. United States*,
  683 F. Supp. 269 (D.D.C. 1987)..........................................................................22

*Pappan Enters., Inc. v Hardee's Food Sys., Inc.*
  143 F.3d 800 (3d Cir. 1998)...............................................................................20

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare*,
  292 F. Supp. 2d 611 (D.N.J. 2003) ................................................................15, 19

*Pod-Ners, LLC v. N. Feed & Bean of Lucerne Ltd. Liability Co.*,
  204 F.R.D. 675 (D. Colo. 2002) ...................................................................22, 24

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
  902 F.2d 222 (3d Cir. 1990)........................................................................12, 15, 18

NYC_752646.4

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
  208 F.R.D. 273 (N.D. Cal. 2002) ..................................................................22, 24

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ..............................................................................14

*Sys. Corp. v. Advanced Cerametrics, Inc.*,
  No. CIV. A. 95-7956, 1996 WL 130991 (E.D. Pa. Mar. 15, 1996) .......................23

*Tambrands v. Warner-Lambert*,
  673 F. Supp. 1190 (S.D.N.Y. 1987) ......................................................................14

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007) ..................................................................................13

*Tisch Hotels, Inc. v. Americana Inn, Inc.*,
  350 F.2d 609 (7th Cir. 1965) .................................................................................18

*W.L. Gore & Assocs., Inc. v. Totes. Inc.*,
  788 F. Supp. 800 (D. Del. 1992) .............................................................. 17, 20-21

*Warner-Lambert Co. v. Breathasure Inc.*,
  204 F.3d 87 (3d Cir. 2000) .............................................................................11, 15

## STATUTES, RULES & REGULATIONS

16 C.F.R. § 255.0(b) ...................................................................................................16

16 C.F.R. §255.3(b) ....................................................................................................16

16 C.F.R. § 255.5 ........................................................................................................16

15 U.S.C. § 1125(a) ....................................................................................................10

Del. Code Ann. Tit. 6 § 2532 ......................................................................................11

Delaware Consumer Frad Act, 6 Del. C. 2525 ...........................................................11

Delaware Consumer Fraud Act .....................................................................................11

Delaware Consumer Fraud Act, 6 Del. C. 2513 .......................................................2, 11

Delaware Deceptive Trade Practices Act ....................................................................11

Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6 § 2531 et seq. (2009)
  ("DDTPA") ................................................................................................................2

NYC_752646.4

Fed. R. Civ. P. 26, 26(b)(2), 26(d) and 26(f) ................................................................................22

Fed.R.Civ.P. Rule 34(b)................................................................................................................22

Fed.R.Civ.P. Rule 65(b)................................................................................................................10

Section 43(a) of the Lanham Act ..........................................................................................2, 10, 17

NYC_752646.4

# I.     PRELIMINARY STATEMENT

QVC brings this motion to bring a halt to a campaign of inflammatory, false and misleading promotions by defendants, who are seeking to promote their own dietary supplements by disparaging QVC's competing products.  Defendants' false and unsustainable claims include the following:

QVC's dietary supplements include a carcinogen.

QVC's dietary supplements are "unhealthy" [sic].

QVC's dietary supplements are of poor quality, and the Q in QVC means questionable.

QVC's dietary supplements use unwholesome artificial flavors and sweeteners.

QVC's dietary supplements have no health benefits.

Certain active ingredients in QVC's dietary supplements are inert and have no benefits.

QVC's tablets are somehow inherently inferior to defendants' capsules.

QVC and its products are "sleazy and deceptive".

In truth, QVC's NATURE'S CODE dietary supplements are all certified by the most prominent applicable standards-setting authorities.  For its NATURE'S CODE Hair Skin & Nails product, the appropriate certifying body is the United States Pharmacopeia ("USP"), the leading standards–setting authority for prescription and over–the–counter medicines and other healthcare products manufactured or sold in the United States.  For its NATURE'S CODE Resveratrex product, the certification is under "cGMP" guidelines of the Center for Professional Innovation & Education.  Defendants' competing products disclose no such independent certifications of quality.

Defendants' statements in issue are literally false, false by necessary implication, or are based on unsubstantiated claims that defendants can not possibly support.  In each respect, as a

NYC_752646.4

matter of law, defendants' advertising claims are unlawful even without further proof of harm. However, the harm to QVC from defendants' verbal assault is already palpable.  In the few short weeks since defendants began their smear campaign, there is already substantial evidence of actually confused consumers proclaiming their refusal to purchase QVC's directly competing products; consumers returning the products they had already purchased from QVC, and even consumers proposing a boycott of QVC or refusing to purchase other products of QVC.

Defendants' openly publish the comments of such confused consumers on their website so as to foster further confusion. These include statements describing QVC as having an "utter lack of quality control"; referring to QVC's conduct as "criminal", branding QVC's products as "falsely represented", and the like.  Although defendants undertake to respond to and correct some misimpressions of their audience and to answer some of the questions posed, they have taken no steps to respond to or correct numerous blatantly false assertions of their audience regarding QVC's products.  In publishing comments of users who have been misled and only selectively responding to these comments, defendants embrace the comments as their own and the confusion is allowed to feed on itself.  Unless stopped, it will continue to grow.

Defendants' publication of such false and misleading statements is plainly in violation of Section 43(a) of the Lanham Act, the Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6 § 2531 et seq. (2009) ("DDTPA") and Delaware Consumer Fraud Act, 6 Del. C. 2513 ("DCFA").  Defendants publish these untrue and disparaging statements on their website and on QVC's principal competing shopping channel, Home Shopping Network (as well as on YouTube and no doubt on other platforms). All such publications should be enjoined *pendente lite*, and defendants should be held to account for the harm they have caused.  As demonstrated by defendants' posting on their website and on YouTube on February 3, 4 and 5 of three new videos

NYC_752646.4

attacking QVC, the slanderous campaign continues unabated.   The immediacy of the harm caused by these ongoing publications is plain, and the already abundant evidence of harm being suffered by QVC demonstrates the need for a temporary restraining order pending a hearing for preliminary injunction.   Expedited discovery in anticipation of a hearing on preliminary injunctive relief is also appropriate.

## II.   FACTUAL BACKGROUND

The facts relevant to this motion are set forth in full in the accompanying declarations of Michael Bradley, Mary Davis, Michael Bengivenga and Rich Yoegel, and will only be summarized here.

QVC, Inc. operates the leading nationally broadcast cable television shopping network and the website <qvc.com>, at which it sells and offers for sale a wide variety of consumer products. (Yoegel Decl. ¶ 3.)  Since at least as early as 1997, QVC has promoted and sold on its television channel and website a line of dietary supplements under the trademark NATURE'S CODE. (*Id*.)  The NATURE'S CODE line of dietary supplements from QVC and its QHealth subsidiary has been very successful, with sales totaling in the hundreds of millions of dollars. (*Id.*)  Among the NATURE'S CODE food supplements sold by QVC are products named Hair, Skin & Nails and Resveratrex.  (*Id*. ¶ 4.)

Andrew Lessman and Your Vitamins, Inc. d/b/a ProCaps Laboratories ("ProCaps") produce a line of vitamin products sold under the name PROCAPS, including PROCAPS Healthy Hair, Skin & Nails and Resveratrol-100, which compete directly with the NATURE'S CODE Hair, Skin & Nails and Resveratrex products sold by QVC.  Although Lessman and ProCaps previously promoted their vitamin products on QVC, Defendants currently offer their vitamin products for sale on television on QVC's direct competitor, the Home Shopping

NYC_752646.4

Network ("HSN"), including its website <hsn.com>. (Yoegel Decl. ¶ 5.)  Defendants Lessman and ProCaps also promote and sell their ProCaps dietary supplements at the website <procapslabs.com>, and advertise as well on YouTube and no doubt other platforms.  (*Id*.)

On January 17, 2010, QVC discovered that on Defendants' website, <http://andrew.procapslabs.com/default.aspx>, Defendants were promoting their competing products by disparaging the quality of QVC's dietary supplements.  (Yoegel Decl. ¶ 6.)  Until February 5, no other competing products were even mentioned. (*Id*. at Ex. A.)  On January 23 and 24, Lessman appeared on HSN further promoting defendants' products by disparaging QVC's competing dietary supplements, and directing viewers to their website to learn the full extent of their campaign against QVC.  Videos of those appearance continue to be published on-line at the website <hsn.com>. (*Id*.)  QVC has received similar complaints**.** (*Id*. ¶ 7)

A. Defendants' Deceptive Promotion of ProCaps' Healthy Hair Skin & Nails

As more fully described in the Complaint and in the declarations attached hereto, in advertising and promoting their Healthy Hair Skin & Nails product, Defendants' have made numerous statements challenging the quality and safety of the NATURE'S CODE Hair, Skin & Nails product QVC sells.  Defendants have published examples of what they contend are "sobering facts," including the statement that the compound Hyaluronic Acid, a naturally occurring substance in the human body and also present in NATURE'S CODE Hair Skin & Nails, is "connect[ed] to cancer." (Yoegel Decl. Ex. A.)  The statement is false.  (Davis Decl. ¶¶ 6, 8.)  Moreover, although repeatedly emphasizing the point, Mr. Lessman also admits on his website that he is aware of no research substantiating the claim. (Yoegel Decl. Ex. A.) Another purported "sobering fact" is that the silica in the NATURE'S CODE product is not bio-absorbable. (*Id*.)  The statement is also false. (Bradley Decl. ¶ 9.)  Defendants broadly assert that

4

the NATURE'S CODE "isn't Healthy" [sic]. (Yoegel Decl.Ex. A.)  This too is untrue. (Davis Decl. ¶ 5.)

Without explaining the differences between tablets and capsules, and by disparaging the other active ingredients the NATURE'S CODE Hair Skin & Nails product, defendants deride the supplement as merely "a very big, yellow Biotin tablet with 99% additives and not much more." (Yoegel Decl. Ex. A.)  In addition to the general implication that the quality of the product is poor (a point repeatedly made by defendants), part of the premise of the contention is that capsules are inherently superior to tablets.  This premise is false. (Bradley Decl. ¶ 7.)  Indeed, the very structure of a tablet requires that the active ingredients be presented in a matrix of processing aids and excipents to ensure the nutrients are readily available for absorption and the size of the tablet is largely a function of the matrix used to support the dietary ingredients.  (*Id.*) Nor is there any factual basis for the implication that the coloring in the NATURE'S CODE product, which has been recognized as safe by the FDA, is dangerous or unwholesome. (Davis Decl. ¶ 10.)  Defendants further falsely attribute to QVC a claim it has not made: namely, that lutein will improve growth of hair, skin and nails. (Davis Decl. ¶¶ 11, 12.)

Finally, Defendants publicly accuse QVC of having pirated the descriptive name "hair, skin and nails" from them.  It is actually a widely used phrase that merely describes the product and for which defendants have made no effort to establish trademark rights.  While publicly accusing QVC of being an infringer, defendants have never addressed any such claim to QVC directly.  (Yoegel Decl Ex. A)

As a result of these representations, numerous consumers have concluded that the NATURE'S CODE Hair Skin & Nails product is indeed a carcinogen, and is as lacking in quality as Lessman and ProCaps represent it to be.  As set forth in the following statements of

actual customers published on Defendants' website (Yoegel Decl. Ex A), many have returned product purchased from QVC; state that they will no longer purchase from QVC and, indeed, assert that QVC should be boycotted:

> a. "Thanks for setting the record straight. I knew QVC's product was falsely represented."

> b. "I am SO glad that you are speaking out about this! I saw this product on TV and almost called to yell at them. I got SO MAD and I feel so sorry for anyone spending their money on those vitamins. I hope you are able to fight them about the name - SO UNETHICAL. Anyone who has ever watched your shows or taken your product knows the difference! We are educated (thanks to you) and WILL NOT BE FOOLED."

> c. "I have decided to STOP purchasing anything from QVC until they post a retraction and apology. I sent them an email explaining my decision. … I ask that others join me in a boycott of QVC and please send QVC an email explaining your decision."

> d. "It's astounding! How do these products get past their quality department?! They are treading into dangerous territory when they are dealing with people's health, and the utter lack of quality control. I mean let's face it, if you buy an ugly ring, it doesn't matter you don't have to wear it but if you buy vitamins year after year thinking you are getting benefits and you aren't. wow. It is criminal."

> e. "With 99% additives and just the little bit of biotin, the [QVC] product cannot begin to have the results that Andrew's HSN--Hair, Skin, and Nails ...product has. It is also in a hard tablet form and the good ingredients will not be as easily absorbed as if they were in a powder form."

> f. "My friend's wife ordered QVC's Hair, Skin, and Nails product and then promptly returned it after reading this blog. They keep speaking about USP as if it's better than a no additive product in capsule form."

Lessman and ProCaps not only publish such comments, but also respond to them – albeit only selectively.  For instance, on January 20, 2010 at 13:58 defendants did respond to a post by "JB" on January 20, 2010 at 12:52  addressing JB's concern whether Hyaluronic Acid is a carcinogen if used topically (see Yoegel Decl.Ex. A at 10.)  Defendants again responded  on January 20, 2010 at 17:39 to a post by "Jessie" addressing Jessie's concerns about defendants'

NYC_752646.4

capsules, and on January 21, 2010 at 11:32 defendants responded to a post by "Nick" on January

21, 2010 at 5:19, addressing Nick's concerns about "Candida". (*Id*. at 6.)  However, Defendants

have not sought to correct any of the false conclusions of their audience regarding QVC and its

competing products.

B.  Defendants' Deceptive Promotion of Resveratrol-100

    As more fully described in the Complaint and in the declarations attached hereto, in

advertising and promoting their Resveratrol-100 product, Defendants have made numerous

representations disparaging QVC's Resveratrex products.  Defendants assert that the active

ingredient "Healthy Heart Blend" in Reveratrex as "an all but meaningless list of seven different

botanicals – NONE of which states a standardization of any kind." (Yoegel Decl. Ex. A)  QVC's

"Healthy Heart Blend" in fact consists of grape skin extract standardized for polyphenols and

anthocyanins, pomegranate extract standardized for 40% ellagic acid, quercitin, grape leaf

extract 4:1, olive leaf extract 4:1, lemon extract standardized for 45% total bioflavonoids and

prune powder. (Bengivenga Decl. ¶ 7).  Contrary to defendants' assertion that the compounds are

meaningless, the presence of each of these ingredients, including the grape skins and polygonum,

is supported by substantial research and defined "ORAC"[1] scores. (*Id*. ¶ 7.)  The presence of

such elements provides additional benefits beyond Resveratrol from polygonum cuspidatum

alone, (*Id*.), and defendants admit they do not even know what extracts comprise the Healthy

Heart Blend. (Yoegel Decl. Ex. A.)

    Defendants imply that there are unwholesome origins for the sugar content of

Resveratrex Drink, imply its is artificially sweetened, and indicate that QVC is guilty of labeling

law violations for allegedly concealing the source of the sugar in the drink.  Defendants further

---

[1] Oxygen Radical Absorbance Capacity (ORAC) is a method of measuring antioxidant capacities in biological samples.

NYC_752646.4

claim that the "principal source" of Resveratrex Drink "is NOT the 'vine.'" (Yoegel Decl. Ex.A.)
In fact much of the product is made up of grape juice concentrate, grape skin and grape seed, all
of which are "of the vine", and by volume, there is almost as much grape extract and Muscadine
grape seed extract in the Resveratrex tablet as there is Polygonum Cuspidatum, the principal
source of Resveratrol in Resveratrex (and evidently the sole source or resveratrol in defendants'
competing product). (Bengivenga Decl.¶ 6.)  19.2% of the NATURE'S CODE Resveratrex drink
is made up of grape juice concentrate, grape skin and grape seed, all of which are "of the vine."
(*Id*. ¶ 9.)   By contrast, although defendants have absolutely no grape content in their own
resveratrol product, they nonetheless use on the product label a prominent depiction of a bottle of
wine, glass of wine, and multiple species of grapes (covering half of the principal display panel
on the Resveratrol-100 label).  (*Id*. 9.)

Without explaining the relevant differences between tablets and capsules, and by
disparaging the other active ingredients in the NATURE'S CODE Resveratrex product (which
they admit they do not know), defendants ridicule it as merely a "large, red artificially-colored
tablet."  The implication, based on a false comparison of tablets versus capsules is that capsules
are inherently superior to tablets.  There is no basis to the claim. (Bengivenga Decl.¶ 8)  Nor is
there any factual basis for the assertion that the natural Carmine coloring of the NATURE'S
CODE tablet is artificial or unwholesome.  (*Id*. ¶ 5.)

Summarizing their objections to the NATURE'S CODE Resveratrex product, defendants
also assert that the Q in QVC means "questionable" and identify as "sad," "disturbing" and
"heart-breaking" the quality of the product.  (Yoegel Decl. Ex. A.)  There is no known basis for
any of these criticisms. (Bengivenga Decl.¶ 4.)

NYC_752646.4

As a result of these representations, numerous consumers have concluded that the NATURE'S CODE Resveratrex products (and other NATURE'S CODE products) are of inferior quality, lacking efficacy and a subject of ridicule.  As set forth in the following excerpts, from defendants' website, customers have announced that they get "queezy" [sic] upon seeing QVC's product; that QVC's credibility has taken a "nosedive"; that defendants have exposed QVC as a "joke", and that they are "angry & disappointed" with QVC.  Consumers have voiced many other unfounded criticisms of QVC:

>    a.   "I saw early this morning [QVC's] presentation and watched it just to see how they would sell it. When I heard and saw the 'tablet' my sensitive stomach felt queezy (sic) for those people who don't realize there are binders in there that are not needed, you educated us on that!

>    b.   "QVC has so gone down the wrong path, and now I will wonder about a lot of the products they offer. This will come to no good for them, as their credibility has taken a severe nosedive."

>    c.   "While I certainly understand your previous hesitation to discuss the inferiority of QVC vitamins/supplements, I am so glad that you are defending your own products - and in the process, speaking your mind (and the truth). … Not only is it scientifically sound, but you have proven beyond a doubt that you are on top of the latest research....so what you offer is the best possible product available. QVC can't even come close (as you've shown through your blogs regarding the subject)."

>    d.   "'…but when it comes to their Resveratrol products, the Q might better stand for Questionable'. … well said!"

>    e.   "QVC Natures Code is a joke. Sometimes I'll watch a few minutes of one of their shows just for a good laugh. Andrew I applaud you for exposing Natures Code for the joke that it is. As always, you have given us the truth, the whole truth, and nothing but the truth. "

>    f.   "Join us and take superior products that are made by someone who is passionate about and committed to what he does. … Or continue to support others who choose instead, to aggressively market poor products, which they KNOW are cheaper and clearly not likely to contribue (sic) to better health! …"

>    g.   "Your loyal HSN customers LOVE you and are very angry & disappointed at QVC for going so low in trying to make vitamin and

supplement sales. The truth shall prevail ultimately and your products are so much superior to Nature's Code that there is no doubt in my mind that you will come out ahead after all this dirty warfare is over.".

Although there are other "hair, skin and nails" products and other resveratrol products, the all-but exclusive[2] focus of defendants' marketing has been denigrating and demeaning the NATURE'S CODE Hair, Skin & Nails and Resveratrex products, and castigating QVC. Defendants also fail to disclose on their website that they are sponsored by and affiliated with HSN, QVC's direct competitor.

## III.   ARGUMENT

A. Under Applicable Standards, QVC Is Entitled to Injunctive Relief

Preliminary injunctive relief is appropriate where the moving party shows:

1. a reasonable probability that it will succeed on the merits;

2. it will be irreparably injured by denial of such relief;

3. granting injunctive relief will not result in even greater harm on the non-moving party; and

4. granting injunctive relief is in the public interest.

*Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002).  Not only does QVC satisfy all of these criteria, but defendants' continuing publication of new false statements, and the ongoing deception demonstrated by evidence of actual consumer confusion, demonstrates the immediacy of the harm required for the Court to grant a temporary restraining order pending a preliminary injunction.  Fed.R.Civ.P. Rule 65(b).

1.   QVC Is Likely to Succeed on the Merits of its False Advertising Claim

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the making in commerce of any "…false or misleading description of fact, or false or misleading representation of fact

---

[2] In one very recent, February 5, video, defendants also criticize Dr. Oz, who appears on the Oprah Winfrey television program.  Otherwise, QVC has been the sole focus of defendants' criticisms.

NYC_752646.4

which … (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities".   To establish its Lanham Act claim, a plaintiff must show: (1) the defendant made false or misleading statements about the plaintiff's product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods travel in interstate commerce; and (5) there is a likelihood of injury to the plaintiff, e.g., declining sales and loss of good will. *Warner-Lambert Co. v. Breathasure Inc.*, 204 F.3d 87, 91–92 (3d Cir. 2000).   A similar standard applies under the Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6 § 2532 (2009), and the Delaware Consumer Fraud Act, 6 Del. C. 2513, 2525 ("DCFA").[3] Because QVC's claims under the DDTPA and DCFA require only that the entity make the false representations, by meeting the requirements for a claim under the Lanham Act, QVC thereby establishes a claim under Delaware law as well.

---

[3] Under, the Del. Code Ann. Tit. 6 § 2532 (2009):

> (a) A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:
>
>> (5)  Represents that goods . . . have . . . characteristics, . . . uses, benefits, . . . that they do not have; . . .
>>
>> (8)  Disparages the goods, services, or business of another by false or misleading representation of fact; . . . [or]
>>
>> (12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.
>
> (b) In order to prevail in an action under this chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

The DCFA, 6 Del. C. 2513 prohibits:

> (a) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice. ...

Section 2525 of the DCFA provides that: "(a) A private cause of action shall be available to any victim of a violation of this subchapter. ..."

NYC_752646.4

Many or most of defendants' claims here at issue are literally false. Others are false by necessary implication and thus also deemed false as a matter of law. Indeed, defendants repeatedly make baseless comparisons of a kind routinely held false by necessary implication. Further, many of defendants claims are completely unsubstantiated. There is, moreover, ample evidence that consumers actually have been deceived by the false advertising messages at issue and that QVC is suffering actual harm.[4] For all of these reasons, the Court need not decide whether all of defendants' claims are literally false or arguably true but misleading. The toxic mix of half truths and untruths is actually deceiving consumers and should be stopped.

      a.    <u>Defendants' Claims Are Literally False</u>

Advertising claims violate the Lanham Act where the claims are either literally false or, if literally true, are nonetheless misleading to the consumer. *Castrol Inc. v. Pennzoil Co*., , 943 (3d Cir. 1993). If an advertisement is literally false, the plaintiff need not prove actual consumer deception. *Id*. If, on the other hand, an advertisement is literally true but nonetheless misleading, the plaintiff must prove actual deception by a preponderance of the evidence, including by "show[ing] how consumers actually do react.'" *Id*. (quoting *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc*., 902 F.2d 222, 228–29 (3d Cir. 1990)). *See also Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160 (3d Cir. 2001) (affirming a preliminary injunction against comparative advertising of health care plans). *Novartis*, 290 F.3d at 586 ("Liability arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." citing *Castrol*, 987 F.2d at 943).

Among the literally false claims made by Lessman and ProCaps about the NATURE'S CODE Hair Skin & Nails product are that it is a carcinogen; that the silica in the product is non

---

[4] There should also be no dispute that the misrepresentations are material and that the parties' goods travel in interstate commerce.

NYC_752646.4

absorptive; that the product itself is "unhealthy" (sic); and of poor quality.  Among the literally false claims made by Lessman and ProCaps about the NATURE'S CODE Resveratrex product are that its Healthy Heart Blend of anti-oxidants is "meaningless" and lacking efficacy; it is not a genuine grape-based product; that it is artificially sweetened; that it is unlawfully mislabeled and that it is of "questionable" quality.  Also untrue is the implication that the coloring agents in the NATURE'S CODE products are unwholesome or dangerous.  Defendants have also published (with apparent approval) many false statements, including that QVC's products are inferior to their own; suffer from an "utter lack of quality control", and even that QVC's conduct is "criminal".

> b.   <u>Defendants' Claims Are False by Necessary Implication</u>

"[A] 'literally false' message may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'" *Novartis*, 290 F.3d at 586–87, quoting *Clorox Co. P.R. v. Procter & Gamble Commercial Co*., 228 F.3d 24, 35 (1st Cir. 2000).  In *Novartis*, the offending message was deemed false by necessary implication because "[t]he phrase 'nighttime strength' . . . necessarily conveys a message that the [] product is specially made to work at night."

False comparisons such as those made by defendants based on differences between capsules and tablets, or based on health claims that QVC and QH have not made, routinely have been held false by necessary implication. *Time Warner Cable, Inc. v. DIRECTV, Inc*., 497 F.3d 144, 158 (2d Cir. 2007) (finding that the statement "settling for cable would be illogical" taken in context "unambiguously made the false claim that cable's HD picture quality is inferior to that of" defendant's satellite service.); *Cuisinarts, Inc. v. Robot-Coupe Int'l Corp*., No. 81 Civ. 731-

CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982) (finding that the statement "When all 21 of the three-star restaurants in France's Michelin Guide choose the same professional model food processor" in front of a scoreboard 'Robot-Coupe: 21, Cuisinart: 0' when in fact Cuisinart does not manufacture a professional model food processor was false by necessary implication); *Tambrands v. Warner-Lambert*, 673 F. Supp. 1190 (S.D.N.Y. 1987) (statement that a home pregnancy test works "as fast as ten minutes" necessarily implied that the tests were fully accurate after ten minutes when in fact the test is only fully accurate after thirty minutes).[5]

Not only are defendants' baseless comparisons between tablets and capsules false by necessary implication, so too is the premise that their own products are superior. False too by necessary implication is the attribution to QVC of health claims (such as that lutein promotes growth of hair) which QVC simply has not made. So too the implied claims that QVC's products are inferior to defendants' are untrue and unlawful, as is the implication that the parties' resveratrol products have similar levels of grape content. In fact, QVC's products do have substantial grape content and honestly say so; defendants' have none and misrepresent that they do.

     c.    <u>Defendants' Unsubstantiated Claims Are Literally False</u>

In *Novartis*, the Third Circuit explained that "although the plaintiff normally has the burden to demonstrate that the defendant's advertising claims is false, a court may find that a completely unsubstantiated advertising claim by the defendant is per se false without additional evidence from the plaintiff to that effect." 290 F.3d at 590. *See also Kennedy Indus. Inc. v. Aparo*, 41 F. Supp. 2d 311 (E.D. Pa. 2005) (citing the *Novartis*' "completely unsubstantiated" standard; finding that the defendant did not conduct the correct studies to support its claims, and granting permanent injunction); *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare*,

---

[5] *See also Castrol*, 987 F.2d 939; *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997).

292 F. Supp. 2d 611, 618 (D.N.J. 2003) (citing the *Novartis* "completely unsubstantiated" standard, and finding defendant's unsupported claims to be per se false).

Many of defendants' claims are made to sound as if they have a "scientific" basis, when no such support actually exists. Accordingly, the court can and should conclude that these "completely unsubstantiated advertising claim[s]" are false on this ground alone. *Novartis*, 290 F. 3d at 590. Defendants expressly assert that QVC's dietary supplements are dangerous, carcinogenic and of poor quality, and press the point so that consumers can – and <u>do</u>! – take away the frightening concern that QVC's products can not be trusted and will cause cancer – and even that QVC's behavior is criminal. Yet, defendants also admit they have no evidence Hyaluronic Acid causes cancer. Indeed, there is none. (Davis Decl. ¶ 8.) Defendants baldly assert that the silica in QVC's NATURE'S CODE Hair Skin & Nails product is no more bio-absorbable than glass or sand, yet no research can possibly support the claim. Defendants assert that the Healthy Heart Blend of nutrients in QVC's Resveratrex product are meaningless, yet by admitting they do not even know what the ingredients are. Defendants make plain their claims are without substantiation. So too, defendants insist there must be something suspicious about the source of sugar in the Resveratrex drink, even while they concede they do not know.

Such unsubstantiated claims are false and violate the Lanham Act. *Novartis*, 290 F. 3d at 590. *See also Sandoz*, 902 F.2d at 228 n.7 ("[T]here is a plausible argument that the claim is literally false because the advertiser has absolutely no grounds for believing that its claim is true."); *Breathasure*, 204 F.3d at 96 (affirming that defendants claims were "not supported by any reliable scientific evidence" and that the "unsupported claims made in advertising . . . regarding the efficacy of its ingestible capsules is without any scientific foundation," and thus calling for the grant of a permanent injunction).

NYC_752646.4

d.   Defendants' Website Violates FTC Regulations

As a matter of law, defendants blog violates FTC regulations by failing to disclose the terms of defendants' relationship with HSN, QVC's largest direct competitor. *See* 16 C.F.R. § 255.5 ("When there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement (*i.e.*, the connection is not reasonably expected by the audience), such connection must be fully disclosed.")[6]   It would also appear that defendants failed to conduct appropriate testing and evaluations of plaintiffs' NATURE'S CODE products to support their disparaging conclusions.[7]

e.   Evidence of Actual Confusion Renders All of Defendants' Claims Unlawful

Because there is evidence of actual confusion, it is not necessary for the Court to parse out which of defendants' claims are literally false, false by necessary implication, per se false as lacking substantiation, or "merely" misleading. *Highmark*, 276 F.3d at 171 (affirming that "[t]he District Court found nine separate claims made in the [defendant's] ad false and, in the alternative misleading" as proven by testimonial evidence of, among other things, "employees specifically ask[ing] questions about the claim" at issue); *Novartis*, 290 F.2d at 590 (finding that plaintiffs were likely to succeed on the merits because (1) defendant's claims were per se false as

---

[6] *See* 16 C.F.R. § 255.0(b) For purposes of this part, an endorsement means any advertising message . . . that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser. . .

[7] *See* 16 C.F.R. §255.3(b) Although the expert may, in endorsing a product, take into account factors not within his or her expertise (*e.g.*, matters of taste or price), the endorsement must be supported by an actual exercise of that expertise in evaluating product features or characteristics with respect to which he or she is expert and which are relevant to an ordinary consumer's use of or experience with the product and are available to the ordinary consumer. This evaluation must have included an examination or testing of the product at least as extensive as someone with the same degree of expertise would normally need to conduct in order to support the conclusions presented in the endorsement. . . . . Moreover, where the net impression created by the endorsement is that the advertised product is superior to other products with respect to any such feature or features, then the expert must in fact have found such superiority.

NYC_752646.4

unsubstantiated, and (2) in the alternative, misleading as plaintiff's survey evidence proved confusion).  It is enough that consumers here have been and are being misled.

Because QVC has presented ample evidence of actual deception, a likelihood of success on the merits is established.  *See Novartis*, 290 F.3d at 586 (in analyzing likelihood of success, noting that "a plaintiff must prove either literal falsity or consumer confusion" and finding that plaintiff was likely to succeed. (*quoting Castrol*, 987 F.2d at 943 (affirming that plaintiff had proven defendant's ads were literally false and were likely to succeed on the merits)).  Not only are the above-quoted consumer comments regarding QVC's NATURE'S CODE Hair, Skin & Nails and Resveratrex products evidence of actual confusion caused by defendants' false advertising, but in publishing on their website and only selectively responding to comments of their readers while failing to correct their mistaken conclusions regarding the quality of QVC's products and the integrity of QVC, and in continuing to allow such comments to remain in print without correction, defendants have adopted as their own these false, disparaging and injurious comments.

2.    QVC has Suffered and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief

"To prove irreparable injury under § 43(a), [the plaintiff] need only provide a reasonable basis for the belief that [it] is likely to be damaged as a result of the false advertising.  Irreparable injury does not require diversion of actual sales and it can include the loss of control of reputation, loss of trade, and loss of goodwill." *W.L. Gore & Assocs., Inc. v. Totes. Inc.*, 788 F. Supp. 800, 810 (D. Del. 1992) (internal citations omitted).  In a false advertising case, "public reaction is the measure of a commercial's impact." *Johnson Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms. Inc.*, 19 F.3d 125 (3d Cir. 1994).  However, where as here there is substantial evidence of actual confusion, courts have found the irreparable harm prong to

be satisfied. *Novartis*, 290 F. 3d at 595–96 (finding that the defendant's advertising "had already had a measureable effect on [plaintiff's] market share as reflected by a decrease in sales . . . that corresponds to the increased sales [for defendant]").

Actual evidence of consumer misinterpretation is an acceptable measure of public reaction, demonstrating that a claim is "verifiably misleading" by showing "how consumers actually do react." *Sandoz*, 902 F.2d at 229, 231 (3d Cir. 1990); *see also Novartis*, 290 F.3d at 595–96 (evidence of "loss of market share constitutes irreparable harm"); *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 605 (3d Cir. 1978) (The district court considered evidence of actual confusion including "unsolicited letters to [plaintiff] from shop owners and customers 'asking if (or assuming that) [defendant's] banks, advertised as 'certified, authentic' replicas with a certificate of authenticity (but with no manufacturer's name given), are [plaintiff's] banks'" and the Third Circuit affirmed that plaintiff had shown likelihood of success.). "Where evidence of actual confusion exists, courts have weighed it heavily precisely because it is so hard to obtain." *Facenda v. N.F.L. Films, Inc.*, 448 F. Supp. 2d 491, 512 (citing *Checkpoint Sys. v. Check Point Software Tech.*, 269 F.3d 270, 291 (3d Cir. 1991) (citing *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 612 (7th Cir. 1965) ("[S]ince reliable evidence of actual confusion is difficult to obtain in trademark and unfair competition cases, any such evidence is substantial evidence of likelihood of confusion")).

Substantial evidence of actual harm in the form of consumer postings to defendants' blog and inquiries to QVC (Yoegel Decl. Exs. A and B)**,** confirm that injunctive relief is needed. The comments of consumers published by defendants on their website in response to defendants' false and misleading representations of QVC's NATURE'S CODE Hair, Skin & Nails and Resveratrex products demonstrate that consumers are returning products already purchased from

NYC_752646.4

QVC, are refusing to make additional purchases, are contemplating boycotting QVC and are expressing their own "sobering" doubts about the quality of all of QVC's products and threatening to refuse other purchases.  The harm is thus very real, and the need for injunctive relief is immediate.  In equal measure, such consumers are concluding that defendants' products are superior, thus generating sales for defendants at plaintiffs' expense.

Given defendants' single-minded focus on QVC and its NATURE'S CODE products, and given defendants' prior relationship with QVC, the inescapable conclusion is that their false and misleading comments directed at QVC and its products are made <u>deliberately</u> to mislead consumers and cause injury to QVC.  Where as here a defendant acts with "intent to mislead" and there is evidence of "deliberate conduct" of an "egregious nature" a presumption of likelihood of confusion arises. *Johnson & Johnson-Merck*, 19 F.3d 125 (citing *Johnson & Johnson-Merck Consumer Pharms. Co. v. SmithKline Beecham*, 960 F.2d 294, 298–99 (2d Cir. 1992) ("[W]here a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard is of an egregious nature, a presumption arises that consumers are, in fact, being deceived." (citation and quotations omitted)).

Moreover "where the challenged advertising makes a misleading comparison or reference to a competitor's product, irreparable harm is presumed." *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare*, 292 F. Supp. 2d 611, 621 (D.N.J. 2003) (quoting *Novartis*, 129 F. Supp. 2d at 367).  Defendants' false and misleading claims of product superiority (including, for example, based on inherently misleading comparisons between tablet and capsule forms of the parties' supplements) warrants such a presumption here.

NYC_752646.4

Not only should irreparable harm be presumed, evidence of actual confusion confirms that QVC is suffering and, absent injunctive relief will continue to suffer, irreparable harm in the form of consumer confusion, lost sales and market share, eroding consumer confidence, declining profits and loss of goodwill.  It is well-settled that "loss of market share constitutes irreparable harm."  *Novartis*, 290 F.3d at 596.  ("In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial." quoting *Instant Air Freight v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)).  Likewise the injury to QVC's reputation makes clear the need for an injunction.  *Pappan Enters., Inc. v Hardee's Food Sys., Inc.* 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.").

3.    Defendants Will Not Be Harmed By The Grant Of A Preliminary Injunction

It should be possible for defendants to promote their vitamin products on the merits, without their single-minded focus on disparaging QVC's goods.  A preliminary injunction will simply bar defendants from further disseminating false information and advertisements, which the law does not condone.  "Commercial speech is protected only in so far as it serves an informational function and it loses its protection if it deceives, misleads, or constitutes fraudulent activity." *Castrol*, 169 F. Supp. 2d at 339.  Where claims are "carelessly or irresponsibly made . . . any 'prejudice' which accrues can be considered to be self-inflicted." *W.L. Gore & Assocs.*, 788 F. Supp. at 812.  By disseminating the several false, misleading and unsubstantiated advertising claims at issue, defendants have brought on themselves any potential injury from an injunction.  Defendants can continue to make truthful, accurate, and scientifically supported claims about their products.

NYC_752646.4

Moreover, although the harm to QVC is already very real - albeit difficult to measure or quantify precisely in monetary damages - the harm to defendants of having to advertise and promote their products honestly is insignificant.  The harm to QVC of not granting an injunction thus far outweighs speculative injury, if any, to defendants.

      4.     <u>The public interest supports an injunction</u>

"There is a strong public interest in the prevention of misleading advertisements . . . where the plaintiff has demonstrated a likelihood of success on the merits, the public interest leans even more towards granting the injunction." *Novartis*, 290 F. 3d at 597 (internal citations and quotations omitted).  "The public has a right not to be deceived or confused." *W.L. Gore & Assocs.*, 788 F. Supp. at 813.[8]  This is particularly true where health-related products are at issue. *Novartis*, 290 F. 3d at 597 ("There is a strong public interest in the prevention of misleading advertisements, and this interest is particularly strong where over-the-counter drugs are concerned." (citations omitted)); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, Civ. No. 01-55154, 2002 WL 1163624, at *10 (9th Cir. 2002) ("[T]he public has a particularly strong interest in an accurate description of health and medical products."); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 ("We have consistently held that the public's interest is especially significant when health and safety concerns are implicated, as with the advertising of over the counter medications.").  QVC has demonstrated a reasonable likelihood of success on the merits, as explained above, and thus, the public interest favors granting the preliminary injunction to prevent defendants' persistent dissemination of the false statements at issue.  Additionally, as consumers rely on these nutritional supplements in addressing their various health concerns, it is

---

[8] *See also Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 440 (D.N.J. 2001) (noting the "compelling public interest in protecting competitors and consumers from false advertising claims"); *Church & Dwight Co. v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 912 (D.N.J. 1994) ("Because defendant S.C. Johnson's false advertisements actually deceive and confuse the consuming public, there is sufficient public interest to permanently enjoin defendant from continuing in its deceptive advertising practices.")

NYC_752646.4

imperative that the advertising regarding these products be truthful, further implicating the public interests and supporting an injunction.

**B.**  **There Exists Good Cause to Allow Expedited Discovery.**

Courts enjoy broad discretion under the Federal Rules to vary the timing and sequence of discovery.[9]  *BAE Sys. Aircraft Controls Inc. v. Eclipse Aviation Corp.*, 224 F.R.D. 581, 587 (D. Del. 2004).  A reasonableness or good cause standard is applied "when the purpose of the expedited discovery is to gather evidence for an upcoming preliminary injunction hearing." *Id.*[10]

In addition to the pendency of a preliminary injunction motion, and the actual circumstances of the given case, other relevant factors include the breadth of the discovery requests; the purpose for requesting the expedited discovery; the burden on the defendants to comply with the requests; and how far in advance of the typical discovery process the request is made.  *Id.* at 587; *Entm't Tech. Corp. v. Walt Disney Imagineering*, No. Civ.A. 03-3546, 2003 WL 22519440, at *3–5 (E.D. Pa. Oct. 2, 2003); *Commissariat a L'Energie Atomique v. Dell Computer Corp.*, No. Civ.A. 03-484-KAJ, 2004 WL 406351, at *1 (D. Del. Mar. 3, 2004) (allowing expedited discovery to permit plaintiff to fully brief a pending preliminary injunction motion).

"Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp 841, 844 (D.D.C. 1996) (ordering expedited discovery where it would "expedite resolution of [plaintiffs'] claims for injunctive relief") (citing *Optic-Electronic Corp.*

---

[9] *See, e.g.*, Fed. R. Civ. P. 26(b)(2) and 26(d) (A party may seek discovery before the parties have conferred as required by Rule 26(f) "when authorized by [Court] order"); see also Rule 34(b) (giving courts discretion to vary response time).

[10] *See also Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 275–76 (N.D. Cal. 2002) (applying a good cause standard, involving a balancing between the need for expedited discovery in consideration of the administration of justice and the prejudice to the responding party); *Pod-Ners, LLC v. N. Feed & Bean of Lucerne Ltd. Liability Co.*, 204 F.R.D. 675, 676 (D. Colo. 2002) (noting that Rule 26 "allows [the court] to order expedited discovery upon a showing of good cause").

NYC_752646.4

*v. United States*, 683 F. Supp. 269, 271 (D.D.C. 1987) and *Onan Corp. v. United States*, 476 F. Supp. 428, 434 (D. Minn. 1979)).   Expedited discovery may "better enable the court to judge the parties' interest and respective chances for success on the merits" at a preliminary injunction hearing.  *Edudata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 429 (8th Cir. 1985).[11]

Here, plaintiffs' false advertising allegations go primarily to the scientific support for and accuracy of the defendants' false advertising claims concerning plaintiffs' products.  In ruling on the motion for preliminary injunction, the Court will be in a better position to judge the parties' chances for success on the merits if it has the opportunity to review the research, if any, on which defendants relied to support the claims in issue.   Expedited discovery thus is appropriate. Plaintiffs proposed discovery requests are also narrowly "tailored to the time constraints under which both parties must proceed [and] to the specific issues that will have to be determined at the preliminary injunction hearing."[12]

If plaintiffs are correct that many or most of defendants advertising claims lack proper substantiation, it will be a simple matter to confirm that defendants are without proper scientific support for their claims.  Nor should a great deal of time be required to learn on what scientific data defendants actually did rely in making the claims in issue.  As need be, and particularly if a temporary restraining order is in place, the parties can adjust the timing for defendants' responses to discovery to meet the Court's schedule for a hearing on a preliminary injunction motions.

---

[11] *See also Sys. Corp. v. Advanced Cerametrics, Inc.*, No. CIV. A. 95-7956, 1996 WL 130991, at *2 (E.D. Pa. Mar. 15, 1996) (permitting expedited discovery in connection with a previously filed motion for preliminary injunction).

[12] *Fed. Express Corp. v. Fed. Expresso, Inc.*, NO. 97 CV 1219 (RSP) (GJD), 1997 WL 736530, at *2 (N.D.N.Y. Nov. 24, 1997) (citing *Irish Lesbian & Gay Org. v. Giuliani*, 918 F. Supp. 728, 731 (S.D.N.Y. 1996) (granting expedited discovery in anticipation of preliminary injunction hearing on trademark infringement)).

NYC_752646.4

Defendants will not be prejudiced by having to produce on an expedited basis (with appropriate protections for confidentiality) documents that they already have prepared in preparation for their advertising campaign and to which they likely have ready access.  By contrast, plaintiffs face lasting harm to their  goodwill and customer loyalty as a result of defendants' false and deceptive advertising.  Assessing damages after such harm is done presents unique challenges.  Not surprisingly, courts have noted the special nature of intellectual property litigation in considering requests for expedited discovery, holding that such discovery can be particularly appropriate in such cases.[13]  Such discovery is appropriate here.

## IV.    CONCLUSION

For the foregoing reasons, defendants should be restrained and enjoined during the pendency of this action from disseminating false and misleading statements concerning QVC and its NATURE'S CODE Hair, Skin & Nails and Resveratrex products, and the Court should enter such other and further relief as appropriate.

Dated:      February 9, 2010

Respectfully submitted,

By:   _/s/ Joseph Grey_
Joseph Grey (ID 2358)
Sean T. O'Kelly (ID 4349)
Cross & Simon, LLC
913 North Market Street
Eleventh Floor
P.O. Box 1380
Wilmington, DE  19899-1380
Telephone: (302) 777-4200
Facsimile: (302) 777-4224 (fax)
Email: jgrey@crosslaw.com

---

[13] *Pod-Ners*, 204 F.R.D. at 676 ("Good cause [for expedited discovery] frequently exists in cases involving claims of infringement and unfair competition."); *Benham Jewelry Com. v. Aron Basha Corp.*, 45 U.S.P.Q. 2d 1078, 1997 WL 639037, at *20 (S.D.N.Y. 1997) ("[Expedited] discovery is routinely granted in actions involving infringement and unfair competition."); *see also Semitool*, 208 F.R.D. at 278 (permitting expedited discovery in infringement case).

NYC_752646.4

and
Jonathan E. Moskin
Britton Payne
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 682-7474
Facsimile: (212) 687-3229
Email: jmoskin@foley.com

Attorneys for Plaintiffs

25