IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QVC, INC. and QHEALTH, INC., | ) | |
| | ) | |
| Plaintiffs/Counterclaim-Defendants, | ) | |
| | ) | |
| v. | ) | C.A. No. 10-094 (SLR) |
| | ) | |
| YOUR VITAMINS, INC. d/b/a PROCAPS | ) | **DEMAND FOR JURY TRIAL** |
| LABORATORIES and ANDREW | ) | |
| LESSMAN, | ) | |
| | ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs. | | |

## <u>ANSWER AND COUNTERCLAIMS</u>

Defendants YourVitamins, Inc. d/b/a ProCaps Laboratories, Inc. ("ProCaps") and Andrew Lessman ("Lessman") (collectively "Defendants" or "Counter-Claimants") submit the following answer to Plaintiffs QVC, Inc. and QHealth, Inc.'s (collectively "QVC," "Plaintiffs," or "Counter-Defendants") Complaint.

1.    Defendants admit that Plaintiff QVC, Inc. is a Delaware corporation, having an address at 1200 Wilson Drive, West Chester, Pennsylvania.

2.    Defendants admit that Plaintiff QHealth is a Delaware corporation, having an address at 1200 Wilson Drive, West Chester, Pennsylvania.

3.    Defendants admit that Defendant YourVitamins, Inc. is a Nevada corporation doing business under the name ProCaps Laboratories, and which has an address at 430 Parkson Road, Henderson, Nevada 89011.

4.    Defendants admit that Defendant Lessman is an individual and the sole shareholder of Procaps, and has an address at 430 Parkson Road, Henderson, Nevada 89011.

5.     Paragraph 5 of the Complaint is an enumeration of legal claims to which no response is required.

6.     Defendants admit the allegations set forth in Paragraph 6 of the Complaint.

7.     Defendants deny the allegations set forth in Paragraph 7 of the Complaint.

8.     Defendants admit that the Court has personal jurisdiction over Lessman, that he has done business within this District, and that he is an officer and the sole shareholder of ProCaps.  Defendants deny the remaining allegations in Paragraph 8 of the Complaint.

9.     Defendants admit that Defendant ProCaps has done business within this District. Defendants otherwise deny the allegations in Paragraph 9 of the Complaint.

10.     Defendants admit the allegation set forth in Paragraph 10 of the Complaint.

11.     Defendants admit that QVC operates a nationally broadcast television shopping channel and the qvc.com website at which it sells and offers for sale various products. Defendants otherwise deny the allegations in Paragraph 11 of the Complaint.

12.     Defendants admit the allegations set forth in Paragraph 12 of the Complaint.

13.     Defendants lack information or knowledge to admit or deny the allegations set forth in Paragraph 13.

14.     Defendants admit that Plaintiffs sell products named "Hair, Skin & Nails" and "Resveratrex."  Defendants further note that Plaintiffs have marketed their "Hair, Skin, & Nails" product as "Healthy Hair, Skin & Nails."  Defendants otherwise deny the allegations set forth in Paragraph 14 of the Complaint.

15.     Defendants deny the allegations set forth in Paragraph 15 of the Complaint.

16.     Defendants deny the allegations set forth in Paragraph 16 of the Complaint.

17.     Defendants admit that television marketing of vitamins and dietary supplements is a uniquely competitive market in which brand loyalty is important, and that injury to brand loyalty can result in a loss of revenue. Defendants further state that brand reputation depends on the development of customer goodwill by marketing quality products possessing desirable attributes in a non-misleading manner, and that marketing products of lesser perceived quality or doing so in a misleading manner can result in a loss of customers. Defendants otherwise deny the allegations set forth in Paragraph 17 of the Complaint.

18.     Defendants admit that they produce ProCaps vitamin and dietary supplement products, that Plaintiffs produce "NATURE'S CODE" products, and that Defendants' and Plaintiffs' products compete with each other.

19.     Defendants admit that they previously sold ProCaps products on QVC, and now market them on the Home Shopping Network ("HSN"), which competes with QVC both on air and on the Internet. Defendants further state that they marketed vitamin and dietary supplements on QVC from 1992 until 1996, when they left QVC and began marketing the same formulas in the same fashion (*i.e.*, no artificial colors, no tablets, easy to swallow capsules) on the Home Shopping Network ("HSN"). In 2007, Plaintiffs sought to bring Defendants' products back to QVC, but failed to convince Defendants to return.

20.     Defendants admit the allegations set forth in Paragraph 20 of the Complaint that ProCaps markets vitamin and dietary supplements through its website and that Lessman participates in such marketing. However, Defendants further state that while a customer can link to Lessman's personal blog from the ProCaps website, ProCaps vitamins and dietary supplements are not sold on or accessible from Lessman's personal blog. Nor can a reader link to the ProCaps website or HSN's website from Lessman's personal blog.

21.     Defendants admit that some videos from Lessman's blog have been posted on YouTube.  Defendants otherwise deny the allegations set forth in Paragraph 21 of the Complaint.

22.     Defendants admit the allegations set forth in Paragraph 22 of the Complaint.

23.     Defendants admit the allegations set forth in Paragraph 23 of the Complaint.

24.     Defendants admit the allegations set forth in Paragraph 24 of the Complaint.

25.     Defendants deny the allegations set forth in Paragraph 25 of the Complaint.

26.     Defendants deny the allegations set forth in Paragraph 26 of the Complaint. Defendants state further that far from being devoted to denigrating Plaintiffs' products, Lessman's blog is principally dedicated to the discussion of wellness issues as they pertain to various nutritional supplement ingredients and products.  Since Lessman launched his blog in February 2009, only a handful of recent posts discuss QVC products, all of which post-date and respond to QVC's unlawful and intentional misappropriation of Defendants' product name in January 2010, as detailed below, except for a single blog post, to which QVC has never objected. Moreover, contrary to Plaintiffs' claim, Lessman has discussed products other than Plaintiffs' products on his blog.  Indeed, far from targeting QVC exclusively, Lessman strongly criticized on his blog a product marketed on HSN, his own network.  Finally, each comment Lessman has made regarding QVC products has been truthful and scientifically supported fact or opinion.

27.     Defendants deny the allegations set forth in Paragraph 27 of the Complaint except to the extent detailed in the following subparagraphs:

a)      Defendants admit that Lessman used the quoted words on his personal blog, but otherwise deny the allegations set forth in sub-paragraph 27(a).  Defendants further state that Plaintiffs take Lessman's words out of context in this paragraph and throughout the Complaint.  Lessman's opinions, read in context as written, reflect basic science.  As Lessman

explained on his blog, Plaintiffs' own product label demonstrates that their Hair, Skin & Nails product contains volumes of unnecessary fillers, additives, excipients, and inactive ingredients. As Lessman further stated, Plaintiffs' acted in a deceptive manner in misappropriating Defendants' product name and making false claims about the value and efficacy of their own product.

b)      Defendants deny the allegations set forth in sub-paragraph 27(b).

c)      Defendants admit that Lessman used the quoted words on his personal blog but otherwise deny the allegations set forth in sub-paragraph 27(c). Defendants further state that Plaintiffs take Lessman's words out of context and attribute false meaning to them. As explained on Lessman's blog, Plaintiffs' own product label demonstrates the truth of the observation that QVC's Hair, Skin & Nails product contains 99 percent additives. Moreover, far from attempting to "emphasize the alleged risk" of cancer, Lessman in fact stated clearly on his blog that "[hyaluronic acid] does not necessarily 'cause' cancer since it occurs naturally in the body," and that in any event, the "ultra-low level" of hyaluronic acid contained in Plaintiffs' product "likely poses no risk."

d)      Defendants admit that Lessman stated on his personal blog that "there is no science that shows that [hyaluronic acid] offers any benefit when taken orally," a truthful and accurate observation. Defendants further state that Lessman nowhere said that hyaluronic acid is a carcinogen. Defendants otherwise deny the allegations set forth in sub-paragraph 27(d).

e)      Defendants admit that Lessman made the quoted statements on his personal blog but otherwise deny the allegations set forth in sub-paragraph 27(e).

f)      Defendants deny the allegations set forth in sub-paragraph 27(f). Defendants further state that in none of the blog entries did Lessman make any comparison

between tablets and capsules.  Defendants further state, however, that many consumers prefer capsules to tablets for a variety of reasons.  That said, however, Lessman offered no such comparison.

g)      Defendants deny the allegations set forth in sub-paragraph 27(g). Defendants further state that none of Lessman's blog posts made any comment as to the health impact of these artificial colors.  That said, many consumers actively seek to avoid ingesting artificial colors, and many retailers prohibit them.

h)      Defendants deny the allegations set forth in sub-paragraph 27(h).

i)      Defendants admit that Lessman made the quoted statements on his personal blog but otherwise deny the allegations set forth in sub-paragraph 27(i).  Defendants further state that Lessman offered no comparison between the silica used in ProCaps products and the silica used in Plaintiffs' product.

j)      Defendants deny the allegations set forth in sub-paragraph 27(j).

k)      Defendants lack information or knowledge to admit or deny the allegations set forth in sub-paragraph 27(k).

l)      Defendants admit that Lessman made the quoted statement on his personal blog, but otherwise deny the allegations set forth in sub-paragraph 27(l).

m)      Defendants deny the allegations set forth in sub-paragraph 27(m).

28.      Defendants deny the allegations set forth in Paragraph 28 of the Complaint.

29.      Defendants deny that they falsely accused Plaintiffs of trademark infringement for use of the phrase "Hair, Skin, and Nails" in order to disparage QVC or its products.  Defendants further state that while the phrase "Hair, Skin, and Nails" is a registered trademark, that mark is held by someone other than Plaintiffs or Defendants.  Lessman did not object to QVC using the

name "Hair, Skin, and Nails," and in fact wrote specifically that if Plaintiffs had done only that, "that would have been generically legal."   Instead, Lessman objected to QVC marketing its product as "*Healthy* Hair, Skin, and Nails" (emphasis added), thus falsely, unlawfully, and confusingly misappropriating the precise name of Defendants' product.

30.   Defendants admit that, except as set forth on Lessman's personal blog, Defendants have not made any direct objection or representation to QVC regarding its infringement on ProCaps' trademark or otherwise explained the basis for that claim.   Nor did QVC object to Lessman's blog before filing this lawsuit.

31.   Defendants deny the allegations set forth in Paragraph 31 of the Complaint.

32.   Defendants deny the allegations set forth in Paragraph 32 of the Complaint. Defendants further state that each of the complained-of statements that Lessman actually made is truthful and scientifically supportable fact or opinion.

33.   Defendants deny the allegation that any "misrepresentation," "message" or "necessary implication" thereof of Defendants has misled any consumers to form any mistaken views regarding Plaintiffs' products.   Defendants otherwise lack knowledge or information to admit or deny the allegations set forth in Paragraph 33 of the Complaint.

34.   Defendants admit that Lessman has referred consumers to information provided on his personal blog and that videos of Lessman's on-air presentations remain available on HSN's website.   Defendants otherwise deny the allegations set forth in Paragraph 34 of the Complaint.

35.   Defendants deny the allegations set forth in Paragraph 35 of the Complaint.

36.     Defendants admit that the statements alleged in sub-paragraphs 36(a) through 36(g) were posted by third parties on Lessman's personal blog.  Defendants otherwise deny the allegations set forth in Paragraph 36 of the Complaint.

37.     Defendants deny the allegations set forth in Paragraph 37 of the Complaint. Lessman further states that in order to maintain his blog as a free and open forum for discussion, his policy is never to edit or censor in any way comments made by third parties on his personal blog, no matter how uncomplimentary or disparaging they might be to Defendants, except to remove material that is obscene or dangerous.   And in fact Lessman has never censored or removed any comments from his blog.

38.     Defendants deny the allegations set forth in Paragraph 38 of the Complaint.

39.     Defendants deny the allegations set forth in Paragraph 39 of the Complaint.

40.     Defendants deny the allegations set forth in Paragraph 40 of the Complaint.

41.     Defendants deny the allegations set forth in Paragraph 41 of the Complaint.

42.     Defendants deny the allegations set forth in Paragraph 42 of the Complaint. Defendants state further that far from being devoted to denigrating Plaintiffs' products, Lessman's blog is predominantly dedicated to the discussion of wellness issues, as they pertain to various nutritional supplement ingredients and products.  Since Lessman launched his blog in February 2009, only a handful of recent posts discuss QVC products, all of which post-date and respond to QVC's unlawful and intentional misappropriation of Defendants' product name in January 2010, as detailed below, except for a single blog post, to which QVC has never objected. Moreover, contrary to Plaintiffs' claim, Lessman has discussed products other than Plaintiffs' products on his blog.  Indeed, far from targeting QVC exclusively, Lessman strongly criticized

on his blog a product marketed on HSN, his own network.  Finally, each comment Lessman has made regarding QVC products has been truthful and scientifically supported fact or opinion.

43.     Defendants deny the allegations set forth in Paragraph 43 of the Complaint except to the extent detailed in the following subparagraphs:

a)     Defendants admit that Lessman made the quoted statement on his personal blog but otherwise deny the allegations set forth in sub-paragraph 43(a).

b)     Defendants deny the allegations set forth in sub-paragraph 43(b). Defendants further state that this comment posted on Lessman's personal blog reflects Lessman's personal opinion regarding Plaintiffs' product and is supported by scientific evidence.

c)     Defendants admit that Lessman used the quoted words on his personal blog but otherwise deny the allegations set forth in sub-paragraph 43(c).

d)     Defendants deny the allegations set forth in sub-paragraph 43(d). Defendants state further that on his blog, Lessman did not state that the artificial colors used in Plaintiffs' products pose a risk to health.

e)     Defendants admit that Lessman made the quoted statement on his personal blog but otherwise deny the allegations set forth in sub-paragraph 43(e).

f)     Defendants admit that Polygonum Cuspidatum is the source of the resveratrol found in ProCaps' Resveratrol 100 product.   Defendants lack information or knowledge to admit or deny the remaining allegations set forth in sub-paragraph 43(f).

g)     Defendants deny the allegations set forth in sub-paragraph 43(g), except to admit that Lessman used the quoted words on his personal blog in order to point out that Plaintiffs failed to disclose the quantity or specifications of the ingredients in their "healthy heart blend" or the levels of any of their beneficial components therein.

h)      Defendants lack information or knowledge to admit or deny the allegations.  Defendants further state that Lessman never made any statement alleging that Plaintiffs' "healthy heart blend" has no benefit, but rather stated that Plaintiffs' failure to identify on their product label the quantity or standardizations of the ingredients or beneficial components therein renders Plaintiffs' labeling essentially "meaningless" as to the composition of the Health Heart Blend.

i)      Defendants admit that Lessman made the quoted statement on his personal blog but otherwise deny the allegations set forth in sub-paragraph 43(i).  Defendants further state that, although many consumers prefer capsules to tablets for a variety of reasons, Lessman offered no comparison between tablets and capsules.

j)      Defendants deny the allegations set forth in sub-paragraph 43(j).

k)      Defendants deny the allegations set forth in sub-paragraph 43(k).

l)      Defendants deny the allegations set forth in sub-paragraph 43(l).

m)      Defendants lack information or knowledge to admit or deny the allegations set forth in sub-paragraph 43(m), except to agree that grapes and grape products are "of the vine."

n)      Defendants deny the allegations set forth in sub-paragraph 43(n).

o)      Defendants admit that their product Resveratol-100 contains no grape-derived ingredients.  Defendants otherwise lack information or knowledge to admit or deny the allegations set forth in sub-paragraph 43(o).

p)      Defendants admit that Lessman made the quoted statement on his personal blog, but otherwise deny the allegations set forth in sub-paragraph 43(p).  Defendants further

state that, far from alleging that Plaintiffs employ artificial sweeteners, Lessman stated expressly that Plaintiffs' product contains "sugar," a natural sweetener.

q)      Defendants lack information or knowledge to admit or deny the allegations set forth in sub-paragraph 43(q).

r)      Defendants admit that Lessman made the quoted statement on his personal blog, but otherwise deny the allegations set forth in sub-paragraph 43(r).  Defendants further state again that, far from alleging that Plaintiffs employ artificial sweeteners, Lessman stated expressly that Plaintiffs' product contains "sugar," a natural sweetener.

s)      Defendants lack information or knowledge to admit or deny the allegations set forth in sub-paragraph 43(s).

t)      Defendants admit that Lessman made the quoted statement on his personal blog, but otherwise deny the allegations set forth in sub-paragraph 43(t).  Defendants further state again that, far from alleging that Plaintiffs employ artificial sweeteners, Lessman stated expressly that Plaintiffs' product contains "sugar," a natural sweetener.

u)      Defendants lack information or knowledge to admit or deny the allegations set forth in sub-paragraph 43(u).

44.     Defendants deny the allegations set forth in Paragraph 44 of the Complaint, which mischaracterize Lessman's statements.

45.     Defendants deny the allegations set forth in Paragraph 45 of the Complaint.

46.     Defendants deny the allegations set forth in Paragraph 46 of the Complaint. Defendants further state that each of Lessman's statements is truthful and scientifically supportable fact or opinion.

47.     Defendants deny the allegation that any "misrepresentation[]," "message" or "necessary implication" therefrom of Defendants has misled led any consumers to form any mistaken views regarding Plaintiffs' products.   Defendants otherwise lack knowledge or information to admit or deny the allegations set forth in Paragraph 47 of the Complaint.

48.     Defendants admit that Lessman has referred consumers to information provided on his personal website and that some videos of Lessman's on-air presentations remain available on HSN's website.  Defendants otherwise deny the allegations set forth in Paragraph 48 of the Complaint.

49.     Defendants deny the allegations set forth in Paragraph 49 of the Complaint.

50.     Defendants admit that the statements alleged in sub-paragraphs 50(a) through 50(h) were posted as responses on Lessman's personal blog by third parties.  Defendants otherwise deny the allegations set forth in Paragraph 50 of the Complaint.

51.     Defendants deny the allegations set forth in Paragraph 51 of the Complaint.

52.     Defendants deny the allegations set forth in Paragraph 52 of the Complaint.

53.     Defendants deny the allegations set forth in Paragraph 53 of the Complaint.

54.     Defendants deny the allegations set forth in Paragraph 54 of the Complaint.

55.     Defendants deny the allegations set forth in Paragraph 55 of the Complaint.

56.     Defendants deny the allegations set forth in Paragraph 56 of the Complaint.

57.     Defendants incorporate their responses to paragraphs 1 through 56, *supra*, in response to Paragraph 57 of the Complaint.

58.     Defendants deny the allegations set forth in Paragraph 58 of the Complaint.

59.     Defendants deny the allegations set forth in Paragraph 59 of the Complaint.

60.     Defendants deny the allegations set forth in Paragraph 60 of the Complaint.

61.     Defendants deny the allegations set forth in Paragraph 61 of the Complaint.

62.     Defendants incorporate their responses to paragraphs 1 through 61, *supra*, in response to Paragraph 62 of the Complaint.

63.     Defendants deny the allegations set forth in Paragraph 63 of the Complaint.

64.     Defendants deny the allegations set forth in Paragraph 64 of the Complaint.

65.     Defendants deny the allegations set forth in Paragraph 65 of the Complaint.

66.     Defendants deny the allegations set forth in Paragraph 66 of the Complaint.

67.     Defendants incorporate their responses to paragraphs 1 through 66, *supra*, in response to Paragraph 67 of the Complaint.

68.     Defendants admit that Delaware has an interest in ensuring that persons doing business in Delaware comply with Delaware law.  Defendants otherwise deny the allegations set forth in Paragraph 68 of the Complaint.

69.     Defendants deny the allegations set forth in Paragraph 69 of the Complaint.

70.     Defendants deny the allegations set forth in Paragraph 70 of the Complaint.

71.     Defendants deny the allegations set forth in Paragraph 71 of the Complaint.

72.     Defendants deny the allegations set forth in Paragraph 72 of the Complaint.

73.     Defendants incorporate their responses to paragraphs 1 through 72, *supra*, in response to Paragraph 73 of the Complaint.

74.     Defendants admit that Delaware has an interest in ensuring that persons doing business in Delaware comply with Delaware law.  Defendants otherwise deny the allegations set forth in Paragraph 74 of the Complaint.

75.     Defendants deny the allegations set forth in Paragraph 75 of the Complaint.

76.     Defendants deny the allegations set forth in Paragraph 76 of the Complaint.

77.     Defendants deny the allegations set forth in Paragraph 77 of the Complaint.

78.     Defendants deny the allegations set forth in Paragraph 78 of the Complaint.

79.     Defendants deny the allegations set forth in Paragraph 79 of the Complaint.

80.     Defendants incorporate their responses to paragraphs 1 through 79, *supra*, in response to Paragraph 80 of the Complaint.

81.     Defendants deny the allegations set forth in Paragraph 81 of the Complaint.

82.     Defendants deny the allegations set forth in Paragraph 82 of the Complaint.

83.     Defendants deny the allegations set forth in Paragraph 83 of the Complaint.

84.     Defendants deny that Plaintiffs are entitled to judgment on any of their claims or to any of the relief requested in paragraphs 1-6 following their prayer for relief.

WHEREFORE, Defendants deny any and all liability with regard to Plaintiffs' claims and respectfully requests that Plaintiffs' claims be dismissed with prejudice and that Defendants be awarded such general, further relief as justice may require.

## AFFIRMATIVE DEFENSES

Defendants further state that one or more of the following affirmative defenses may apply to one or more of Plaintiffs' claims:

85.     As detailed below in Defendants/Counter-Claimants' counterclaims, Plaintiffs acted fraudulently in marketing various of their products, including their Hair, Skin & Nails and Resveratrex products.

86.     As detailed below in Defendants/Counter-Claimants' counterclaims, Plaintiffs acted unlawfully in marketing various of their products, including their Hair, Skin & Nails and Resveratrex products.

87.     Plaintiffs are estopped and barred from pursuing their allegations arising out of Lessman's statements by the doctrine of unclean hands as Plaintiffs induced Lessman's statements by their own fraudulent and unlawful conduct.

88.     Plaintiffs are barred from pursuing claims arising from any third-party postings made on Lessman's, HSN's, or ProCaps' blogs or websites by the Communications Decency Act, 47 U.S.C. § 230.

89.     Plaintiffs are barred from pursuing claims arising from any statements made by Lessman or ProCaps that are protected by the First Amendment to the United States Constitution.

90.     Lessman's statements on his blog were not made in commercial advertising or promotion, nor in connection with a sale or advertisement of any merchandise.

91.     Plaintiffs lack standing to pursue a claim arising under the Delaware Consumer Fraud Act as Plaintiffs are not a consumer but rather are competitors.

## COUNTERCLAIMS

Andrew Lessman and ProCaps Laboratories, Inc. state the following counterclaims against QVC, Inc and QHealth.

## JURISDICTION AND VENUE

92.     This Court has subject matter jurisdiction over the counterclaim arising under the Lanham Act, 15 U.S.C. § 1125(a) (Count One) pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.  This Court has subject matter jurisdiction over the counterclaims arising under the statutory and common law of the State of Delaware (Counts Two to Nine) pursuant to 28 U.S.C. § 1367(a) because the Delaware claims are so related to the federal claim that they form part of the same case or controversy.  *See also* Fed. R. Civ. P. 13.

93.     This Court has personal jurisdiction over Counter-Defendant QVC because QVC, Inc. is incorporated in the State of Delaware, has consented to jurisdiction by filing this suit in the State of Delaware, and conducts substantial business within the State of Delaware related to the unlawful activities complained of herein.

94.     This Court has personal jurisdiction over Counter-Defendant QHealth because QHealth is incorporated in the State of Delaware, has consented to jurisdiction by filing this suit in the State of Delaware, and conducts substantial business within the State of Delaware related to the unlawful activities complained of herein.

95.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to these counterclaims occurred in this District.

## BACKGROUND

96.     Andrew Lessman began manufacturing vitamins in 1979 at which time he founded ProCaps Laboratories under the name The Winning Combination.  The company name was subsequently changed to YourVitamins, Inc., which now does business as ProCaps Laboratories.

97.     Lessman entered the vitamin business with the express intention of offering products that were of higher purity, gentler, and easier to digest in order to meet the needs and demands of consumers who experience discomfort swallowing or digesting large, conventional tablets, or who, as a result of allergies, sensitivities, or basic personal preference, seek to avoid the myriad of colors, fillers, excipients, and additives typical in conventionally available vitamin products.

98.     From 1992 through 1996, Counter-Claimants marketed ProCaps products on the QVC network.  Because QVC insisted that he do so personally, in January 1992, Lessman

appeared on-air for the initial broadcast of ProCaps products on the QVC network.  Thereafter until October 1996, Lessman regularly appeared on QVC whenever ProCaps products were offered to viewers.  During that period, Lessman promoted on QVC the numerous advantages of ProCaps' higher purity, powdered, encapsulated products, asserting to QVC's advantage many of the same claims that QVC now alleges are unlawful.

99.     Upon information and belief, by the Fall of 1996, ProCaps products was one of QVC's most productive brands (if not the most productive brand) in terms of total on-air and off-air sales, as measured by total revenue generated per hour in both on-air and off-air sales per hour of broadcast airtime utilized.

100.    Lessman left QVC in the Fall of 1996, and shortly thereafter began marketing his ProCaps products on HSN.  Neither Lessman nor ProCaps had ever entered into a contract with QVC (exclusive or otherwise) purporting to transfer to QVC any rights or interest in Lessman's name, likeness, products or services while at QVC.  Nevertheless, QVC responded to his departure by threatening to interfere with his future business endeavors, including his appearance on HSN.  The parties resolved their differences.  Lessman has appeared on HSN from November 1996 through the present day.

101.    In late 2006, then-QVC President Darlene Daggett communicated to Lessman that its on-air "Wellness Doctor," Dr. Edward Taub, M.D., would soon be retiring.  Dr. Taub had appeared regularly on QVC's network since 1997 (after Lessman departure), and continued to appear until 2008/2009 to promote Nature's Code vitamin and dietary supplements.  Ms. Daggett inquired whether, in the event QVC was interested, if Lessman might consider taking Dr. Taub's place and promoting ProCaps' supplements on QVC.

102.     This initial inquiry led to a meeting with Michael George, President and CEO of QVC, who eventually handed the matter off to his Merchandising Executives to document and finalize the terms of Lessman's return to QVC.  Ultimately, in November 2007, after months of discussions, Lessman communicated to Mr. George that he was no longer interested in returning to QVC, that he was terminating all such discussions, and that he would remain at HSN.  QVC continued to encourage Lessman to reconsider, since QVC is a much larger network with much greater business opportunities than HSN; however, Lessman decided to remain at the smaller network, HSN.

103.     After Lessman declined to return to QVC, Dr. Taub's position as "Wellness Doctor" and Nature's Code spokesperson was filled by James Rouse.  As described in detail below, QVC and Rouse represent Rouse as a "doctor," even though Rouse did not attend medical school and does not have an M.D. or D.O. degree.

104.     Despite HSN being less than half the size of QVC, Counter-Claimants' business has enjoyed substantial growth and commercial success since leaving QVC in 1996.  Through the hard work and entrepreneurship of Lessman, the ProCaps' brand and its key products have grown steadily over the past thirteen years.

## QVC'S FRAUDULENT, UNLAWFUL, MISLEADING
## AND/OR TRADEMARK-INFRINGING CONDUCT

**I.     QVC's Misappropriation of ProCaps' "Healthy Hair Skin & Nails" Trademark and Fraudulent Marketing of Its Hair, Skin & Nails Product**

**A.     Misappropriation of ProCaps' "Healthy Hair Skin & Nails" Trademark**

105.     In August 2000, ProCaps Laboratories began selling a supplement called "Healthy Hair Skin & Nails™."  Healthy Hair Skin & Nails™ is designed to be gentle and consumer friendly, being delivered as an ultra-fine, free-flowing powder in a small, soft, easy-to-swallow capsule.  It is also designed to be more pure, since it is produced using only the

ingredients listed on the label without adding any additional colors, binders, fillers, excipients, or other ingredients during the manufacturing process.

106.    Upon information and belief, at the time Healthy Hair Skin & Nails™ was introduced, while other products used combinations of the words "skin," "nails," and "hair," no comparable product in the world used the name "Healthy Hair Skin and Nails."    Since introducing Healthy Hair Skin & Nails™, ProCaps has actively monitored the Internet and various databases to insure that its name was not being infringed upon.

107.    Over the past decade, Lessman and ProCaps have grown Healthy Hair Skin & Nails™ into one of ProCaps' top-selling supplements.  ProCaps has sold Healthy Hair Skin & Nails™ on HSN continuously for almost ten years, and as ProCaps' most important stand-alone product, it has been featured in approximately 8,000 minutes (more than 133 hours) of live national television air time.  In less than ten years, Healthy Hair Skin & Nails™ has achieved sales of more than $70 million and more than one million customers have purchased more than 340 million capsules.  Other than ProCaps' multivitamin product Complete™, Healthy Hair Skin & Nails™ is by far the most consumed of all of ProCaps' vitamin products and arguably is its most well-known brand.  Nearly 700 customers, far more than typical, have reviewed ProCaps' Healthy Hair Skin & Nails™ on HSN's website, giving the product an average of 4.5 stars out of 5.  ProCaps' Healthy Hair Skin & Nails™ has received more national television airtime and exposure than any other ProCaps product ever to air on HSN.  As a result, Lessman and ProCaps have generated substantial goodwill in this product name, which is widely and closely associated with Lessman and ProCaps.

108.    During his discussions with QVC in 2007 over the possibility of returning to that network, Lessman disclosed to QVC the critical importance to his brand of the Healthy Hair Skin

& Nails™ product. Specifically, Lessman disclosed that, although "beauty vitamins" are not ordinarily big sellers, Healthy Hair Skin & Nails™ was unique and was more than just ProCaps' most successful stand-alone product in terms of sales. It was also, he disclosed, a product capable of generating substantial off-air sales (reorders), as well as the most effective product in bringing valuable new customers to both the ProCaps brand and to HSN, which are of paramount importance to a television retailing network.

109. A standard QVC programming feature is its "Today's Special Value," which is a single product heavily promoted throughout the day both on television and on QVC's website. On January 14, 2010, QVC unveiled as its "Today's Special Value" a new Nature's Code product labeled as "Hair, Skin & Nails."

110. Although the label on this new product said "Hair, Skin, & Nails," QVC's principal on-screen graphics, QVC.com's homepage headline, and the manner in which QVC's on-air personalities promoted it throughout the day as "Healthy Hair Skin and Nails." QVC thus willfully and intentionally appropriated the specific name Lessman and ProCaps had invested almost a decade developing for their flagship product, a fact QVC had learned during its negotiations with Lessman, which were terminated just over two years ago. During its presentation, QVC stated that it had developed this new product over the past two years.

111. QVC's product rollout strategy caused significant marketplace confusion. ProCaps' call-center received calls from customers confused as to whether QVC was promoting ProCaps' Healthy Hair Skin & Nails™ product. Postings on the bulletin board at QVC's websites and comments on Andrew Lessman's personal blog acknowledged the confusion and discussed the Healthy Hair Skin & Nails™ being "stolen." Upon information and belief,

consumers confused QVC's for ProCaps' product, injuring Lessman's and ProCaps' reputation and damaging their business.

112.   Further increasing the confusion, during its initial broadcast of its "Hair, Skin Nails" product, QVC informed customers that there was no other product like the product they were marketing.

113.   Since its January 14, 2010, rollout, QVC has gradually removed from its website references to its product as "Healthy Hair, Skin and Nails," in lieu of its labeled name, "Hair, Skin & Nails."  However, as of the date of this filing, QVC continued to host on its website a video from the January 14th "Today's Special Value" presentation that misappropriates Counter-Claimants' "Healthy Hair Skin & Nails™" product name.

114.   QVC's false and misleading statements have directly injured Counter-claimants and caused loss of sales.

**B.      False and Misleading Statements Regarding the Benefits
          of QVC's "Hair, Skin & Nails"**

115.   Counter-Defendants' Hair, Skin & Nails product competes directly with ProCaps' Healthy Hair Skin & Nails™ product.

116.   In advertising and promoting their Hair, Skin & Nails product on their website and broadcasts, Counter-Defendants have made numerous materially false, misleading, and unsubstantiated representations concerning the nature, characteristics, qualities, and benefits of the active ingredients in their product.

117.   In advertising and promoting their Hair, Skin & Nails product, Counter-Defendants have made numerous materially false and misleading representations concerning the 1 mg of hyaluronic acid (HA) in the product, including the following:

a)      On QVC's website and broadcast promotions, Counter-Defendants claim that the Nature's Code Hair, Skin & Nails tablet contains the "right amount" of HA to "provide structural support to the cells" of hair, skin, and nails.  Counter-Defendants compare the efficacy of the HA in their tablet to "different creams, different lotions" containing HA that are administered topically, stating that the HA in their tablet provides "structural support to the cells" "from the inside out."

b)      There is no factual basis for Counter-Defendants' claims that the 1 mg of HA in the Nature's Code Hair, Skin & Nails tablet can provide any nutritional benefits whatsoever, let alone benefits to the hair, skin, or nails.

c)      In fact, there no scientific evidence showing that orally ingesting HA at levels anywhere near as low as 1 mg provides any health benefits.

118.    In advertising and promoting their Hair, Skin & Nails product, Counter-Defendants have made numerous materially false and misleading representations concerning the 0.6 mg of lutein in the product, including the following:

a)      On QVC's website and broadcast promotions, Counter-Defendants claim that the Hair, Skin & Nails tablet contains the "right amount" of lutein for health benefits. Counter-Defendants further make misleading representations that necessarily imply that lutein provides benefits to the hair, skin, or nails.  For example, during the January 14, 2010 on-air promotion that is still available by video on QVC's website, QVC received a call from a customer complaining about thinning hair.  QVC's on-air spokespersons—including James Rouse—described the combination of biotin, lutein, and HA as providing "systemic support for healthy hair, skin, and nails coming from those three different dimensions."

b)      There is no factual or scientific basis for QVC's statements that just 0.6 mg of lutein is sufficient to provide antioxidant or protective benefits to the skin.  To the extent Rouse suggested that lutein provides benefits to hair and nails, there is no factual or scientific basis for such a statement.

119.    In addition, in advertising and promoting their Hair, Skin & Nails product (and other products) on QVC's website, Counter-Defendants fail to offer a complete Supplement Fact panel and therefore fail to disclose in their Supplement Facts any of the volumes of unnecessary fillers, additives, excipients, and inactive ingredients in the product.

120.    QVC's false and misleading statements have directly injured Counter-Claimants and caused loss of sales.

C.      **False and Misleading Statements of the Value of QVC's "Hair, Skin & Nails"**

121.    On broadcasts advertising and promoting Nature's Code Hair, Skin & Nails that are still available on QVC's website, Counter-Defendants have made numerous false and misleading statements regarding the supposed market value of the product's ingredients and the supposed price discounts offered by QVC:

a)      QVC represented that in order to make "an apples to apples comparison," or "value comparison" between the Hair, Skin & Nails product, a consumer would have to purchase the product's four active ingredients individually at a market price of "$120."

b)      Upon information and belief, at the time QVC made those statements, the market value of the four active ingredients was, and is, far below $120.

122.    QVC's false and misleading statements directly injured Counter-Claimants product and reputation, and resulted in a loss of sales.

## II.   QVC's False and Misleading Statements Regarding USP "Certification"

123.   Nearly all of Counter-Defendants' Nature's Code products compete directly with ProCaps products.

124.   In advertising and promoting their Nature's Code products, Counter-Defendants have made materially false and misleading claims to a non-existent relationship between those products and the United States Pharmacopeia (USP).   USP is a non-governmental, public standards-setting authority for medicines as well as dietary supplements and other healthcare products.   Among other activities, USP conducts a voluntary program that verifies the quality, purity, and potency of dietary supplement finished products.   According to USP, "[o]nly those [dietary supplements] that meet USP's stringent criteria are awarded use of the USP Verified Dietary Supplement Mark to display on their product labels."   *See http://www.usp.org/USPVerified/*.

125.   As they have in this lawsuit, Counter-Defendants have repeatedly suggested that their Nature's Code Hair, Skin & Nails product is "certified" by USP and that such "certification" provides "independent verification" of the efficacy of Nature's Code products. For example, on a video of a prior on-air promotion of Nature's Code Hair, Skin & Nails currently available on QVC's website, James Rouse made the following statements:

a)      "*USP is a whole other level of certification that we take in Nature's Code*, because when you get right down to it, it's all about safety, and it's all about efficacy. . . . And we have USP.   You can give yourself the peace of mind that what you're taking is giving your body the benefit of what you're investing in."   (emphasis added).

b)      "To get the greatest benefit from supplementation, think in terms of the concerts really.   You have to have everyone lined up just right, and this part of the design have

every ingredient in the right amount with the *USP, which again is your independent validation, the peace of mind you're looking for when you take that supplement, it goes to work and do the benefit for you*." (emphasis added).

        c)      "[Y]ou're going to find, Rick, that the vast majority [of *competing vitamins*] *unfortunately do not have USP.  It's a whole other level of distinction that we give with Nature's Code, which is what we're all about here, safety, assurance and efficacy*.  This comes down to fact that when you take your Nature's Code vitamins, it goes in the stomach and from there it starts to break down, from there it's broken down further in the small intestine and [Indiscernible] [0:30:57] from the small intestine right into the bloodstream as it passes through the wall of the small intestine and this is where it gives the benefit. . . .  USP is another step beyond when it comes to supplementation and making sure you get great results, and this is what we do at Nature's Code.  This USP is something about you for peace of mind." (emphasis added).

        d)      "*USP is your independent validation*, real simple guys, its all about making sure when these vitamins go into your body, they breakdown and from breaking down, they go into the system, so your body can get the benefit from the supplements themselves, that's the key distinction.  That's USP." (emphasis added).

    126.   Counter-Defendants have made numerous similar false and misleading representations about USP in advertising and promoting other Nature's Code supplements, including but not limited to the following representations:

        a)      On a February 11, 2010, broadcast advertising and promoting Nature's Code SuperSunshine Liquid Vitamin D Supplement, James Rouse stated:  "We have something called United States Pharmacopeia, sometimes called USP.  Basically, [QVC Host], this tells you

that when you take our Nature's Code vitamins, they'll go into the stomach, from there they'll start to get broken down.  From there they fall under the small intestines and from the small intestine they break down further, pass through the small intestinal lining, where they're actually absorbed in the blood stream, where they'll give your body benefit."

  b)  On a January 22, 2010, broadcast advertising and promoting Nature's Code "Vitamin Packs with CoQ10 & Antioxidants," James Rouse stated:  "the USP is your independent validation.  It's your peace of mind, that allows you to know that when you take these supplements they are actually getting into your system, going through the cellular wall and actually benefitting your body the way supplements need to, to truly get a benefit.  So you're not what you take, you're what you absorb. And Nature's Code is what you're going to absorb, *guaranteed by USP*." (emphasis added)

  c)  On a January 22, 2010, broadcast advertising and promoting Nature's Code Acidophilus product, James Rouse told a caller:  "The USP distinction, [Caller], is your independent validation and your piece of mind, verification that when you take our vitamins, you're going to get the benefit in your body."

  127.  There is no factual basis for Counter-Defendants' contention that their Nature's Code products are "certified" by USP.  USP does not administer a certification program, so it is not possible that Nature's Code products are certified by USP.  Upon information and belief, although USP does administer a voluntary verification program for dietary supplements, no Nature's Code product has been verified by USP.  Tellingly, Nature's Code product labels do not bear the USP Verified Mark.  Nor are any Nature's Code products included in USP's list of verified dietary supplements.  *See*  http://www.usp.org/USPVerified/dietarySupplements/ supplements.html.

128.     Even if Nature's Code products were verified by USP, there would still be no factual basis for Counter-Defendants' contentions that such verification provides a guarantee of the products' efficacy or safety.   USP's verification program includes laboratory tests of disintegration and dissolution of certain ingredients in water or other solutions and testing for containments, but USP does not seek to establish or measure the efficacy or safety of the composition itself.

129.     Moreover, USP's verification program does not assess whether a product's formulation contains ingredients in amounts adequate to ensure benefits to consumers.   Nor does USP's verification program assess whether a product contains the proper mix of ingredients to deliver its intended benefit.   Nor does USP allow any conclusions to be drawn about the safety of specific ingredients or the formula as a whole.

130.     By making unlawful claims about their Nature's Code products, Counter-Defendants unfairly and unlawfully advantage their own products as against ProCaps' products. ProCaps markets a supplement that competes directly against each of the products mentioned above about which QVC makes unfounded claims to USP verification.

131.     These false and unsupportable claims have and will result in injury to Counter-Claimants' product and reputations and have resulted in a loss of sales.

**III.     QVC's Fraudulent Marketing of Nature's Code SuperSunshine
Liquid Vitamin D Supplement**

132.     Counter-Defendants recently launched a new product named "Nature's Code SuperSunshine Liquid Vitamin D Supplement" ("Nature's Sunshine").

133.     Federal law prohibits the making of health claims in marketing dietary supplements unless the specific claim has been approved by the Food and Drug Administration. *See* 21 C.F.R. § 101.14(e).

134.   In marketing Nature's Sunshine, Counter-Defendants have repeatedly made false, unsubstantiated, unsupportable, and unlawful health claims, not approved by the FDA, alleging that the Vitamin D in their product can reduce the risk of various diseases, including cancer and heart disease:

a)   During several broadcasts promoting Nature's Sunshine, including at least broadcasts on February 11, 2009, and February 26, 2009 (a video of which is currently available on QVC's website), QVC displayed a graphic representing that "Vitamin D plays [a role] in decreasing the risk of many chronic illnesses, including cancer, autoimmune disease, infectious diseases and cardiovascular disease."

b)   On February 11, 2010, QVC's vitamin spokesperson, James Rouse, informed QVC viewers that:

> Also of great interest is the role of vitamin D that plays in decreasing risk of many chronic diseases including cancer, auto immune disease, infectious diseases and cardiovascular disease.

c)   On that same broadcast, QVC's host and vitamin spokesman then associated cancer with Vitamin D deficiency:

> **Rouse**:  [B]ut look at this bottom piece here, it has been estimated that one billion people world-wide have vitamin D deficiency or insufficiency, one billion people.
>
> **Interviewer**:  No wonder we hear out there in the news that, oh, this is happening, you know, people are getting all those cancers…
>
> **Rouse**:  Right.

d)   On that same broadcast, Rouse then went on to suggest that vitamin D supplementation (treatment) will benefit those individuals suffering from muscle aches, bone aches, depression, chronic fatigues syndrome, and fibromyalgia:

> **Rouse**:  We're thinking across the world been one billion people being deficient, we're looking at how it is this can be effective for

a lot of different support system[s].  There was a hospital study that came out about 3 years ago, [QVC Host], and they spoke to an emergency room situation where they actually we're looking at people between the ages of 10 and 65 years of age. They came in with things like muscle aches and bone aches, and what we also found is that when they actually looked at these people and gave further evaluation, the diagnosis were depression, chronic fatigues syndrome, as well as fibromyalgia, and with those 3 disease, they also found out that 93% of people who had those chief complaints, had those diagnosis, were also deficient in vitamin D.

e)      On QVC's February 26, 2010, broadcast, a video of which, upon information and belief, is now available on QVC's website, QVC's host and Rouse repeated many of these same claims in promoting their Nature's Sunshine product.

f)      During these same broadcasts, having represented that Vitamin D can reduce the risk of certain diseases, QVC hosts and Rouse fielded calls from individuals suffering from two of those diseases, autoimmune disorders and fibromyalgia.

135.    Counter-Defendants' health claims are false and entirely without scientific support.  Counter-Defendants' health claims are also unlawful under clearly established federal law.

136.    QVC competes directly against other Vitamin D supplements including those manufactured by ProCaps, such as "Vitamin D-1000" and "Vitamin D-2500."

137.    By making their false, unsubstantiated, and unlawful claims of disease reduction, Counter-Defendants unfairly and unlawfully promote their product to the disadvantage of ProCaps' products, because ProCaps will not make unlawful health claims in promoting its competing products.  Specifically, Counter-Defendants' false and unsupportable statements will cause consumers to believe that their Nature's Sunshine product will help them reduce their risk of, if not treat or prevent entirely, conditions including cancer, autoimmune disease, infectious diseases, cardiovascular disease, muscle aches, bone aches, depression, chronic fatigue

syndrome, and fibromyalgia.   Because Counter-Claimants will not make similarly false and unlawful claims in support of their competing products, they are competitively disadvantaged.

138.    These false, unsupportable, and illegal claims have and will result in injury to Counter-Claimants' products and reputations, and have resulted in a loss of sales.

## IV.    QVC's Fraudulent Marketing of Nature's Code Resveratrex

139.    QVC promotes a product called Nature's Code Resveratrex, which contains 100 mg of the compound resveratrol.  Nature's Code Resveratrex competes directly with Counter-Claimants' product Resveratrol-100, which also contains 100 mg of resveratrol.

140.    In advertising and promoting their Resveratrex liquid product, Counter-Defendants have made numerous false and misleading representations concerning their Resveratrex product.

141.    In a video of a broadcast promotion of Resveratrex available on QVC's website, Defendants made false and misleading representations concerning the product's amount and concentration of resveratrol.  Rouse began the promotion by stating that the Resveratrex product is "like no other product in the entire universe," containing resveratrol in amounts equivalent to 93 bottles of red wine.  Rouse then stated minutes later that the concentration of resveratrol in the Resveratrex product is "off the charts."

142.    There is no factual basis for Counter-Defendants' claim that their Resveratrex product contains unparalleled amounts and concentrations of resveratrol.  There are numerous products, including ProCaps' Resveratrol-100, that deliver the same or considerably higher amounts of resveratrol.  Many competing products offer resveratrol in even higher concentration. This is especially the case because the Resveratrex drink dilutes resveratrol in an ounce of liquid.

143.   Defendants also made false and misleading statements regarding the Resveratrex drink that concealed its high sugar content.

144.   Specifically, Rouse favorably compared the Resveratrex drink to red wine.  He stated that consumers should purchase Resveratrex as an alternative to "red wine," because of "not just the alcohol, but the calories."  But the Resveratrex drink contains 4 grams of sugar per ounce—sugar being a source of calories consumers seek to avoid.  By comparison, red wine typically contains just a fraction of 1 gram of sugar.  For example, according to the United States Department of Agriculture's Nutrient Database, an ounce of merlot or red table wine contains 0.18 grams of sugar.

145.   Rouse also touted the Resveratrex Drink's "Healthy Heart Blend," the predominant ingredient of which is apparently grape concentrate.  That concentrate provides the high sugar content of the drink, and Rouse never explains how sugar promotes a healthy heart.

146.   The false and misleading statements are material to consumers' purchasing decisions.  Many health-conscious consumers who purchase dietary supplements, such as resveratrol-containing products, try to avoid consuming unnecessary quantities of sugar.  Indeed, when promoting Resveratrex tablets, Rouse advertises the importance of obtaining resveratrol without not only the calories and alcohol of red wine, but also "without the sugar" of red wine.  Given that context, his failure to mention the 4 grams of sugar in the Resveratrex drink is quite misleading.

147.   QVC's false and misleading statements have directly injured Counter-Claimants and caused loss of sales.

**V.     QVC's     Unlawful     Marketing     of     Nature's     Code     CardioQ10 Heart Health Cardio Packs**

148.    As noted above, health claims for dietary supplements are strictly prohibited by federal law unless expressly and specifically authorized by the FDA.   Because substantial research demonstrates that "vegetable sterols," specifically phytosterol, can reduce the risk for coronary heart disease by lowering cholesterol levels, the FDA has approved sterol-based health claims.   However, the FDA has prescribed the contours of any such claim, allowing them only for products that are taken at least twice daily.

149.    Consistent with the FDA's requirements, ProCaps sells products designed to promote heart health and to reduce cholesterol, CholestraCare™ and CholestraCare+Fibermucil. An active ingredient in each of these products is plant sterols.   For both products, consumers are instructed to take the supplements at least twice daily.

150.    QVC produces a competing product.   On information and belief, on or about February 13, 2009, QVC began offering for sale a product called "CardioQ10 Heart Health Cardio Packs" ("CardioQ10").    *See* http://www.qvc.com/qic/qvcapp.aspx/view.2/app.detail/ params.item.A85213.desc.Natures-Code-180-Day-Heart-Health-Cardio-Packs.   QVC describes this product as "[a]n advanced nutritional supplement pack containing targeted nutrients that may reduce the risk of heart disease." *Id.* Consumers are instructed to take a four-pill pack each day. The four pills (two of which are "vegetable sterols," specifically phytosterol) are wrapped together in a single packet that was instructed to be consumed at one time as a single serving.

151.    QVC failed to inform consumers that they must take vegetable sterols at least twice daily and, in so doing, QVC failed to abide by the FDA's restrictions on such claims, thereby making a false and unlawful health claim.   Most notably, customers were instructed to

take the entire pack "with breakfast or any meal."  QVC's packaging expressly informed customers that the two sterol pills constituted a "single serving."

152.    On information and belief, any corrective measures that QVC has taken have been incomplete and inadequate.  Although QVC has revised the product's label to note that the tablets should be taken twice daily, QVC's website (which is what the consumers see when they research or order the product on the Internet) remains ambiguous and may still leave consumers with the impression that they can take the supplement in a convenient single dose.

153.    By marketing its product in this false, misleading, and unlawful manner, QVC has gained an unfair and illegal advantage for its product.  Customers generally favor products that offer a convenient single serving rather than multiple servings.  Because Lessman and ProCaps refuse to make unlawful and unsubstantiated claims about the appropriate use of their competing products, they are placed at a competitive disadvantage.

## VI.    False and Misleading Statements Regarding James Rouse's Qualifications

154.    Upon information and belief, QVC promotes its products on air using a system of hosts or interviewers and guests.  QVC hosts/interviewers promote a wide range of products, whereas guests are more specifically associated with particular products or categories of products.  QVC promotes its Nature's Code vitamin and supplement products in this manner.

155.    The QVC Nature's Code line was originally promoted on-air by guest Dr. Edward Taub.  Upon information and belief, QVC credits Dr. Taub with establishing the Nature's Code brand, and Dr. Taub appeared on QVC for more than a decade to promote Nature's Code products.  Dr. Taub's name and likeness is still used in connection with the promotion and sale of the Nature's Code products.

156.    Upon information and belief, Dr. Taub holds a Doctor of Medicine ("M.D.") degree and practiced medicine in addition to serving as a spokesman for the Nature's Code line of products.   When he appeared on QVC, Dr. Taub was introduced to viewers as QVC's "Wellness Doctor."  Dr. Taub was referred to as "Dr." on the air, and QVC customers were made aware that Dr. Taub was an actual medical doctor.

157.    Upon information and belief, Dr. Taub retired from QVC sometime in or around 2008 or 2009.   Having failed to lure Lessman back to the network, QVC retained James Rouse to appear on its network in Dr. Taub's place to promote the Nature's Code products.

158.    Since then, upon information and belief, QVC has engaged in a willful and deliberate course of conduct to give viewers the impression that Rouse was a medical doctor, just like Dr. Taub.  To that end, QVC has treated Rouse on-air in the same manner as they had treated Dr. Taub.  He is introduced as QVC's "Wellness Doctor," and is referred to on-air by QVC's hosts as "Dr." Rouse.  On numerous occasions, QVC hosts have referred back to Dr. Taub in order to establish "Dr." Rouse's pedigree:

g)    During QVC's initial on-air promotion of Nature's Code Hair, Skin & Nails on January 14, 2010, the on-air host informed viewers:

> Actually this [product] was two years in the making.  *Dr. Edward Taub played a hand in this, right, and it was like, ok, I'm passing the baton to Dr. James.*  We know we still have this in the making. Let's do this, and let's do this right (emphasis added).

h)    During a January 22, 2010 on-air promotion of Nature's Code multivitamin, a caller congratulated Rouse on the anniversary of his appearance on QVC and stated with reference to Dr. Taub, "You had really big shoes to fill."  Rouse responded without clarifying that he, unlike Dr. Taub, did not have a medical degree; instead, Rouse embraced the comparison, stating "Well, I'm still in sneakers rather than trying Dr. Taub's loafers."

- 34 -

159.     Despite this course of conduct, Rouse is not, in fact, a medical doctor.  Rouse never went to medical school and has no medical degree (M.D. or D.O.), but instead holds a doctorate in naturopathy from the National College of Naturopathic Medicine (NCNM).  According to the Association of Accredited Naturopathic Medical Colleges, of which NCNM is a member:

> Naturopathy is a traditional approach to health that is holistic, meaning that it encompasses the whole being.  It is based on natural and preventative care.  Naturopathic medicine combines many methodologies, such as acupuncture, massage, chiropractic adjustment, homeopathy and herbal cures, along with sensible concepts such as good nutrition, exercise and relaxation techniques.

*See* Association of Accredited Naturopathic Medical Colleges, www.aanmc.org/naturopathic-medicine.php.

160.     Upon information and belief, training in naturopathy differs markedly from medical training in that it lacks the same focus on hard sciences, evidence-based treatment, and rigorous clinical training.  For instance, upon information and belief, a naturopath is not required to undergo a traditional residency after graduation.  Further, only a minority of States license and regulate the practice of naturopathy.  In some States, the practice of naturopathy is expressly prohibited altogether.

161.     Upon information and belief, QVC broadcasts "Dr." Rouse promoting QVC's Nature's Code products in all 50 States and other U.S. jurisdictions.  Yet despite the varied treatment of naturopathy in different jurisdictions, QVC does not fully disclose Rouse's educational and certification background.  QVC instead takes steps to conceal these differences and to create the impression that "Dr." Rouse is Dr. Taub's successor as a medical doctor.

162.     As noted above (at least until Lessman commented in a blog posting regarding Rouse's actual credentials), Rouse is referred to on-air as "Dr." Rouse, often without any

reference to his actual background in naturopathy as distinct from medical training.  Similarly, "Dr. Rouse" is referred to as "Dr. Taub's" successor.

163.   Indeed, QVC treats Rouse on-air and on-line in the same manner as it treats its other guests who do hold medical degrees.  For example, upon information and belief, QVC markets a separate line of health and beauty products through the promotion of Dr. Adrienne Denese, who holds an M.D. from Cornell's medical school.  She, like Rouse, is referred to on-air and on-line as "Doctor."  Likewise, upon information and belief, QVC markets another line of skin care products through the promotion of Dr. Nicholas Perricone, who holds an M.D. and is a board-certified dermatologist.  Like Dr. Denese and Rouse, he is referred to on-air and on-line as "Doctor."

164.   QVC's website reinforces the appearance that Rouse is Dr. Taub's medical successor.  Each Nature's Code product's web page includes a tab entitled "About Dr. Rouse," which supplies customers with a brief biography for QVC's "wellness doctor" spokesman.  On that biography, Rouse is first compared extremely favorably to the average medical practitioner.

> "Energizing" isn't a word that leaps to mind when describing a visit with your doctor.  But Dr. James Rouse isn't your average doc.  He's a man affectionately referred to by colleagues as "superhuman."

The website then goes on to give the impression that "Dr." Rouse has medical training in addition to training in other disciplines, suggesting that he is some form of "M.D.-plus."

> Dr. James *earned his medical degree* at the National College of Naturopathic Medicine, one of only a handful of accredited naturopathic medical schools in the country.  The program integrated *training in conventional medicine, including pharmacology and other "Western" treatment methods* with intensive study in botanical, nutritional, homeopathic medicine, and additional holistic approaches.

*See*, *e.g.*, *http://www.qvc.com/qic/qvcapp.aspx/view.2/app.detail/params.CM_SCID.coll.item.* *A00195. desc.Natures-Code-SuperSunshine-VitaminD-Supplement90-Day-Supply* (emphasis added).

165.    QVC compounds this appearance by allowing Rouse routinely to refer to "his practice" and "his patients," and to engage in clinical and diagnostic discussions with customers who call in on the air.  For example:

a)    Rouse advised a caller who reported suffering from fibromyalgia to purchase the Nature's Sunshine product, and then described a research study that he claimed correlated vitamin D deficiency with fibromyalgia.

b)    During a January 22, 2010, on-air promotion of Nature's Code multivitamin, an elderly person called and described her energy level as a result of taking the Nature's Code product:  "I'll tell you something, I feel terrific.  Rap on wood.  And you do have an energy, there is an energy level.  I don't care if you can say it or not, you do have more energy.  Now I know as you get older, we get lazy and take a nap and do this and that.  But there is an energy. I do have more energy than a lot of my friends."  Without clarifying his qualifications, Rouse counseled the caller, advising that "naps are a good thing," and that "to get great results," she should "follow through every single day" taking the multivitamin.

c)    During a January 30, 2010, on-air promotion of Nature's Code Acidophilus, a caller greeted "Dr. James" and explained that after she "had gastric bypass back in '04," she had "tried every vitamin on the planet" without success in "improving" her blood work, but that "the minute [she] started taking Nature's Code all of [her] blood work improved" because it "does absorb [so] you do get the benefit from it that you do not get from some other vitamins."  Without clarifying his qualifications, Rouse congratulated the caller on her "great

results," stated that the Nature's Code products had "great absorbability," and claimed that "we take the highest level of research and make sure that they are going to work for you in a level that's absolutely uncompromising."  After the call ended, Rouse gave the caveats that "Nature's Code vitamins . . . are not medications, and if you have any surgeries and you know that there are certain things that you need, always get with your physician and make sure this is the right program for you."  At no point, however, did Rouse clarify that he was not himself a medical doctor.

d)    During calls such as these, QVC often makes no effort to remind the caller or the viewing audience that "Dr." Rouse does not possess the kind of experience of background nor is he the type of physician or medical doctor a reasonable viewer might expect.

166.    Many of the Nature's Code products that Rouse promotes on-air and on-line compete with various ProCaps' products.  The products promoted by Rouse include, but are not limited to, Hair, Skin & Nails, Resveratrex tablets, Resveratrex drink, Nature's Sunshine, and CardioQ10.  ProCaps products, by comparison, are promoted on-air and on the Internet by Lessman.  Lessman is not, and has never claimed to be, a medical doctor.

167.    By holding "Dr. Rouse" out to customers as a medical doctor, QVC falsely, misleadingly, and, in some jurisdictions, unlawfully, suggests a degree of expertise and qualification that Rouse does not in fact have.

168.    This gives QVC's Nature's Code products an unfair and unlawful commercial advantage.  Some customers may prefer a product promoted by a medical doctor, with all of the training and knowledge that presumably accompanies such a degree.  Customers may give statements by a doctor greater credit than comments made by a non-medical doctor.  Indeed,

comments made on QVC's website by some third parties demonstrate confusion regarding Rouse's credentials and professional stature in relation to Dr. Taub:

a)      On February 13, 2009, third parties discussed in a QVC website forum one person's question "where is Dr. Taub?"  One person responded that Dr. Taub had "retired and he 'hand picked' Dr. Rouse to replace him."

b)      On May 10, 2009, third parties again discussed Dr. Taub's departure in a QVC website forum.  One person commented that Dr. Taub "actually retired and I saw the announcement a couple of months ago and they introduced a young doctor to take his place. . . . The new one is taking over with the Wellness program, etc., everything Dr. Taub did, [Rouse] said."

c)      On January 14, 2010, third parties discussed in a QVC website forum one person's question "what happened to Dr. Taub."  One person responded that "Dr. Taub was on [air] and introduced the other guy [Rouse].  He passed the baton to him.  Dr. Taub said something about moving on to other interests.  It was a nice way of making the switch."

d)      On January 24, 2010, another person described Dr. Taub and Rouse in that same QVC website forum, stating "They are both extremely intelligent doctors in their field.  . . . Dr. Rouse is just as intelligent . . . .  I think he is a young Dr. Taub in thought and preparation."

e)      On February 5, 2010, third parties discussed in a QVC website forum QVC's misleading representation of Rouse as a medical doctor.  In those discussions, one third-party stated "I think Rouse is a D.O., isn't he?  In which case, he can use the term 'Dr.'  This comment spawned several more comments of people noting that a D.O. degree, like an M.D. degree, entitles one to be called a medical doctor.

f)      On February 22, 2010, a customer, aware that Lessman was trained as an attorney, posted on QVC's website that she preferred Nature's Code products over ProCaps' products because "I trust a Dr. to make my vitamins a lot more than I do a lawyer."

g)      These posts display both confusion among consumers regarding Rouse's credentials and also the resulting harm to ProCaps' competitive position.

169.    QVC's false and misleading statements have injured Counter-Claimant's products and reputation, have directly injured Counter-Claimants, and have caused a loss of sales.

WHEREFORE, Counter-Claimants allege the following causes of action.

## FIRST CAUSE OF ACTION
[False Designation of Origin and False Advertising Under 15 U.S.C. § 1125(a)]

170.    Counter-Claimants reallege and incorporate by reference each and every allegation of paragraphs 92 through 169.

171.    In connection with the sale of goods in interstate commerce, Counter-Defendants have willfully and deliberately made false and misleading advertising and promotional statements that are material to consumers' purchasing decisions.

172.    Counter-Defendants' conduct constitutes false designations of origin and false and misleading descriptions and representations that have caused and are likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association of Counter-Defendants with Counter-Claimants, or as to the origin, sponsorship, or approval of Counter-Defendants' goods or commercial activities by Counter-Claimant, in violation of 15 U.S.C. § 1125(a).

173.    Counter-Defendants' conduct constitutes false designations of origin and false and misleading descriptions and representations in commercial advertising and promotion that

misrepresent the nature, characteristics, and qualities of Counter-Defendants' goods and commercial activities, in violation of 11 U.S.C. § 1125(a).

174.    Counter-Defendants' conduct has caused damage and irreparable injury to Counter-Claimants, and unless restrained and enjoined by this Court, Counter-Defendants' conduct will continue to cause damage and irreparably injury to Counter-Claimants.

175.    Counter-Claimants have no adequate and complete remedy at law.

## SECOND CAUSE OF ACTION
[Trademark Infringement and False Advertising Under Delaware Common Law]

176.    Counter-Claimants reallege and incorporate by reference each and every allegation of paragraphs 92 through 169.

177.    Counter-Defendants have willfully and deliberately made false and misleading advertising and promotional statements that are material to consumers' purchasing decisions.

178.    Counter-Defendants' conduct constitutes false designations of origin and false and misleading descriptions and representations that are likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association of Counter-Defendants with Counter-Claimants, or as to the origin, sponsorship, or approval of Counter-Defendants' goods or commercial activities by Counter-Claimant, in violation of the common law of Delaware.

179.    Counter-Defendants' conduct constitutes false designations of origin and false and misleading descriptions and representations in commercial advertising and promotion that misrepresent the nature, characteristics, and qualities of Counter-Defendants' goods, services, and commercial activities, in violation of Delaware common law.

180.    Counter-Defendants' conduct has caused damage and irreparable injury to Counter-Claimants, and unless restrained and enjoined by this Court, Counter-Defendants' conduct will continue to cause damage and irreparably injury to Counter-Claimants.

181.   Counter-Claimants have no adequate and complete remedy at law.

### THIRD CAUSE OF ACTION
[Injury to Business Reputation and Dilution Under. 6 *Del. C.* § 3313]

182.   Counter-Claimants reallege and incorporate by reference each and every allegation of paragraphs 92 through 169.

183.   Counter-Defendants' conduct will cause a likelihood of injury to Counter-Claimants' business reputation and of dilution of the distinctive quality of a Counter-Claimants' trade mark and trade name, which are valid at common law.

184.   Counter-Defendants' conduct has caused damage and irreparable injury to Counter-Claimants, and unless restrained and enjoined by this Court, Counter-Defendants' conduct will continue to cause damage and irreparably injury to Counter-Claimants.

185.   Counter-Defendants have engaged in aforesaid conduct willfully and deliberately with knowledge of the damage and irreparable injury likely to result to Counter-Claimants.

186.   Counter-Claimants have no adequate and complete remedy at law.

### FOURTH CAUSE OF ACTION
[Violation of Delaware Deceptive Trade Practices Act, 6 Del. C. § 2532]

187.   Counter-Claimants reallege and incorporate by reference each and every allegation of paragraphs 92 through 169.

188.   The State of Delaware has an important interest in ensuring that persons and entities doing business in Delaware and with Delaware residents comply with Delaware law. Counter-Defendants' deceptive and unfair conduct, as well as their false and misleading advertising, implicate the public interest.

189.   Counter-Defendants' false and misleading advertising and promotional statements are material to consumers' purchasing decisions.

190.   Counter-Defendants' conduct constitutes deceptive trade practices, in violation of the Delaware Deceptive Trade Practices Act, 6 Del. C. § 2532.   Counter-Defendants' deceptive trade practices including, but are not limited to the following:

a)   Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of Nature's Code Hair, Skin & Nails products;

b)   Causing likelihood of confusion or misunderstanding as to Nature's Code products' affiliation, connection, or association with, or certification by, ProCaps or USP;

c)   Representing that QVC and Nature's Code goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

d)   Representing that James Rouse has a sponsorship, approval, status, affiliation, or connection that the person does not have;

e)   Representing that Nature's Code products are of particular standards, qualities, and grades when they are of another, including but not limited to representing that Nature's Code products are "certified" by USP;

f)   Disparaging the goods, services, or business of another by false or misleading representation of fact;

g)   Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; and

h)   Engaging in other conduct that similarly creates a likelihood of confusion or of misunderstanding.

191.   Upon information and belief, Counter-Defendants have knowingly and willfully made false designations, representations, and descriptions of their goods, services, and business,

and have knowingly and willfully created a likelihood of confusion or mistake among Counter-Claimants' and Counter-Defendants' customers.

192.   Counter-Defendants' conduct has caused damage and irreparable injury to Counter-Claimants, and unless restrained and enjoined by this Court, Counter-Defendants' conduct will continue to cause damage and irreparably injury to Counter-Claimants.

193.   Counter-Claimants have no adequate and complete remedy at law.

**FIFTH CAUSE OF ACTION**
[Unfair Competition Under Delaware Common Law]

194.   Counter-Claimants reallege and incorporate by reference each and every allegation of paragraphs 92 through 169.

195.   Counter-Defendants' conduct constitutes unfair competition under the common law of Delaware.

196.   Counter-Defendants' conduct has caused damage and irreparable injury to Counter-Claimants, and unless restrained and enjoined by this Court, Counter-Defendants' conduct will continue to cause damage and irreparably injury to Counter-Claimants.

197.   Counter-Defendants have engaged in aforesaid conduct willfully and deliberately with knowledge of the damage and irreparable injury likely to result to Counter-Claimants.

198.   Counter-Claimants have no adequate and complete remedy at law.

## SIXTH CAUSE OF ACTION

[Violation of Delaware Consumer Fraud Act, 6 Del. C. §§ 2511-2527][1]

199.    Counter-Claimants reallege and incorporate by reference each and every allegation of paragraphs 92 through 169.

200.    The State of Delaware has an important interest in ensuring that persons and entities doing business in Delaware and with Delaware residents comply with Delaware law. Counter-Defendants' deceptive and unfair conduct, as well as their false and misleading advertising, implicate the public interest.

201.    Counter-Defendants have willfully and deliberately made false and misleading advertising and promotional statements that are material to consumers' purchasing decisions and are likely to cause confusion or mistake among Counter-Claimants' and Counter-Defendants' customers.

202.    Counter-Defendants' conduct constitutes a violation of the Delaware Consumer Fraud Act, 6 Del. C. § 2513.

203.    Counter-Defendants' conduct has caused damage and irreparable injury to Counter-Claimants, and unless restrained and enjoined by this Court, Counter-Defendants' conduct will continue to cause damage and irreparably injury to Counter-Claimants.

204.    Counter-Claimants have no adequate and complete remedy at law.

---

[1]     Plaintiffs/Counter-Defendants cannot maintain their claim under the Delaware Consumer Fraud Act for want of standing in that they are competitors of Defendants/Counter-Claimants, instead of protected consumers.   This similarly forecloses the claim Defendants/Counter-Claimants state herein.    Nevertheless, Defendants/Counter-Claimants state this claim in the alternative in the event the Court disagrees with this view of standing.

## SEVENTH CAUSE OF ACTION
### [Tortious Interference With Contractual Relationship]

205.    Counter-Claimants reallege and incorporate by reference each and every allegation of paragraphs 92 through 169.

206.    Upon information and belief, through their conduct, Counter-Defendants purposefully and improperly induced or otherwise purposefully caused third parties not to enter into or continue their prospective contractual relationships as purchasers of Counter-Claimants' products.

207.    Counter-Defendants' conduct has caused damage and irreparable injury to Counter-Claimants, and unless restrained and enjoined by this Court, Counter-Defendants' conduct will continue to cause damage and irreparably injury to Counter-Claimants.

208.    Counter-Claimants have no adequate and complete remedy at law.

## EIGHTH CAUSE OF ACTION
### [Misappropriation]

209.    Counter-Claimants reallege and incorporate by reference each and every allegation of paragraphs 92 through 169.

210.    Counter-Defendants' use of the term "healthy hair, skin, and nails" constitutes misappropriation to their own benefit of the valuable goodwill, reputation, advertising, promotion, product development, and business properties of Counter-Claimants.

211.    Counter-Defendants' conduct has caused damage and irreparable injury to Counter-Claimants, and unless restrained and enjoined by this Court, Counter-Defendants' conduct will continue to cause damage and irreparably injury to Counter-Claimants.

212.    Counter-Defendants have engaged in aforesaid conduct willfully and deliberately with knowledge of the damage and irreparable injury likely to result to Counter-Claimants.

213.    Counter-Claimants have no adequate and complete remedy at law.

## NINTH CAUSE OF ACTION
[Unjust Enrichment]

214.    Counter-Claimants reallege and incorporate by reference each and every allegation of paragraphs 92 through 169.

215.    Counter-Defendants' conduct has caused and is causing them to become enriched without justification through the sales of products to customers who, absent Counter-Defendants' wrongful conduct, would purchase competing products from Counter-Claimants, thereby resulting in impoverishment of Counter-Claimants.

216.    Counter-Defendants and Counter-Claimants are related in that they are direct competitors, such that the wrongful conduct of Counter-Defendants results in sales to the detriment of Counter-Claimants.

217.    Counter-Defendants' conduct has caused damage and irreparable injury to Counter-Claimants, and unless restrained and enjoined by this Court, Counter-Defendants' conduct will continue to cause damage and irreparably injury to Counter-Claimants.

218.    Counter-Defendants have engaged in aforesaid conduct willfully and deliberately with knowledge of the damage and irreparable injury likely to result to Counter-Claimants.

219.    Counter-claimants have no adequate and complete remedy at law.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Counter-Claimants demand a trial by jury as to all issues so triable raised in their counter-claims.

**WHEREFORE**, Counter-Claimants respectfully request the judgment against Counter-Defendants as follows:

1.       Permanently enjoining Counter-Defendants, their agents, representatives, employees, assigns, and suppliers, and all persons acting in concert or privity with them, from directly or indirectly:

(a)       using the name "Healthy Hair Skin & Nails™" (and similar variations thereon), or using any other marks, words or names similar to Counter-Claimants' trademarks, trade name, and trade dress;

(b)       making false or misleading representations in commercial advertising and promotion regarding the nature, characteristics, or qualities of Counter-Defendants' hair, skin, and nails products;

(c)       making false or misleading representations in commercial advertising and promotion regarding the value of or price reductions associated with any of Counter-Defendants' products;

(d)       making false or misleading representations in commercial advertising or promotion regarding the certification of any of Counter-Defendants' products or their affiliation with USP;

(e)       making false or misleading representations in commercial advertising or promotion regarding the nature, characteristics, or qualities of Counter-Defendants' Vitamin D products;

(f)       making false or misleading representations in commercial advertising or promotion regarding the nature, characteristics, or qualities of Counter-Defendants' CardioQ10 product;

(g)      making false or misleading representations in commercial advertising and promotion regarding the nature, characteristics, or qualities of Counter-Defendants' Resveratrex products;

(h)      making false or misleading representations in commercial advertising or promotion of Counter-Defendants' products regarding the qualifications, training, accreditation, or certification of any on-air spokesperson or guest;

2.      Directing that Counter-Defendants engage in corrective advertising appropriate to remedy the injury caused Counter-Claimants;

3.      Awarding Counter-Claimants compensatory damages and any unjust enrichment or profits derived by reason of the unlawful conduct complained of herein as provided by law;

4.      Awarding Counter-Claimants treble damages as provided by law;

5.      Awarding Counter-Claimants exemplary damages as provided by law;

6.      Awarding Counter-Claimants their reasonable attorneys' fees, prejudgment interest, and costs of this action as provided by law; and

7.      Awarding such other legal or equitable relief as the Court may deem proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

———————————————————
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Defendants*

OF COUNSEL:

Jonathan F. Cohn
Gordon D. Todd
Matthew D. Krueger
SIDLEY AUSTIN LLP
1501 K Street
Washington, DC  20005
(202) 736-8000

James D. Arden
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY  10019
(212) 839-5300

March 1, 2010
3419011

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2010, I caused the foregoing to be electronically

filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to:

> Joseph Grey, Esquire
> Sean T. O'Kelly, Esquire
> CROSS & SIMON, LLC

I further certify that I caused copies of the foregoing document to be served on

March 1, 2010, upon the following in the manner indicated:

Joseph Grey, Esquire                                         *VIA ELECTRONIC MAIL*
Sean T. O'Kelly, Esquire
CROSS & SIMON, LLC
913 North Market Street
11th Floor
Wilmington, DE  19801

Jonathan E. Moskin, Esquire                            *VIA ELECTRONIC MAIL*
Britton Payne, Esquire
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY  10016


                                        */s/ Rodger D. Smith II*
                                        _____
                                        Rodger D. Smith II (#3778)