IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QVC, INC. and QHEALTH, INC., | ) | |
| | ) | |
| Plaintiffs/ | ) | |
| Counter-Defendants, | ) | |
| | ) | |
| v. | ) | C.A. No. 10-094 (SLR) |
| | ) | |
| YOUR VITAMINS, INC. d/b/a PROCAPS | ) | |
| LABORATORIES and ANDREW | ) | |
| LESSMAN, | ) | |
| | ) | |
| Defendants/ | ) | |
| Counter-Plaintiffs. | ) | |

## DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY [D.I. 4&5]

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Defendants*

OF COUNSEL:

Jonathan F. Cohn
Gordon D. Todd
Matthew D. Krueger
SIDLEY AUSTIN LLP
1501 K Street
Washington, DC  20005
(202) 736-8000

James D. Arden
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY  10019
(212) 839-5300

May 3, 2010

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTORITIES ......................................................................................... iii

NATURE AND STAGE OF PROCEEDINGS ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

STATEMENT OF FACTS ......................................................................................... 2

ARGUMENT ............................................................................................................. 6

I.  PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ................ 6

    A.  Mr. Lessman's Statements Were Not Literally False ............................... 7

        1.  Statements About QVC's Hair, Skin & Nails ............................ 8

            a.  99% Additives ........................................................... 8

            b.  Hyaluronic Acid ........................................................ 9

            c.  Lutein ...................................................................... 12

            d.  Silica ....................................................................... 13

            e.  Artificial Colors ...................................................... 14

            f.  Capsules and Tablets ............................................... 14

        2.  Statements About QVC's Reservatrex Products ....................... 15

            a.  "Healthy Heart Blend" ............................................ 15

            b.  Sugar in Resveratrex Drink ..................................... 15

            c.  Grape-Base of Resveratrex ...................................... 16

            d.  Added Colors ........................................................... 16

        3.  Opinion Statements About QVC's Dietary Supplements ........... 17

        4.  Third-Party Comments ............................................................. 18

    B.  Mr. Lessman's Statement Were Not Misleading .................................. 20

    C.  Plaintiffs Are Unlikely to Prevail Because of Their Own Unclean Hands ........... 21

II.     PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE INJURY ...................22

III.    THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH AGAINST
        GRANTING AN INJUNCTION .......................................................................................23

CONCLUSION..............................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Accu Personnel v. Accustaff, Inc.,
846 F. Supp. 1191 (D. Del. 1994) ........................................................................... 7

Alexander v. United States,
509 U.S. 544 (1993) ................................................................................................. 6

Bailey v. Systems Innovation, Inc.,
852 F.2d 93 (3d Cir. 1988) ...................................................................................... 6

Ben Ezra, Weinstein, & Co. v. AOL,
206 F.3d 980 (10th Cir. 2000) .............................................................................. 19

Beneficial Corp. v. F.T.C.,
542 F.2d 611 (3d Cir. 1976) .................................................................................. 24

Blumenthal v. Drudge,
992 F. Supp. 44 (D.D.C. 1998) ............................................................................. 19

Carafano v. Metrosplash.com, Inc.,
207 F. Supp. 2d 1055 (C.D. Cal. 2002), aff'd, 339 F.3d 1119 (9th Cir. 2003) ....... 19

Castrol Inc. v. Pennzoil Co.,
987 F.2d 939 (3d Cir. 1993) ............................................................................. 7, 17

Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth.,
148 F.3d 242 (3d Cir. 1998) .................................................................................. 24

Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.,
441 F. Supp. 2d 695 (M.D. Pa. 2006) ................................................................... 21

Diessner v. Mortgage Elec. Registration Sys.,
618 F. Supp. 2d 1184 (D. Ariz. 2009) .................................................................. 19

Dimeo v. Max,
433 F. Supp. 2d 523 (E.D. Pa. 2006) ............................................................... 18, 19

Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.,
847 F.2d 100 (3d Cir. 1988) .................................................................................. 23

Gerardi v. Pelullo,
16 F.3d 1363 (3d Cir. 1994) .................................................................................. 23

*Grand Ventures, Inc. v. Whaley*,
   632 A.2d 63 (Del. 1993) ...................................................................................7

*Green v. AOL*,
   318 F.3d 465 (3d Cir. 2003)....................................................................18, 19

*IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.*,
   250 Fed. Appx. 476 (3d Cir. 2007).................................................................23

*In re R.M.J.*,
   455 U.S. 191 (1982).......................................................................................24

*John P. Prods., Inc. v. CBS, Inc.*,
   10 F. Supp. 2d 395 (S.D.N.Y. 1998)..............................................................21

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*,
   19 F.3d 125 (3d Cir. 1994)......................................................................20, 21

*Langdon v. Google, Inc.*,
   474 F. Supp. 2d 622 (D. Del. 2007)...............................................................18

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*,
   511 F.3d 350 (3d Cir. 2007)............................................................................6

*Minn. Mining & Mfg. Co. v. Dentsply, Int'l, Inc.*,
   1994 WL 827735 (D. Del. Nov. 1, 1994) .......................................................20

*Monsanto Co. v. Rohm & Haas Co.*,
   456 F.2d 592 (3d Cir. 1972)......................................................................21, 22

*Monsanto Co. v. Syngenta Seeds, Inc.*,
   443 F. Supp. 2d 648 (D. Del. 2006).................................................................7

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
   290 F.3d 578 (3d Cir. 2002).................................................................6, 7, 20

*Parker v. Learn Skills Corp.*,
   530 F. Supp. 2d 661 (D. Del. 2008)....................................................14, 17, 19

*Pernod Ricard USA LLC v. Bacardi U.S.A., Inc.*,
   -- F. Supp. 2d -- , 2010 WL 1348241 (D. Del. Apr. 6, 2010)..........................20, 24

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
   227 F.3d 489 (5th Cir. 2000) ........................................................................17

*Procter & Gamble Co. v. Kimberly-Clark Corp.*,
   569 F. Supp. 2d 796 (E.D. Wisc. 2008).........................................................17

*Regscan, Inc. v. Dean Mark Brewer*,
   2006 WL 4100007 (E.D. Pa. Sept. 5, 2006) ..........................................................20

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
   902 F. 2d 222 (3d Cir. 1990) .................................................................7, 19, 20

*Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*,
   642 F. Supp. 2d 304 (D. Del. 2009) ...................................................................23

*Teleconference Systems v. Proctor & Gamble Pharm., Inc.*,
   676 F. Supp. 2d 321 (D. Del. 2009) .....................................................................8

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
   497 F.3d 144 (2d Cir. 2007) ...............................................................................17

*Triangle Publications v. Knight-Ridder Newspapers*,
   626 F.2d 1171 (5th Cir. 1980) ............................................................................24

## STATUTES

15 U.S.C. § 1125(a), (ii) ..............................................................................................6

42 U.S.C. § 230(c)(1) .................................................................................................18

42 U.S.C. § 230(e)(3) .................................................................................................18

42 U.S.C. § 230(f)(2) ..................................................................................................18

Delaware Consumer Fraud Act, 6 Del. C. 2513, 2525 ................................................6

Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6 § 2532, and (iii)........6

## OTHER AUTHORITIES

U.S. CONST. amend. I .................................................................................................24

16 C.F.R.§§ 255.5, 255.3(b) ......................................................................................19

Webster II New Riverside University Dictionary at 1084 (1984) ................................13

Webster's New World Dictionary at 691 (1966) .........................................................13

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs QVC Inc. and QHealth, Inc. filed false advertising claims against Defendants ProCaps Laboratories, Inc. and Andrew Lessman, D.I. 1 (Feb. 5, 2010), and moved for a temporary restraining order and preliminary injunction. *See* D.I. 4 (Feb. 9, 2010); *see also* Opening Brief in Support of Motion, D.I. 5 (Feb. 9, 2010) ("Op. Br."). Defendants have filed counter-claims based on Plaintiffs' false advertising and trademark infringement. D.I. 15 (Mar. 1, 2010). Pursuant to the Court's Order, D.I. 27 (Apr. 12, 2010), Defendants submit this Answering Brief in Opposition ("Opposition") to Plaintiffs' motion.

## INTRODUCTION AND SUMMARY OF ARGUMENT

While stealing the name of Defendants' most important and heavily promoted vitamin product, Plaintiffs misrepresented the efficacy and safety of their own. Most notably, QVC promoted its Hair, Skin & Nails product as containing "three dimensions" of support, even though two of these so-called dimensions do not support the health of hair, skin, and nails. QVC also invoked "certification" by United States Pharmacopeia ("USP") as guaranteeing the efficacy and safety of QVC's supplement, even though USP does not certify any products, let alone QVC's. These marketing tactics caused confusion and implied that Defendants' product was inferior – lacking key ingredients and possessing no USP certification.

In response, Mr. Lessman posted several blog entries clarifying that he had nothing to do with QVC's new product, and stating why QVC's promotions were misleading. Each and every one of Mr. Lessman's statements is true. Indeed, his statements serve the public interest by disclosing the products' true characteristics and alerting the public to important information, including the significant body of research demonstrating a relationship between cancer and hyaluronic acid (one of the ingredients in QVC's product). Plaintiffs' lawsuit and request for

injunctive relief are baseless attempts to silence Mr. Lessman and to shield QVC's product from fair and open scrutiny. Their motion should be denied for the following reasons:

1.      Plaintiffs are unlikely to succeed on the merits. Each of Defendants' statements is true on its face, not literally false. Moreover, Plaintiffs cannot prove that consumers were misled, and Plaintiffs' unclean hands foreclose their claims.

2.      Plaintiffs cannot show irreparable injury. Plaintiffs have conducted no consumer surveys and proffered no evidence of market-share loss or reputational injury. In any event, loss of sales can be remedied at law.

3.      The balance of harms and public interest do not favor an injunction, which would censor Mr. Lessman on issues vital to consumers.

## STATEMENT OF FACTS

The parties to this action are no strangers. Mr. Lessman began marketing ProCaps products on QVC in 1992. Lessman Decl. ¶ 5. After a successful five-year run, Mr. Lessman left QVC and thereafter began marketing his vitamins at QVC's chief rival, the Home Shopping Network ("HSN"). *Id.* ¶ 6. Defendants have enjoyed tremendous success at HSN, where some 13 years later, Mr. Lessman still markets his products today. *Id.* ¶ 8.

One of ProCaps' most successful products is Healthy Hair Skin & Nails$^{TM}$, a vitamin supplement designed to support the hair, skin, and nails. *Id.* ¶ 9, 11. Although "beauty vitamins" are not usually major sellers, in less than ten years, Healthy Hair Skin & Nails$^{TM}$ has enjoyed enormous success, with sales of more than $70 million reaching more than one million customers. *Id.* Defendants have generated incalculable goodwill in this product name, which is widely and closely associated with ProCaps and Mr. Lessman. *Id.* ¶ 11.

In November 2006, a QVC executive inquired of Mr. Lessman whether he would consider returning to QVC to replace its soon-to-be-retiring on-air vitamin spokesman. *Id.* ¶ 13.

This led to discussions with QVC executives, during which Mr. Lessman disclosed the critical importance of his Healthy Hair, Skin & Nails™ product. *Id.* ¶ 13-14. He explained that it was ProCaps' most successful stand-alone product in terms of on-air sales. *Id.* ¶ 14. It was also the most productive product in terms of generating re-orders and in terms of capturing valuable new customers for ProCaps and HSN. *Id.*

In November 2007, Mr. Lessman broke off discussions with QVC and elected to remain with HSN. *Id.* ¶ 13. Approximately two years later, on January 14, 2010, QVC rolled out a competing product, under the surprisingly similar name, "Hair, Skin & Nails." *Id.* ¶ 15. QVC launched this new product with substantial fanfare, giving it significant airtime and promoting it as a "Today's Special Value." *Id.* Notably, QVC did not market the product using its given name, but instead chose to call it "*Healthy* Hair, Skin & Nails" throughout QVC's broadcasts and website, thus misappropriating the precise product name that Defendants had worked for a decade to develop. *See* Lessman Decl. ¶ 16; *id.* Exs. A-C (show transcript, website pages, product purchase receipt). QVC's misappropriation resulted in immediate customer reaction, causing some confused consumers to inquire whether QVC was selling ProCaps' product, and many consumers to express outrage that QVC would use Defendants' product's name. *See* Lessman Decl. ¶ 17; Cohn Decl. Ex. A (comments posted on QVC's and Defendants' websites).

Moreover, in promoting its product, QVC made numerous false statements that unfairly disadvantaged Defendants' Healthy Hair Skin & Nails™. QVC's overriding sales pitch was that the four active ingredients in its product provide a unique "three dimensions of support":

> Number one, nutritional support coming from **biotin** and **silica**. Second dimension [is] antioxidant protection given through **lutein**. And then the third piece of protection, I love this one, **hyaluronic acid**. . . . This is all about the extra cellular matrix that actually helps to give structural support to the cells. So you're getting three dimensions, [Host], all in one tablet.

Cohn Decl., Ex. B (emphasis added); *see also id.*, Ex. C (graphic from video).   Although Defendants' Healthy Hair Skin & Nails product contains more than a dozen ingredients, it contains only two of Plaintiffs' four ingredients—biotin and silica, the so-called first dimension of support.   Defendants' product does not contain lutein or hyaluronic acid ("HA").   For this reason, QVC's spokesperson contended: "Outside of [biotin and silica], you will never see a product like this anywhere other than Nature's Code because you're getting three dimensions of support, [Host], for healthy hair, skin and nails."   *See* Cohn Decl., Ex. B.   QVC also claimed that its Hair, Skin & Nails product has "certification" by USP, which "can give you peace of mind" about its "safety and efficacy."   *Id.*   In fact, as Plaintiffs have conceded in this litigation, Reply to Counterclaims, ¶¶ 34-38, USP does not "certify" any products and did not certify Plaintiffs' products.   Nor does USP test safety or efficacy of products.   Nicolosi Decl. ¶ 12.

In response to QVC's actions—indeed, while QVC's presentation was still on the air— Mr. Lessman stated on his blog that the product being advertised on QVC was not ProCaps' Healthy Hair, Skin & Nails[TM].   *See* Cohn Decl., Ex. D (Jan. 14, 2010 blog post entitled "QVC's Hair Skin and Nails isn't Healthy … it is just sleazy and deceptive.").   Mr. Lessman informed his readers that "I have **nothing** to do with this product from QVC.   I find it shocking that they would use my exact product name to sell this product."   *Id.*   (emphasis in original).

Over the next few days, Defendants reviewed QVC's products and claims, and responded with three additional blog posts.   On January 19, 2010, Mr. Lessman wrote a blog entry entitled "A Quick Follow-up on QVC's Hair, Skin and Nails."   *See* Cohn Decl., Ex. E.   Mr. Lessman explained that, while the "Hair, Skin & Nails" name on QVC's product label was "harmless" and "generic," he objected to QVC promoting the product under his own precise product's name.   *Id.*

Next, on January 20, 2010, Mr. Lessman posted a blog entitled "QVC's Hair, Skin and Nails … Over 99% Additives!"  Lessman Decl., Ex. G.  Before posting the blog, Defendants ordered QVC's Hair, Skin & Nails product and weighed the tablet; it weighed 1480 mg. Lessman Decl. ¶ 31; *id.*, Ex. H.  Defendants also determined from the product label that the four claimed active ingredients – *i.e.*, the ingredients providing the "three dimensions of support" – weigh 14.6 mg, or less than 1% of the tablet's weight.  *Id.* ¶ 31.  QVC's product contains 15 other ingredients that QVC did not disclose on television or on its website.  The weight of these added ingredients comprise over 99% of the tablet's weight.  *Id.*

Mr. Lessman then discussed the product's four active ingredients, including HA and lutein, to explain why he specifically chose to exclude those two "dimensions" from his product. *Id.*, Ex. G.  Mr. Lessman stated that he "has never used" HA in his products because "there is no science that shows [HA] offers any benefits when taken orally," and because of a potential risk associated with HA.  *Id.*  Specifically, he stated that although "HA does not necessarily 'cause' cancer," there is a "significant body of troubling research that connects it to cancer."  *Id.*  With respect to lutein, Mr. Lessman observed that although it has some "ability to absorb harmful radiation," QVC's "formula provides only 0.6 mg, which is likely far below the levels required for this benefit to the skin."  *Id.*  He also explained that "[l]utein will NOT improve the growth of your hair, skin and nails."  *Id.*

Two days later, Mr. Lessman added a post addressing the contents and packaging of QVC's Resveratrex products, as well as the different sources of the compound resveratrol in them.  Cohn Decl., Ex. F.  Finally, on February 3, 4, and 5, 2010, Mr. Lessman added video posts discussing essentially the same content as his prior written posts.

Plaintiffs responded with this lawsuit and moved for a temporary restraining order and preliminary injunction.  In their papers, Plaintiffs mischaracterize the content of the blogs and attribute to Mr. Lessman statements he never made.  Because each of Mr. Lessman's actual statements is literally true or a non-actionable opinion, the motion should be denied.

## ARGUMENT

A preliminary injunction "is 'an extraordinary remedy, which should be granted only in limited circumstances.'"  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (citation omitted).  This is particularly true where, as here, the moving party seeks remedies "that actually forbid speech activities— classic examples of prior restraints."  *Alexander v. United States*, 509 U.S. 544, 550 (1993); *see also Bailey v. Systems Innovation, Inc.*, 852 F.2d 93, 98 (3d Cir. 1988).

A preliminary injunction may issue only if the Court is "convinced" that the plaintiff has shown that "each" of four factors "favors the requested relief":

> (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.

*McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir. 2007).  Here, none of the four factors favors an injunction.

## I.     PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS

Plaintiffs' motion fails because Plaintiffs cannot show a likelihood of success.  Plaintiffs seek preliminary injunctive relief under (i) the Lanham Act, 15 U.S.C. § 1125(a), (ii) the Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6 § 2532, and (iii) the Delaware

Consumer Fraud Act, 6 Del. C. 2513, 2525.[1]  *See* Op. Br. at 10-11.  Plaintiffs' claim under the

Delaware Consumer Fraud Act has no chance of success because, as competitors rather than

consumers, Plaintiffs lack standing.  *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 70 (Del.

1993).  Plaintiffs' remaining two claims are subject to the same analysis because "the Deceptive

Trade Practices Act affords no greater protection than the Lanham Act."  *Monsanto Co. v.*

*Syngenta Seeds, Inc.,* 443 F. Supp. 2d 648, 653 (D. Del. 2006).

To prevail on these claims, Plaintiffs must demonstrate, among other things, that "the

defendant has made false or misleading statements as to his own product [or another's]."

*Novartis*, 290 F.3d at 590.  Plaintiffs must show that the statements are either (1) "literally false"

or (2) have "the tendency to deceive consumers."  *Novartis*, 290 F.3d at 586.  Either way,

Plaintiffs "bear[] the burden of proving that a challenged [statement] is false or misleading, not

merely that it is unsubstantiated by acceptable tests or other proof."  *Sandoz Pharm. Corp. v.*

*Richardson-Vicks, Inc.*, 902 F. 2d 222, 228 (3d Cir. 1990).  Because Plaintiffs cannot carry this

burden, their request for injunctive relief should be denied.

### A.     Mr. Lessman's Statements Were Not Literally False

A "literally false" message may be "either explicit or conveyed by necessary

implication," but, in all cases, "only an *unambiguous* message can be literally false."  *Novartis*,

290 F.3d at 587.  Literal falsity must be discerned from a "facial analysis" of the statement, *id.*,

reading it "in full context," *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993).

Although a "completely unsubstantiated" statement is *per se* false, the plaintiff retains the burden

---

[1]      Plaintiffs' Complaint also alleges two Delaware common law counts (false advertising and unfair competition), D.I. 1, Complaint ¶¶ 62-66, 80-83, but Plaintiffs do not move for injunctive relief under those counts.  At any rate, those common law claims parallel the statutory claims.  *Accu Personnel v. Accustaff, Inc.*, 846 F. Supp. 1191, 1215-16 (D. Del. 1994).

to show literal falsity so long as a defendant has "some semblance of support" for his claims. *Novartis*, 290 F.3d at 589-90.

As explained below, Plaintiffs cannot show that Mr. Lessman's statements were literally false.  Indeed, Plaintiffs do not even challenge Mr. Lessman's principal points, including that the "four active ingredients" in QVC's Hair, Skin & Nails product comprise only "about 1%" of the weight of the tablet.  *See* Lessman Decl., Ex. G.  Instead, Plaintiffs pluck words out of context, misconstrue them, and attribute to Mr. Lessman statements he never made.  Read in full, Mr. Lessman's comments are all literally true or non-actionable statements of opinion.

      **1.**     **Statements About QVC's Hair, Skin & Nails**

        **a.**     **99% Additives**

Plaintiffs' papers hardly dispute Mr. Lessman's statement that QVC's Hair, Skin & Nails product is "99% additives."  *See* Op. Br. 5.  Nor could they.  The "weight of [a Hair, Skin & Nails tablet] is 1480 mg," and the four ingredients that QVC promoted as supporting the hair, skin, and nails total 14.6 mg.  Lessman Decl., Ex. G.  His statement thus reflected the unassailable mathematical conclusion that the other added ingredients constitute 99% of the product.  *See id.*; Op. Br., Yoegel Decl., Ex. C, at 4 (transcript of Mr. Lessman's video statement that "[i]t's 99% additives because the four ingredients [QVC] tell[s] us are their active ingredients weigh less than 15 milligrams, the tablet weighs almost 1500 milligrams.").

During their deposition of Mr. Lessman, Plaintiffs for the first time suggested that ingredients other than the four active ingredients provide some health benefit and, for that reason, are not additives.  *See* Cohn Decl., Ex. N (Deposition of Andrew Lessman, at 61 (Apr. 23, 2010) ("Lessman Dep.").  Not only is this argument waived, *see Teleconference Systems v. Proctor & Gamble Pharm., Inc.*, 676 F. Supp. 2d 321, 331 n.13 (D. Del. 2009), but it cannot be squared with QVC's promotion of its product.  QVC repeatedly marketed Hair, Skin &

Nails as delivering just four ingredients for hair, skin, and nails.  Cohn Decl., Ex. B (show transcript).  These four ingredients make up the so-called "three dimensions of support."  *Id.* Likewise, QVC's website formerly provided a "Supplement Facts" panel that describes only these four ingredients, and nowhere discloses the other ingredients.  Cohn Decl., Ex. G.  (QVC now provides no Supplement Facts panel at all for the product on its website.)  And the actual QVC Hair, Skin & Nails label lists only the four ingredients in bright red under the Supplement Facts panel, disclosing their weight, while listing all other ingredients only in small black print without their respective weights.  *Id.*, Ex. H.  QVC has not promoted the other ingredients, such as Calcium Carbonate and Dicalcium Phosphate, as delivering any benefits for hair, skin, and nails.

### b.      Hyaluronic Acid

Plaintiffs accuse Mr. Lessman of claiming that HA "is a carcinogen."  Op. Br. at 4; *see also id.* at 1, 12.  But Mr. Lessman made no such statement.  To the contrary, Mr. Lessman said that HA "does not necessarily 'cause' cancer, since it occurs naturally in the body."  Lessman Decl., Ex. G.  There is, however, "a significant body of troubling research that connects HA to cancer."  *Id.*  Ultimately, Mr. Lessman stated that Plaintiffs' product contains only 1 mg of HA, an "ultra-low level," so low that it is "all but meaningless" and "likely poses no risk."  *Id.*

Mr. Lessman's statements are true.  As Professor Nicolosi explains in his accompanying declaration, Mr. Lessman's comments accurately describe the current scientific literature on HA. *See* Nicolosi Decl. ¶¶ 11-13.  Before posting the statements, ProCaps's research staff and Mr. Lessman confirmed that a large body of scientific literature shows that HA is related to the growth and spread of cancer.  Lessman Decl. ¶ 33; *id.*, Ex. I (emails).  Following is just a small sample of the literature they reviewed, which amply substantiates Mr. Lessman's statement:

- "This volume attempts to bring attention to the critical role of HA in cancer biology, in its initiation, progression, and spread."  Robert Stern, Hyaluronan in Cancer Biology, xix (2009) (Lessman Decl., Ex. K).

- "HA has been associated with aberrant cell behavior in cancer development and progression."  Patel, et al. *The Role of Hyaluronan in Cancer*, in Chemistry and Biology of Hyaluronan, 285 (Garg & Hales eds. 2004) (Lessman Decl., Ex. L).

- "[HA] and its biosynthetic enzymes, HA synthases (HAS1, 2, and 3) are thought to participate in cancer progression. . . .  [A]ddition of exogenous HA restored invasion [of the extracellular matrix by colon carcinoma cells]."  Kim, et al., *Hyaluronan Facilitates Invasion of Colon Carcinoma Cells* in Vitro *via Interaction with CD44*, Cancer Research 64, 4569 (July 1, 2004) (Lessman Decl., Ex. J, at YV_PI_29).

- "Adhesion [of cancer cells] to the ECM [extracellular matrix] is a prerequisite to" the "process of metastasis." . . .  Scientific "[r]eports suggest that HA may play a critical role in facilitating cellular adhesion necessary for metastasis in some tumors."  Laurich, et al., *Hyaluronan Mediates Adhesion of Metastatic Colon Carcinoma Cells*, J. of Surgical Research, 122, 70-74 (2004) (Lessman Decl., Ex. J, at YV_PI_38).

- "A [HA]-rich environment often correlates with tumor progression, and may be one mechanism for the invasive behavior of malignancies."  Shuster, et al., *Hyaluronidase Reduces Human Breast Cancer Xenografts in SCID Mice*, Int. J. Cancer, 102, 192-97 (2002) (finding that the increases in the enzyme that degrades HA (*i.e.*, hyaluronidase) may reduce tumor growth) (Lessman Decl., Ex. J, at YV_PI_50).

HA's relationship with cancer is such a fundamental principle of cellular biology that a 468-page book was recently published entitled "Hyaluronan in Cancer Biology."  Lessman Decl. ¶ 34; *id.*, Ex L.  When Mr. Lessman entered the words "cancer" and "hyaluronic acid" into the online database (PubMed) maintained by the U.S. National Library of Medicine and the National Institutes of Health, more than 2,100 citations were returned.  Lessman Decl. ¶ 34.  Indeed, HA's association with cancer is noted in such common sources as Wikipedia.  *See id.*; *id.*, Ex. M.

Not only was Mr. Lessman's statement true, it was a necessary response to QVC's deceptive promotion of its Hair, Skin & Nails product.  QVC claimed that HA provided an additional "dimension" of support that Mr. Lessman's product lacked.  Cohn Decl., Ex. B.  And QVC falsely invoked a non-existent "certification" by claiming that USP certified its product as

safe, while saying nothing about the research connecting HA to cancer. *Id.* Against that backdrop, Mr. Lessman's statement fairly responded and also defended his product.

During their deposition of Mr. Lessman, Plaintiffs probed whether the scientific literature specifically addressed the relationship between cancer and HA delivered orally, as opposed to HA delivered through other routes (like injection) or naturally occurring in the body. Cohn Decl., Ex. N (Lessman Dep. at 32). If Plaintiffs raise such a distinction in their reply brief, it would be meritless. The research demonstrates that HA generally promotes the growth and spread of cancer because of its presence and role in the "extracellular matrix." Nicolosi Decl. ¶ 12.[2] QVC claims that the HA in its product "is all about the extracellular matrix." Cohn Decl., Ex. B (show transcript); *see also id.* ("this is obviously coming on the cellular level"); *id.* ("[HA] is all about making sure that a structural support is given to you in the extra extracellular matrix of the cells themselves."). If QVC is correct that its product delivers HA to the extracellular matrix, then the significant body of research that Mr. Lessman identified cannot be ignored. Moreover, as Mr. Lessman stated in his blog, the science does not show HA to be beneficial when delivered orally, Nicolosi ¶¶ 9-10, which might explain why the research on HA and cancer does not focus on oral delivery. In any event, Mr. Lessman made clear that QVC's product contains only a miniscule amount of HA (1 mg) and thus "likely poses no risk." Lessman Decl., Ex. G.

---

[2]      *See also, e.g.* Kim, et al., *Hyaluronan Facilitates Invasion of Colon Carcinoma Cells* in Vitro *via Interaction with CD44*, Cancer Research 64, 4569 (July 1, 2004) (Lessman Decl., Ex. K, at YV_PI_29) ("pericellular HA is critical for" colon cancer cells' "invasion of the extracellular matrix"); Laurich, et al., *Hyaluronan Mediates Adhesion of Metastatic Colon Carcinoma Cells*, J. of Surgical Research, 122, 70-74 (2004) (Lessman Decl., Ex. K, at YV_PI_37) ("pericellular HA mediates adhesion to the ECM"); Shuster, et al., *Hyaluronidase Reduces Human Breast Cancer Xenografts in SCID Mice*, Int. J. Cancer, 102, 192-97 (2002) (Lessman Decl., Ex. K, at YV_PI_50) ("Hyaluronan . . . is prominent in the extracellular matrix surrounding cancer cells . . .  Hyaluronan promotes growth and spread of tumor cells.").

Plaintiffs also implied that they may argue that certain scientific studies suggest that HA can play a beneficial role in reducing tumor growth.  *See* Cohn Decl., Ex. N (Lessman Dep. at 19-20).  As an initial matter, Plaintiffs have never before suggested that HA reduces the risk of cancer, even though they readily have made cancer-risk reduction claims for other products.  *See, e.g.*, Cohn Decl., Ex. I (Vitamin D promotion).  This is not surprising, because the studies suggesting that HA can play a beneficial role are limited and the exceptions to the norm.  *See* Nicolosi Decl. ¶ 11 n.7; Lessman Decl., Ex. J, at YV_PI_1-2 (Adamia, et al., *Hyaluronan and Hyaluronan Synthases: Potential Therapeutic Targets in Cancer*, Current Drug Targets, 2005, 5:3-14 (noting such studies but concluding that HA, "a core component of [the extracellular matrix], contributes to certain types of cancer development").  In any event, the existence of some isolated and explainable exceptions is expected in the biological sciences and does not negate the substantial body of science supporting Mr. Lessman's statement.  Plaintiffs can present their own view of the scientific literature, but they should not be awarded an injunction silencing Defendants.

Plaintiffs also dispute Mr. Lessman's statement that "there is no science that shows HA offers any benefit when taken orally."  Compl. ¶ 27(d); Op. Br., Davis Decl. ¶ 9.  But Plaintiffs' declarant relies on a single, very small pilot study, which, in fact, concluded that any reduction in joint pain experienced by people taking HA orally was *not* statistically distinguishable from the effect of a placebo.  *See* Nicolosi Decl. ¶ 9.  Thus, plaintiffs cannot carry their burden.

### c.      Lutein

Plaintiffs take issue with Mr. Lessman's comments regarding lutein.  Plaintiffs do not, however, dispute that the 0.6 mg of lutein is likely insufficient to impart any benefit.  Nor do they dispute that lutein will not improve hair, skin, or nail growth.  Instead, Plaintiffs' argue that

Mr. Lessman "falsely *attribute[d]* to QVC a claim it has not made, namely that lutein will improve growth of hair, skin, and nails." Op. Br. at 5; *see also id.* at 14; *id.*, Davis Decl. ¶ 12.

This argument is meritless.  As an initial matter, Mr. Lessman did not "attribute" anything to QVC except the inclusion of an ingredient in its hair, skin, and nails product that does nothing to promote the growth of hair, skin, and nails.  In any event, Plaintiffs' argument ignores how QVC has marketed the product.  During its broadcasts, QVC repeatedly claimed that lutein provides one of the "three dimensions" of support for hair, skin, and nails.  Cohn Decl., Ex. B; *see also id.*, Ex. C (QVC graphic claiming "three layers of protection"); *id.*, Ex. G (product label).  Given Plaintiffs' marketing, Mr. Lessman had every right to inform consumers that "Lutein will NOT improve the growth of your hair, skin and nails."  Lessman Decl., Ex. G.

### d.   Silica

Mr. Lessman's statements regarding silica—an ingredient that is in both his product and Plaintiffs' product—were also literally true.  Mr. Lessman wrote:

> **Silica (from Silicon Dioxide).**  We are all familiar with the more common names for Silica: Sand or Glass.  Sil**ica** is the oxide form of the mineral Sili**con**, but it is not the ideal form, since it is virtually insoluble (think of glass or sand).  We also use Silica in our **Healthy Hair Skin & Nails**, but because we recognize its solubility limitations, we include our Soluble Organic Silica.

*See* Lessman Decl., Ex. G (emphasis in original).  Mr. Lessman also noted, in response to a comment on the blog, that although silica is not "totally insoluble," it "possesses very limited solubility."  Op. Br., Yoegel Decl. Ex. A, at 13-14.[3]

As Professor Nicolosi explains, these statements accurately describe the properties of silica, which is the molecule in sand and glass and which is known to be virtually insoluble.  *See* Nicolosi Decl. ¶ 16; *see also* Webster's New World Dictionary at 691 (1966) (Silica: "the

---

[3]      For this reason, Mr. Lessman explained, Soluble Organic Silicon is added to ProCaps products "to insure that even those with absorptive challenges and/or limited Silicon in their diets will be assured of getting the small amounts of Silicon we all need."  Lessman Decl., Ex. G.

dioxide of silicon, SiO$_2$, a hard, glassy mineral found in a variety of forms, as quartz, sand, etc."); Webster II New Riverside University Dictionary at 1084 (1984) (Silica:  "occurring as . . . sand . . . and used to make glass and concrete").

Moreover, contrary to Plaintiffs' claim, Compl. ¶ 27(i)-(k), Mr. Lessman did not "false[ly] imply superiority" of "the silica ProCaps uses" over the silica in Plaintiffs' products.  Mr. Lessman's point was simply that one of the four "active" ingredients in Plaintiffs' product is known to have significant solubility problems, which he admits occur in his products as well.  Critically, Plaintiffs do not dispute Mr. Lessman's statement that silica has limited solubility.  Although Plaintiffs assert that they use a form of silica "structur[ally] engineered to maximize absorption," *Id.* ¶ 27(j), they do not contend that, even as "maximized," the absorption is anything but limited.  Nor could they.  *See* Nicolosi Decl. ¶ 16.

### e.  Artificial Colors

Plaintiffs accuse Mr. Lessman of falsely suggesting that the artificial colors in QVC's Hair, Skin & Nails are "dangerous or unwholesome."  *See* Op. Br. at 5, 13.  Mr. Lessman made no such statement.  Rather, he simply pointed out the undisputed fact that among the product's many additives are two artificial colors, and that QVC fails to disclose these artificial colors on its website.  Lessman Decl., Ex. G.  Because of this omission, "QVC prevents you from knowing what's in this product until you get it home."  *Id.*; *see also* Nicolosi ¶¶ 3, 8.  This matters because many consumers seek to avoid artificial colors, *see* Nicolosi ¶ 8, as QVC itself has recognized, trumpeting its joint supplement as being free of artificial colors*, see* Cohn Decl., Ex. J.

### f.  Capsules and Tablets

Plaintiffs also allege that Mr. Lessman falsely implied that tablets are inferior to capsules.  *See* Op. Br. at 5, 8, 13.  Although Mr. Lessman did not compare tablets to capsules on the blogs about which Plaintiffs complain, he has expressed his preference for capsules in other video and

television appearances.  Mr. Lessman's preference is a non-actionable statement of opinion.  *See Parker v. Learn Skills Corp.*, 530 F. Supp. 2d 661, 679 (D. Del. 2008).  Moreover, many consumers share his preference, either because they find capsules easier to swallow or digest, or because capsules are less likely to contain "a matrix of processing aids and excipients," Compl. ¶ 27 (f); *see* Cohn Decl., Exs. A, K (consumer comments); Nicolosi Decl. ¶ 8.

### 2.    Statements About QVC's Resveratrex Products

Plaintiffs' claims regarding QVC's Resveratrex products likewise distort Mr. Lessman's actual statements, all of which are literally true.

### a.   "Healthy Heart Blend"

Plaintiffs accuse Mr. Lessman of claiming that the "Healthy Heart Blend" of botanical ingredients included in their Resveratrex product is "'meaningless' and lacking efficacy."  Op. Br. at 13.  But Mr. Lessman did not say that.  Instead, he simply criticized how QVC presents the *list* of botanicals on the Resveratrex product labels.  *See* Cohn Decl., Ex. F ("an all but meaningless *list* of seven different botanicals") (emphasis added).  Neither label provides the amount or standardization[4] of the many different ingredients within the "Healthy Heart Blend." *Id.*, Ex. L (product labels).  Consequently, as Mr. Lessman wrote:  "You have NO idea how much you get of each of the seven … none at all.  In short, you know nothing about the quantity, quality, standards, or nature of any of this Healthy Heart Blend."  Cohn Decl., Ex. F.  QVC has not disputed this statement, which is undeniably true.  *See* Nicolosi Decl. ¶¶ 23-26.

### b.   Sugar in Resveratrex Drink

Next, Plaintiffs argue that Mr. Lessman falsely implied that the Resveratrex drink is "artificially sweetened."  Op. Br. at 7, 13.  Mr. Lessman said no such thing.  Rather, he observed

---

[4]    "Standardization" refers to the concentration of a desired beneficial compound within a botanical ingredient.  Thus, 200 mg of a botanical with a 50% standardization for a compound of interest delivers 100 mg of that desired compound.

that the drink contains "sugar" from grape concentrate—a natural, not artificial, sweetener. Cohn Decl., Ex. F.  Mr. Lessman's point was that "**Sugar** [is] the dominant ingredient in the Healthy Heart Blend" in the Resveratrex drink.  *Id.*  As Mr. Lessman remarked, "four grams of sugars" is a *lot* for a vitamin supplement.  *Id.*; *see also* Nicolosi Decl. ¶¶ 5, 27-28.   Further, the amount of sugar and its source—grape concentrate added to the so-called "Healthy Heart Blend"—may come as a surprise to consumers. [5]   Nicolosi Decl. ¶¶ 5, 27.  Plaintiffs do not dispute the truth of Mr. Lessman's actual statements.

### c.       Grape-Base of Resveratrex

Plaintiffs claim that Mr. Lessman falsely stated that Resveratrex is not "grape-based" or "of the vine."  Op. Br. at 13.  Mr. Lessman stated precisely the opposite, by acknowledging that Resveratrex contains "Grape Concentrate," "grape extract[,] and Muscadine grape seed extract." Cohn Decl., Ex. F.  Mr. Lessman's point was that the grape in the Resveratrex products is not their principal source of resveratrol.  *See id.* ("most of the Resveratrol comes from Polygonum Cuspidatum"); *id.* ("the primary source of Resveratrol in this product is NOT Red Wine or even Grapes").  Plaintiffs' papers confirm that Mr. Lessman's statements are true.  *See* Op. Br. at 8 (noting that "Polygonum Cuspidatum [is] the principal source of Resveratrol in Resveratrex").

### d.       Added Colors

Plaintiffs argue that Mr. Lessman falsely asserted that the carmine coloring of the Resveratrex tablet is "artificial or unwholesome."  This, too, is incorrect.  Mr. Lessman explicitly stated that "the Artificial Colors that were present in this product have apparently now been removed and it is [now] colored with Caramel and Carmine."  Cohn Decl., Ex F.  Mr. Lessman

---

[5]       Plaintiffs are thus incorrect when they assert that Mr. Lessman admitted not knowing the source of the sugar in Plaintiffs' product.  *See* Op. Br. at 15.  He identified the source precisely.

did not claim that these natural coloring additives have any detrimental health effects (though

they might, *see* Nicolosi Decl. ¶ 24).

### 3.    Opinion Statements About QVC's Dietary Supplements

The remainder of Mr. Lessman's statements challenged by Plaintiffs are simply opinions

and therefore not actionable.  The Lanham Act and Delaware law prohibit only "statements of

fact capable of being proven false."  *Parker*, 530 F. Supp. 2d at 679; *see Castrol Inc.*, 987 F.2d

at 945.  The law does not reach "personal opinions on nonverifiable matters."  *Parker*, 530 F.

Supp. 2d at 679.  These include statements the accuracy of which depends on customers'

subjective evaluations.  *E.g.*, *Procter & Gamble Co. v. Kimberly-Clark Corp.*, 569 F. Supp. 2d

796, 800-02 (E.D. Wisc. 2008) (rejecting attack on Huggies Diapers' claim to "fit more

naturally" because it was "an assertion whose truth depends solely on customer opinion"); *see*

*also Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 498-99 (5th Cir. 2000) (rejecting

attack on Papa John's Pizza's claim to have "Better Ingredients, Better Pizza").

Plaintiffs attack Mr. Lessman as having claimed that their products are "inferior," of

"poor" and "questionable quality," Op. Br. at 1, 5, 13, and a "terrible imitation," Compl. ¶ 27(a).[6]

Plaintiffs likewise claim that Mr. Lessman falsely described their Resveratrex products as "sad,"

"disturbing," "heart-breaking," Op. Br. at 8, and "disappointing," Compl. ¶ 43(b).  These are all

quintessential opinion statements, akin to "a general claim of superiority over comparable

products that is so vague that it can be understood as nothing more than a mere expression of

opinion."  *Pizza Hut, Inc.*, 227 F.3d at 497; *see Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497

F.3d 144, 160 (2d Cir. 2007) (same).

---

[6]    Although Plaintiffs' attack Mr. Lessman's statement that the "Q in QVC … stand[s] for
Questionable," *e.g.*, Op. Br. at 1, this is simply opinion, irony, and satire, not the stuff of liability.

Finally, Plaintiffs distort Mr. Lessman's words in claiming he stated that QVC's products are "unhealthy," Op. Br. 1, 5, 13.  He did not use that word.  The title of Mr. Lessman's first responsive blog posting was "QVC's Hair Skin and Nails isn't Healthy…it is just sleazy and deceptive," but that plainly refers to QVC's appropriating the word "Healthy" from his product's name—*Healthy* Hair, Skin & Nails—and does not comment on the healthfulness of QVC's product.  In any event, as discussed above, after acknowledging that 3 mg of biotin is "a great start," Mr. Lessman's account of the remaining active ingredients and additives are all true. Lessman Decl., Ex. G.

### 4.  Third-Party Comments

Plaintiffs separately seek to hold Defendants liable for comments posted by third-parties. *See* Op. Br. at 5-7, 10.  This claim is foreclosed by the Communications Decency Act ("CDA"), which states:  "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 42 U.S.C. § 230(c)(1).  This safe harbor "'precludes courts from entertaining claims that would place a computer service provider in a publisher's role,' and therefore bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions— such as whether to publish, withdraw, postpone, or alter content.'"  *Dimeo v. Max*, 433 F. Supp. 2d 523, 528 (E.D. Pa. 2006) (quoting *Green v. AOL*, 318 F.3d 465, 471 (3d Cir. 2003)). Additionally, CDA immunity preempts state law claims.  *See* 42 U.S.C. § 230(e)(3); *id.* § 230(b)(2); *see also Green*, 318 F.3d at 471; *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 626 (D. Del. 2007).

CDA immunity applies when:  (1) the defendant is a provider or user of an "interactive computer service," which is any "system, or access software provider that provides or enables computer access by multiple users to a computer server," 42 U.S.C. § 230(f)(2); (2) the claims

treat the defendant as a publisher or speaker of information; and (3) the challenged communication was provided by another content provider. *Dimeo*, 433 F. Supp. 2d at 529. Each element is met here. First, Mr. Lessman's blog is both a "provider" of "interactive computer services," because it enables readers to access a computer server that hosts the blog, and also a "user" of "interactive computer services," because it uses an internet service provider, XO Communications, to access the Internet. *See* Lessman Decl. ¶ 27; *see Dimeo*, 433 F. Supp. 2d at 529 (website is both a provider and user of interactive computer service under the CDA). Second and third, Plaintiffs seek to hold Defendants liable for failing to edit or delete comments made by third parties. *See Dimeo*, 433 F. Supp. 2d at 530 (finding website entitled to immunity).

Courts have repeatedly held that a website operator is not responsible for third-party posts. *See*, *e.g.*, *Green*, 318 F.3d at 471; *Carafano v. Metrosplash.com, Inc.,* 207 F. Supp. 2d 1055, 1065-66 (C.D. Cal. 2002), *aff'd*, 339 F.3d 1119 (9th Cir. 2003); *Ben Ezra, Weinstein, & Co. v. AOL*, 206 F.3d 980, 985 (10th Cir. 2000); *Blumenthal v. Drudge*, 992 F. Supp. 44, 49-53 (D.D.C. 1998). Thus, the CDA forecloses liability under each of Plaintiffs' claims.[7]

Moreover, even if Defendants could be liable for third-party comments, Plaintiffs' claims would still fail because the comments are non-actionable statements of opinion. Contrary to Plaintiffs' suggestion (Op. Br. 5), none of the comments states that QVC's Hair, Skin & Nails is

---

[7]     Plaintiffs also argue half-heartedly that Mr. Lessman's blog "violates FTC regulations by failing to disclose the terms of defendants' relationship with HSN." Op. Br. at 16. This argument fails because "there is no private right of action under the FTCA, 'which vests initial remedial power solely in the Federal Trade Commission.'" *Diessner v. Mortgage Elec. Registration Sys.*, 618 F. Supp. 2d 1184, 1191 (D. Ariz. 2009); *see also Sandoz*, 902 F.2d at 231 (declining to read a private right of action to enforce FTC and FDA statutes and regulations into the Lanham Act). Nor, in any event, do the FTC guidelines provide any support for Plaintiffs' claims. *See* 16 C.F.R. §§ 255.5, 255.3(b) (addressing failure to disclose endorsement or expert testimonials, neither of which HSN provides on Mr. Lessman's blog).

"a carcinogen." *See* Yoegel Decl. Ex. A.  Rather, the comments reflect readers' own generalized

opinions, such as "QVC Natures Code is a joke." *Id.*; *see also Parker*, 530 F. Supp. 2d at 679.

> **B.     Mr. Lessman's Statement Were Not Misleading**

Because Plaintiffs cannot show that Mr. Lessman's statements were literally false,

Plaintiffs can succeed only by showing that the statements were misleading. *Novartis*, 290 F.3d

at 586.  However, a statement "that is truthful on its face cannot be proven misleading" by

reference to extrinsic evidence, like "surveying customers." *Pernod Ricard USA LLC v. Bacardi

U.S.A., Inc.*, -- F. Supp. 2d --, 2010 WL 1348241, at *8 (D. Del. Apr. 6, 2010).  As demonstrated

above, each of Mr. Lessman's statements is "truthful on its face" or non-actionable opinion.

In any event, Plaintiffs must show "actual deception or at least a tendency to deceive a

substantial portion of the intended audience." *Novartis*, 290 F.3d at 590.  To do this, Plaintiffs

cannot rest on their subjective belief that customer confusion will result, but must adduce

evidence "to establish the reasonableness of the belief." *Warner-Lambert*, 204 F.3d at 96.

Customer-confusion claims "usually turn[] on the persuasiveness of a consumer survey."

*Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19

F.3d 125, 129-30 (3d Cir. 1994); *Sandoz*, 902 F.2d at 229 (plaintiff "*must* produce consumer

surveys or some surrogate therefore") (emphasis added).  Absent a consumer survey, the plaintiff

must proffer some acceptable surrogate such as market-share data. *Novartis*, 290 F.3d at 595-96;

*Sandoz*, 902 F.2d at 229.

Plaintiffs have not presented a single consumer survey or any market-share data.  Instead,

Plaintiffs claim that a few customer comments, which Plaintiffs cherry-picked from

Mr. Lessman's blog and QVC's website, suggest actual confusion. *See* Op. Br. at 6; *id.*, Yoegel

Decl. Exs. A & B.  But such scant and selective evidence is not enough. *See, e.g.*, *Regscan, Inc.

v. Dean Mark Brewer*, 2006 WL 4100007, at *5 (E.D. Pa. Sept. 5, 2006) (dismissing claim

where "plaintiff failed to submit any consumer survey or other such evidence necessary to prove actual deception"); *Minn. Mining & Mfg. Co. v. Dentsply, Int'l, Inc.*, 1994 WL 827735, at *4 (D. Del. Nov. 1, 1994) (holding that inquiries from public regarding representations are not proof of confusion among the target audience of consumers); *John P. Prods., Inc. v. CBS, Inc.*, 10 F. Supp. 2d 395, 397-98 (S.D.N.Y. 1998) (affidavits of three concert attendees out of 3800 did not support summary judgment); *see also, e.g.*, *Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 2d 695, 710 (M.D. Pa. 2006) ("A single incident of customer confusion is not sufficient to establish a Lanham Act claim.").[8]

Moreover, Plaintiffs do not dispute many of Mr. Lessman's principal critiques, including that the four active ingredients in Hair, Skin & Nails comprise only 1% of the product and that QVC failed to disclose on its website and on television the 15 ingredients comprising 99% of the product. The negative comments from consumer may reflect nothing more than agreement with Mr. Lessman on these undisputed points. The comments may also reflect a negative view of QVC's products that pre-dates Mr. Lessman's blog postings. *See* Cohn Decl., Ex. K, at 5-7 (comments on QVC's website); *see also id.*, Ex. M (comments on Mr. Lessman's blog). Plaintiffs have not shown that Mr. Lessman misled consumers.

### C.    Plaintiffs Are Unlikely to Prevail Because of Their Own Unclean Hands

Even if Plaintiffs could show that Mr. Lessman's statements were literally false or misleading, Plaintiffs' claims would still fail because their misconduct bars recovery. Plaintiffs'

---

[8]     Plaintiffs also invoke "a presumption of likelihood of confusion" on the ground that Defendants "deliberately" misled consumers. Op. Br. 19. The Third Circuit has not adopted this presumption. *See Johnson & Johnson*, 19 F.3d at 130-32 (reserving the issue). In any event, Plaintiffs cannot support it. Defendants carefully avoided critiquing QVC for years even while commenting on other brands, and changed course only after QVC began promoting its product under Defendants' name and with unfair and misleading claims. Lessman Decl. ¶¶ 22-24. At that point, Defendants had no choice but to clarify the products' identities and attributes; Defendants' intent was simply to tell the truth and to inform consumers.

motion arises in equity and "concerns the public interest as well as the private interest of litigants." *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 598 (3d Cir. 1972).  Accordingly, the unclean hands doctrine has "significant proportions" in this case.  *Id.*  Plaintiffs have engaged in numerous unfair and deceptive tactics to promote their competing supplements.  Most notably, Plaintiffs misappropriated the name of Defendants' product.  *See supra* 2-4; Lessman Decl. ¶¶ 15-18.  In addition, Plaintiffs claimed that their products are USP certified for safety and efficacy.  As Plaintiffs have already admitted, this claim is false.  *See* D.I. 25, Reply to Counterclaims, ¶¶ 34-38.  Finally, Plaintiffs failed to disclose, on their website and on television, the 15 ingredients that make up 99% of the weight of their Hair, Skin & Nails product, and Plaintiffs never disclosed the voluminous research connecting HA to cancer, instead claiming falsely that USP certified the product as safe.  Plaintiffs' unclean hands bar their claims.

## II.     PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE INJURY

In any event, Plaintiffs' request for injunctive relief must be denied because they have not demonstrated irreparable injury.  Plaintiffs assert a loss of market share and reputational harm, *see* Op. Br. at 17-20, and baldly allege that consumers are returning products and refusing to make additional purchases because of Mr. Lessman's blogs.  Op. Br. at 18.  But Plaintiffs fail to proffer any supporting data on product sales or returns.

Instead, Plaintiffs point again to the same handful of customer statements posted on Mr. Lessman's blog—the vast majority of which simply express a preference for ProCaps' products. *See, e.g.*, Op. Br. at 6 ("Your loyal HSN customers LOVE you and are very angry & disappointed at QVC for going so low in trying to make vitamin and supplement sales."); Yoegel Decl. Ex. A.  Plaintiffs' also point to a few comments submitted to QVC directly, *see* Yoegel Decl. Ex. B, but only one obliquely suggests that the author will not purchase QVC's products again, whereas the other comments suggest that the authors never were QVC customers.  *Id.*

At any rate, apart from counsel's *ipse dixit*, Plaintiffs make no showing that any alleged lost sales are not fully compensable through money damages.  Although "loss of market share can constitute irreparable harm," "a preliminary injunction should not be granted if the injury suffered by the moving party can be recouped in monetary damages." *IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.*, 250 Fed. Appx. 476, 479 (3d Cir. 2007); *see also Gerardi v. Pelullo*, 16 F.3d 1363, 1373-74 (3d Cir. 1994); *Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102-03 (3d Cir. 1988) (loss of sales is not irreparable injury).  Visits to the disputed blogs have become infrequent at best with most receiving just a few dozen visits for the entire month of April.  That number includes visits by people working on this litigation, such that, very few consumers are still reading the blogs in question.  Lessman Decl. ¶ 29.  Any loss of sales going forward would be marginal and easily compensated.  Injunctive relief is not necessary.

## III.  THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH AGAINST GRANTING AN INJUNCTION

Because Plaintiffs are unlikely to prevail on the merits and have not demonstrated irreparable injury, the Court need not address the final two factors:  the balance of harms to Plaintiffs and Defendants, and the public interest.  *Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*, 642 F. Supp. 2d 304, 309 (D. Del. 2009).  Nevertheless, these factors also independently compel a denial of an injunction.

The balance of harms is clear.  The requested injunction would restrain Defendants from speaking out against Plaintiffs' misconduct and providing consumers with valuable and important health information.  To this day, Plaintiffs' website contains no complete list of ingredients and continues to host a video promoting their product as "*Healthy* Hair, Skin & Nails."  Lessman Decl. ¶ 18.  And Plaintiffs continue to assert that the HA and lutein in their product offers entire "dimensions" not found in Defendants' product.  Likewise, Plaintiffs

continue to claim falsely that the HA in their product is "certified" as safe and effective by USP, even though they have admitted in this litigation that USP has not certified the products. *See* D.I. 25, Reply to Counterclaims, ¶¶ 34-38.

Mr. Lessman's statements, shared on his blog, are constitutionally protected speech. *See Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth.*, 148 F.3d 242, 247 (3d Cir. 1998). Even to the extent Mr. Lessman's statements are commercial, they still enjoy "First Amendment protect[ions]." *Pernod Ricard*, 2010 WL 1348241, at *8; *In re R. M. J.*, 455 U.S. 191, 203 (1982). Courts should not issue injunctions to preclude defendants from making statements not yet adjudged to be false or misleading, and in no event should an injunction restrict truthful, non-misleading speech. *See Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 619 (3d Cir. 1976). As demonstrated above, *none* of the alleged statements is untruthful or unlawful.

To the contrary, Mr. Lessman's statements serve vital public interests by giving consumers "important information" to "assist[] them in making rational purchase decisions" and in fairly evaluating QVC's deceptively promoted products. *Triangle Publications v. Knight-Ridder Newspapers*, 626 F.2d 1171, 1176 (5th Cir. 1980). As Plaintiffs concede, "'the public has a particularly strong interest in an accurate description of health and medical products.'" Op. Br. at 21. This very reason requires protection of Mr. Lessman's ability to provide valuable information to consumers thereby shining light on QVC's products and deceptive advertising. Plaintiffs' motion should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' request for a preliminary injunction and temporary restraining order.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Defendants*

OF COUNSEL:

Jonathan F. Cohn
Gordon D. Todd
Matthew D. Krueger
SIDLEY AUSTIN LLP
1501 K Street
Washington, DC  20005
(202) 736-8000

James D. Arden
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY  10019
(212) 839-5300

May 3, 2010
3526018

25

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2010, I caused the foregoing to be electronically filed with

the Clerk of the Court using CM/ECF, which will send notification of such filing to:

> Joseph Grey, Esquire
> Sean T. O'Kelly, Esquire
> CROSS & SIMON, LLC

I further certify that I caused copies of the foregoing document to be served on May 3,

2010, upon the following in the manner indicated:

Joseph Grey, Esquire                                       *VIA ELECTRONIC MAIL*
Sean T. O'Kelly, Esquire
CROSS & SIMON, LLC
913 North Market Street
11th Floor
Wilmington, DE  19801

Jonathan E. Moskin, Esquire                                *VIA ELECTRONIC MAIL*
Britton Payne, Esquire
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY  10016

*/s/ Rodger D. Smith II*
_____
Rodger D. Smith II (#3778)