# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| QVC, INC. and QHEALTH, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No.  10-094 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| YOUR VITAMINS, INC. d/b/a PROCAPS | ) | |
| LABORATORIES and ANDREW | ) | |
| LESSMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY MEMORANDUM OF QVC, INC.
## IN FURTHER SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER
## PRELIMINARY INJUNCTION
## AND EXPEDITED DISCOVERY

Joseph Grey (ID 2358)
Sean T. O'Kelly (ID 4349)
Cross & Simon, LLC
913 North Market Street
Eleventh Floor
P.O. Box 1380
Wilmington, DE  19899-1380
Telephone: (302) 777-4200
Facsimile: (302) 777-4224 (fax)
Email: jgrey@crosslaw.com

and

Jonathan E. Moskin
Britton Payne
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Telephone:  (212) 682-7474
Facsimile:  (212) 687-3229
Email:  jmoskin@foley.com

Attorneys for Plaintiffs

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

I.      PRELIMINARY STATEMENT ....................................................................... 1

II.     ARGUMENT ................................................................................................... 3

        A. Studies Do Not Establish HA As A Cancer Risk ....................................... 3

        B. In Context, Defendants' 99% Additives Claim Is a False Product Inferiority Claim ..... 6

        C. Studies Do Not Support Lessman's Claims That QVC's Silica is Not Absorbable ....... 8

        D. False Accusations Regarding Lutein ........................................................... 9

        E. Resveratrex Is Not Questionable, Over-sweet, Meaningless or 2/3 Additives .............. 9

        F. Mr. Lessman's Statements Were Deliberately Misleading ........................... 10

        G.  The Equities Favor Injunctive Relief ........................................................ 12

NYC_795463.1

**TABLE OF AUTHORITIES**

CASES                                                                          Page(s)

Bracco Diagnostics, Inc. v. Amersham Health, Inc.,
    627 F. Supp. 2d 384 (D.N.J. 2009) ...............................................................................5, 10

Castrol, Inc. v. Pennzoil Co.,
    987 F.2d. 939 (3d Cir. 1993)..........................................................................................12

Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,
    269 F.3d 270 (3d Cir. 2001)........................................................................................5, 8

Citizens Fin. Group Inc. v. Citizens Nat'l Bank,
    383 F.3d 110 (3d Cir. 2004).............................................................................................10

Cuisinarts, Inc. v. Robot-Coupe, Int'l.,
    No. 81 Civ. 731 CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982).................................7, 9

Highmark, Inc. v. UPMC Health Plan, Inc.,
    276 F.3d 160 (3d Cir. 2001).....................................................................................2, 5, 8

Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.,
    19 F.3d 125 (3d Cir. 1994)..............................................................................................12

Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,
    129 F. Supp. 2d 578 (3d Cir. 2002) ..............................................................................9, 12

Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare,
    292 F. Supp. 2d 611 (D.N.J. 2003) ..................................................................................9

Pizza Hut, Inc. v. Papa John's Int'l, Inc.,
    227 F.3d 489 (5th Cir. 2000) ............................................................................................7

Schering-Plough Healthcare Prods. v. Neutrogena Corp.,
    09-CV-268 (SLR) (D.Del. Apr. 8, 2010)..........................................................................4

Scotts Co. v. United Indus. Corp.,
    315 F.3d 264 (4th Cir. 2002) ..........................................................................................2

Time Warner Cable, Inc. v. DIRECTV, Inc.,
    497 F.3d 144 (2d Cir. 2007)..............................................................................................7

NYC_795463.1

## I.  PRELIMINARY STATEMENT

Defendants' opposition to QVC's motion identifies no actual defects in QVC's NATURE'S CODE products rendering them "unhealthy", "bad" "inferior", "low quality", "lacking in quality", "ridiculous", "shocking" "appalling" or "alarming". Indeed, while conceding that the Court must view the subject advertising in context, defendants nowhere address Lessman's repeated assertions of product inferiority and danger that are themselves literally false and give color of meaning to all of his other claims.  Such slanderous statements are not mere harmless "opinion."  Moreover, Lessman's own mischaracterization of the parties' contentious relationship in 1996 (and his more recent efforts to rejoin QVC in 2006–2007 and 2009), has led QVC to review the settlement agreement the parties entered in 1997.  It includes an automatic right to injunctive relief if Lessman violates the contract's "non-disparagement" clause, as he has done. (Supp. Yoegel Decl. ¶ 15.[1])  Although QVC concedes its complaint does not allege breach of contract, the equities plainly favor entry of an injunction now to prevent such disparagements.

Defendants never address the real issue in this case concerning hyaluronic acid ("HA"): namely, whether there was any scientific basis for Mr. Lessman, in his own words, to seek to "alarm" potential purchasers of QVC <u>supplements</u> about a supposed "mechanism between HA and cancer, which should preclude its use in <u>vitamins</u>."  He tried but failed to find proof that ingesting HA is a danger.  The only studies he found concern the body's own natural creation of HA in response to cancer (a mechanism he admits he does not understand) <u>not</u> ingesting HA in vitamins, which is safe.  Indeed, HA is found without alarm in foods we consume, such as chicken soup (Supp. Davis Decl. ¶ 3), and the FDA has approved many uses for adding HA to the human body – by ingestion, injection and absorption.  Entirely ignoring the context of his own statements, which were directed to ordinary <u>consumers</u> of nutritional supplements, not

---

[1] Rather than further breach the confidentiality clauses, QVC will submit a motion to file the settlement under seal.

NYC_795463.1

academicians or researchers studying HA in the body apart from a specific ingestible product, Mr. Lessman effectively concedes that the only possible meaning – in context – of the "alarm" he raised was that consumers of the one product in issue should be worried about cancer risks from <u>ingesting</u> the product. Yet, discovery confirms he had doubts, but no evidence (now or when he made the claim), that consumers had reason to fear.

Although there is no evidence (and no issue in the case) that QVC's supplements are actually "bad", "inferior" or "low quality" (much less "unhealthy" or carcinogenic), consumers continue to conclude they are – and refuse to purchase these (and other QVC products) as a result (Supp. Yoegel Decl. ¶¶ 9–14; Payne Decl. ¶¶ 2–8), thus demonstrating the irreparable harm QVC <u>continues</u> to suffer.  Although survey evidence is not required for a preliminary injunction, <u>Scotts Co.</u> v. <u>United Indus. Corp.</u>, 315 F.3d 264, 276 (4th Cir. 2002); <u>Highmark, Inc.</u> v. <u>UPMC Health Plan, Inc.</u>, 276 F.3d 160, 173 (3d Cir. 2001), there can be no clearer evidence that defendants' statements have a tendency to confuse consumers about the safety and efficacy of QVC's products than the extensive comments of actually deceived consumers that <u>continue</u> to accumulate in substantial numbers, and the <u>increase</u> in net rankings in Google searches tied to the slanderous blog postings. (Payne Decl. ¶¶ 2–8; Supp. Yoegel Decl. ¶¶ 9–14).

Most of defendants' evidence is simply irrelevant – seeking improperly to impose on QVC a burden to prove health claims it has not made and which, at any rate, are not in issue in this case or in this motion.  There is, indeed, no claim that QVC's products in issue have any actual defects.  Given the vast evidence that consumers nonetheless have actually been misled by defendants' to believe QVC's products are inferior and a health risk, the only issue the Court need now decide as to the efficacy of QVC's products is whether defendants had any basis for their criticisms causing the confusion.  Plainly they did not.

NYC_795463.1

## II.   ARGUMENT

### A. Studies Do Not Establish HA As A Cancer Risk

Although defendants urge the Court to review Lessman's statements in context (Br. at 7) they nowhere attempt to explain what meaning his warnings about cancer risks from HA possibly could have had in the context of blogs written and videotaped for consumers of nutritional supplements.  Nor do they confront the actual words he wrote and spoke to inflame his audience's fears, including that "credible research points to a relationship and mechanism between HA and cancer, which should preclude its use in vitamins." Defendants do not explain what this means in a discussion of vitamins other than that consuming HA can cause cancer. Likewise, if not to inflame fears from consuming HA, why else would Lessman say: "I would never take HA, so of course I would never put it in my products"?  And only that explains why he states "its research relating to cancer is alarming to me."  If not a cancer threat, why would consumers of dietary supplements – such as "Shirley" (Supp. Yoegel Decl. Ex D p.4) – have cause for alarm?  Defendants never say.  Defendants similarly do not address the statement in Lessman's video blog that:

> I looked at hyaluronic acid back then [30 years ago] and I've been looking at it ever since, and fortunately that's the only thing I did is look because the research was never very convincing in terms of benefits but there's a whole line of research that's very concerning that relates to cancer, and in fact you'll see many places that if you have a history of cancer or anything like that don't take hyaluronic acid.  I think regardless, you don't take hyaluronic acid.

In simple English: do not consume HA if you have cancer or even if you don't.  If there is any such research that people with or without cancer should not consume HA, defendants have not produced it.  Rather, Lessman admitted he is aware of none. (Payne Decl. Ex. L ("Lessman Tr.") at pp. 32, 36, 37, 75).  Although he had sought "studies involving oral ingestion", he was left only with "concerns", "since this is all so poorly understood and the only thing that puts my

NYC_795463.1

mind at rest is the fact it's not well absorbed." (Payne Decl. Ex M.) Defendants argue otherwise (Br. at 11), but their purported expert nowhere states that <u>consuming</u> HA is a risk. Lessman also admitted he never consulted an expert before or after publishing his tirades (Lessman Tr. pp. 25, 73), so even if the proffered expert, the zoologist Nicolosi, is competent to testify as an oncologist, much less on any of the other wide ranging topics he covers[2] his views never informed Lessman at any relevant time and have no weight.[3]  As this court ruled in <u>Schering-Plough Healthcare Prods</u>. v. <u>Neutrogena Corp</u>., 09-CV-268 (SLR) (D.Del. Apr. 8, 2010), "[t]his type of unsubstantiated 'scientific' claim is precisely what the Lanham Act seeks to prevent." Slip op. at 21.  Just as in <u>Schering-Plough</u>, an vivo study of one product (or a later in vitro study of the product in issue) did not support a "studies establish" claim concerning the product in issue, Lessman's research (however or whenever conducted) about the body's natural production of HA (even as a marker for some cancers) does not support his "research establishes" claim as to the alleged mechanism linking cancer to consuming HA in vitamins.

Discovery has also shown the falsity of Mr. Lessman's blog that he had been closely monitoring HA for thirty years, so as to spread his cancer fears with the authority of an expert. Mr. Lessman admits he has no such expertise and, in his own words at most "vaguely remember[ed]" some such research when, on January 17 he began composing his screed against QVC. (Payne Decl. Ex M.)  Instead, he raised the alarm about consuming HA even though he

---

[2] Without explaining any qualifications, he offers opinions on the following: (i) Mr. Lessman's blog commentary is "important" and "serve[s] the public interest" (¶ 2); (ii) QVC's presentations of its products are misleading (id); (iii) consumers will be misled by QVC's statements of James Rouse's qualifications as a naturopath (¶ 6), which is ironic given his own lack of qualifications as an oncologist or other issues on which he opines; (iv) QVC's product name NATURE'S CODE Hair Skin & Nails is the same as PROCAPS Healthy Hair Skin & Nails (¶ 7); (v) Lessman's criticisms raise "important points" about which consumers "should be informed" of the ingredients of a product and consumers have a preference against additives and artificial colors (¶ 8).

[3] Mr. Lessman also admits his two colleagues at ProCaps who did research for him to flesh out his "vague recollection" of having heard something bad about HA and cancer are not experts and has no idea what scientific qualifications they have. (Lessman Tr. pp.72–73)  Mr. Lessman did not even save the research he conducted before publishing his blogs but instead purports only to have recreated the results by performing a similar Yahoo! Search. (Id. at p.5). However, QVC's own efforts to replicate that search do not match his results.  (Payne Decl. ¶¶ 15–19).

NYC_795463.1

had no evidence then (or now) that <u>consuming</u> HA is connected in any way to cancer.  (Lessman Tr. pp.32, 36, 37, 75.) Indeed, HA is widely found in foods such as chicken soup, and the FDA has approved numerous uses of HA (including as a treatment for pre-cancerous skin lesions) (Supp. Bradley Decl. ¶ 4; Payne Decl. ¶ 11).  As Mr. Lessman concedes, the substance has been shown in some studies (which he deliberately ignores) to help <u>fight</u> cancer (Lessman Tr. at pp.20, 46-47).  He, of course, did not save that research (Id. at pp.12, 14, 16; supra n. 2.)  Even as to the body's natural creation of HA, Mr. Lessman admits he has no reason to believe it <u>causes</u> cancer  (Id. at pp.18–19, 30) and (as with the zoologist, Nicolosi) is unable to confirm the "mechanism" by which HA contributes to cancer (Id. at pp.22–24, 45, 46, 47) much less by which (to use Lessman's own words) potential consumers of QVC's <u>dietary supplements</u> need be "alarmed" about risks from consuming the tablets.

The mere fact that Lessman qualifies his false and unsubstantiated statements with further (albeit also disparaging and false) statements that the quantities of HA in the QVC product are so low as to be "comical" does not make the false statements true.  In similar cases, courts have held that a party making false statements it contends are ameliorated by other truthful statements (such as disclaimers) bears the burden to show that such statements do indeed neutralize the falsity. <u>Bracco Diagnostics, Inc</u>. v. <u>Amersham Health, Inc.</u>, 627 F. Supp. 2d 384, 464 (D.N.J. 2009).   The substantial evidence of actual confusion confirms his audience overlooked Lessman's disclaimers, understanding just what he meant. See <u>Checkpoint Sys., Inc</u>. v. <u>Check Point Software Techs., Inc.</u>, 269 F.3d 270, 291 (3d Cir. 2001) (actual confusion highly probative). <u>Accord</u>, <u>Highmark</u>, 276 F.3d at 173.  Tellingly, <u>no one</u> has written to express relief that any cancer risk is abated by the small quantities or unabsorbability!  If Lessman genuinely believed the cancer risk from consuming HA was neutralized by its unabsorbability or the

NYC_795463.1

"comical" amounts in the NATURE'S CODE product, he had no reason to raise the red flag in the first place.

B. Underline In Context, Defendants' 99% Additives Claim Is a False Product Inferiority Claim

Defendants say their 99% additives claim was merely an innocuous "mathematical" calculation.  Forgetting their own plea that such statements be read in their full context (Br. at 7) defendants ignore the actual basis for QVC's complaint: that the number itself is inherently meaningless, but what makes it false by necessary implication is the context in which Mr. Lessman joins that meaningless number with the literally false statements that the tablets are "bad" "appalling" "inferior", "shocking" "lacking quality", etc. (terms rarely found in a mathematics text).  Lessman offers no support now for those non-mathematical criticisms and does not even pretend to understand the manufacturing process for tablets. (Lessman Tr. pp.49–51, 55–57.)  In truth (which defendants do not dispute) there is no magic number for what is the "right" percentage (Supp. Bradley Decl. ¶ 4), and Lessman admits he has no idea what that percentage might be or if there is any ideal tablet size. (Lessman Tr. 55–57, 69–70).

In fact, the QVC product was designed to be well within the optimal ranges for tablet size (Supp. Bradley Decl. ¶ 5), and the quantities of listed active ingredients were selected because the supplement was made to be consumed with (and consistently is promoted to be consumed with) a multivitamin – either NATURES CODE or a third party's – all of which undermine the literally false claims (which defendants do not even attempt to defend) that the product is "unhealthy", "bad" "inferior", "low quality", "shocking" "appalling" "alarming", etc.

If Lessman had simply expressed a "preference" for capsules, as his brief suggests (Br. p.14), QVC likely would have had no ground for complaint.  However, his actual statements attack the basic formatting of tablets without any point of reference, making them false by

necessary implication. <u>Cuisinarts, Inc. v. Robot-Coupe, Int'l.,</u> No. 81 Civ. 731 CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982) (baseless comparison to a product Cuisinart did not sell false by necessary implication).  Accord <u>Time Warner Cable, Inc.</u> v. <u>DIRECTV, Inc.,</u> 497 F.3d 144, 158 (2d Cir. 2007).  This certainly is the conclusion many consumers have reached (Yoegel Ex. A) and continue to draw (Supp. Yoegel Decl. ¶ 9–14).

    <u>Time Warner</u>, which found that the statement "settling for cable would be illogical", necessarily and falsely implied in context "that HD picture quality is inferior", also confirms that Mr. Lessman's caustic accusations of inferiority can not be brushed aside as mere puffery or opinion.  So too, <u>Pizza Hut, Inc.</u> v. <u>Papa John's Int'l, Inc.</u>, 227 F.3d 489, 498–99 (5th Cir. 2000), on which defendants rely, while finding the slogan "Better Ingredients, Better Pizza", standing alone, to be "nonactionable puffery," went on to hold that "the slogan was transformed as a result of its use in connection with a series of ads" involving specific ingredients into a misleading statement of fact. <u>Id</u>. at 500–02.  As in <u>Pizza Hut</u>, Lessman has far exceeded expressing mere opinions or preferences; instead mixing insults and specific fictions about specific product attributes into false assertions of product inferiority and health risks.

    Lessman's numbers are also inaccurate.  In his haste to lash out at QVC, Lessman never tested the composition of the tablet, so even now he has no idea what is its specific makeup.  In fact, the percent by weight of the listed dietary ingredients is 2.24% of the total weight of the tablet. (Supp. Bradley Decl. ¶ 2.)  And had QVC elected to declare as active ingredients the phosphorus and calcium from calcium carbonate and dicalcium phosphate in the tablet (which it could have) the actual percent by weight would be 71.9%.  Many of defendants' products list calcium carbonate, and at least one is comprised almost exclusively of calcium carbonate and calcium phosphate (Payne Decl. ¶ 12; Supp. Bengivenga Decl. ¶ 8.)  The larger issue remains the

NYC_795463.1

inherently false comparison between tablets and capsules, but the actual weights make clear that throwing at consumers meaningless percentages wrapped in accusations of an "appalling" "lack of quality" can lead to only one conclusion: the confusion that consumers have in fact shown in large numbers.  The literally false claims of product inferiority make the 99% additive claim false by necessary implication or misleading.  Defendants have not even suggested what other meaning readers can ascribe to the charges.  Even if they are deemed simply misleading, the evidence of ongoing actual confusion more than satisfies QVC's burden of proof.  Indeed, Lessman nowhere disputes the specific evidence of actual confusion but merely disputes whether the Communications Decency Act relieves him of direct liability for publishing the statements. Actual confusion is of course highly persuasive proof of a tendency to deceive. Checkpoint Sys., Inc., 269 F.3d at 291; Highmark, 276 F.3d at 173.

   C. Studies Do Not Support Lessman's Claims That QVC's Silica is Not Absorbable

   Although ProCaps promotes the bio-absorbable properties of the silica in its own products (Yoegel Decl. Ex. C), it has done no research to support its assertions that the silica in the NATURE'S CODE product is as inert as glass or sand and offers no evidence to challenge the declaration of Mr. Bradley that the silica is absorbable.  Indeed, defendants again fail to address what Mr. Lessman actually said (e.g. "that's glass, that's quartz, that's sand"), admitting only that he referenced "significant solubility issues." (Br. at 14).  Moreover, the very premise of the Nicolosi declaration (¶ 16) is the plainly inconsistent position that silicon is inherently unabsorbable but that ProCaps' silicon somehow is.  As Mr. Bradley confirms, Perrigo relied on some of the same research now cited by Nicolosi in formulating QVC's product.  Because QVC is not challenging ProCaps advertising claims and agrees that micronized silica should be absorbable, whereas ProCaps is challenging QVC's claims, the burden is on defendants to

substantiate their contentions and justify having misled consumers to believe that "in a hard tablet form … the good ingredients will not be as easily absorbed as if they were in a powder form." (Yoegel Decl. Ex. A).  They have not done so except by pointing to research that supports the absorbability of QVC's micronized silica.

        D. <u>False Accusations Regarding Lutein</u>

Because QVC never claimed that Lutein will improve the growth of your hair skin and nails, Lessman effectively concedes that attributing this statement to QVC (only then to shoot it down) is false. <u>Cuisinarts</u>, 1982 WL 121559.  Indeed, although defendants argue they needed to address QVC's advertising slogan of "three dimensions of support," their extensive counterclaims nowhere even challenge this slogan, which also was of no evident concern to Mr. Lessman when he wrote his blog (<u>see</u> Payne Decl. Ex M).

        E. <u>Resveratrex Is Not Questionable, Over-sweet, Meaningless or 2/3 Additives</u>

Defendants again fail to assess their actual statements in context – summed up by accusations of "questionable" quality (i.e., literally "doubtful propriety") of a "large red artificially colored tablet", supposedly "two-thirds additives", with meaningless non-standardized ingredients, or an allegedly over-sweetened drink.   Other than a misleading comparison between a one ounce serving of Resveratrex and a 12-ounce can Coca-Cola, they do not attempt to justify any of their baseless criticisms. (Supp. Bengivenga Decl. ¶ 9.)  Confused consumers readily understand the false message that QVC is selling "poor products" that "can't come close" to ProCaps. (Yoegel Decl. Ex. A pp.27, 31).  The misleading comparisons to show product inferiority support a presumption of irreparable harm. <u>Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare</u>, 292 F. Supp. 2d 611, 621 (D.N.J. 2003), quoting <u>Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.</u>, 129 F.

Supp. 2d 578, 367 (3d Cir. 2002).

      F. <u>Mr. Lessman's Statements Were Deliberately Misleading</u>

Mr. Lessman admitted at his deposition that his tirade against QVC was meant to neutralize the appearance of superiority created by the addition of HA to QVC's NATURE'S CODE Hair Skin & Nails and retaliate for QVC's supposed theft of his name. (Lessman Tr. pp.42, 45.)   His initial draft of the blog nowhere mentioned cancer, focusing only on the allegation that the HA in QVC's product would be ineffective. (Payne Decl. Ex. M).  He never found the desired proof regarding oral ingestion, and admitted to his staff he only "vaguely remembered" something about HA and cancer.  Although he did not save his research (and only later sought to recreate it in response to the suit) he never consulted an expert before or after rushing to print (Lessman Tr. pp.25, 73) and falsely built himself up as a 30-year expert simply to unfairly diminish QVC by comparison.  Even now, his brief (at p.3) accuses QVC of "unfairly disadvantaging" him by the statements made to promote its NATURE'S CODE Hair Skin & Nails product and that he needed to respond to some unexplained deception in QVC's promotion of its own product, even though Lessman's own counterclaims in this action do not challenge any of the cited statements regarding the active ingredients in QVC's two products in issue.[4]

Rather than honestly challenge anything QVC actually said, or identify any actual flaws in its products, he instead fabricated a claim of trademark infringement (which he continues to misrepresent to this Court) and rushed to accuse QVC publicly without first alerting it that he considered the name "Hair Skin & Nails" to be proprietary.  In truth, until as recently as 2007,

---

[4] Likewise showing a lack of candor, laying aside that QVC disputes it ever claimed to be certified by the US Pharmacopia, that Lessman's blogs make no mention of the alleged certification show this was not his concern at all.  This is simply a claim conceived by his lawyers months later in response to the complaint.  (Moreover, even when QVC does make reference in its advertising to its USP compliance, it is to promote the solubility of its products, not their safety.)  Even if there were any basis for these charges, the simple fact that QVC has said nothing critical if defendants products defeats any unclean hands defense, which requires <u>exact parity</u> of behavior.  <u>Bracco</u>, 627 F. Supp. at 465 n.240 (citing <u>Citizens Fin. Group Inc. v. Citizens Nat'l Bank</u>, 383 F.3d 110, 129 (3d Cir. 2004)).

NYC_795463.1

Mr. Lessman called his product PROCAPS Hair Skin & Nails BENEFITS.  The only apparent use of the phrase he now says is a ten-year-old trademark was as part of descriptive phrases such as the following: "A unique combination of nutrients specifically designed to support and maintain the growth of healthy hair, skin and nails." (Supp. Yoegel Decl. ¶ 6.)  He has never sought to register or otherwise protect the name as a trademark (Payne Decl. ¶ 13), and virtually every competitor in the trade uses the same phrase generically to describe the product category. (Supp. Yoegel Decl. ¶¶ 4, 5.)  The very tenuousness of the claim that his newly adopted generic phrase was a trademark creates the appearance the public accusations (without any sober-minded efforts to resolve the matter directly with QVC) were simply in bad faith.[5]

To justify his false statements, Lessman employs numerous further untruths regarding his relationship with QVC since he left in 1996.  Despite the confidentiality of the parties' 1997 settlement (including a provision prohibiting him from disparaging QVC and entitling QVC to injunctive relief) he falsely and improperly mischaracterizes the settlement. (Supp. Yoegel Decl. ¶ 6; see supra note 1.)  And although it was Mr. Lessman who, with lavish praise of QVC and loud denunciations of HSN (Id. Exs. F, G) sought a possible return to QVC in 2006–2007, he mischaracterizes his own correspondence confirming the impetus was his own desire to leave HSN (not QVC's effort to lure him away).  He does not even mention his further efforts to rejoin QVC in 2009 (Supp. Yoegel Decl. G) but instead falsely asserts that QVC's 2010 launch of its NATURE'S CODE Hair Skin & Nails was somehow related to discussions three years earlier centering around his dissatisfaction with HSN (Id. Ex. F).  Although Lessman applauds his own

---

[5] Although not relevant to this motion, equally baseless is the contention that individuals responding to Mr. Lessman's own blog stirring up anger at QVC is evidence actual confusion.  Mr. Lessman fails to note for instance that the first such allegedly confused consumer (who says she was dreaming – not purchasing) had previously posted that she thought QVC's product was "a copy-cat version," i.e. not confused that the products come from different sources.  The other three also plainly recognize the competitive relationship of QVC and ProCaps. See Payne Decl. ¶ 9–10. They may have been stirred to anger by Lessman but were not confused as to the source of QVC's products.

NYC_795463.1

restraint in not criticizing QVC for "six months" (Lessman Decl. ¶ 22) evidently what changed is that QVC, twice in two years, declined to take him back.  Responding unfairly to a competitive threat, his blogs attacked not only QVC's Hair Skin & Nails product but its Resveratrex product as well (saying nothing about any of the other issues he now raises – such as QVC's compliance with USP standards on disintegration or its "three dimensions of support" advertising slogan).

Lessman's deliberate retaliatory tactics and the egregious nature of his attacks (despite the commitment he made in his 1997 settlement with QVC not to disparage the company) have needlessly damaged QVC's reputation and support an inference that confusion is likely. (Supp. Yoegel Decl. ¶¶ 9–14.) Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc., 19 F.3d 125, 131–32 (3d Cir. 1994) (violation inferred where defendant acts with an "intent to mislead" and there is evidence of "deliberate conduct" of an "egregious nature," using a means that is not common in the industry).

G.  The Equities Favor Injunctive Relief

Although QVC has not yet asserted a breach of contract claim, Lessman's own false statements about the parties' 1997 settlement has put in issue the fact that his disparagements are in breach of that agreement and entitle QVC to preliminary injunctive relief. (Supp. Yoegel Decl. ¶ 15)  Instances of actual confusion continue to occur, and internet links to the disparaging Lessman blogs are increasing over time (Payne Decl. ¶ 2–8).  If Lessman believes no one is viewing his blogs any longer (Br. at 23), there is no excuse or reason in equity to keep them up. There is no First Amendment right to engage in false or misleading speech. Castrol, Inc. v. Pennzoil Co., 987 F.2d. 939 (3d Cir. 1993).  Rather, particularly where health claims are in issue, the law condemns such false claims. Novartis, 290 F.3d at 597.

Dated:      May 10, 2010

NYC_795463.1

Respectfully submitted,

By:   _____/s/ Joseph Grey_____
      Joseph Grey (ID 2358)
      Sean T. O'Kelly (ID 4349)
      Cross & Simon, LLC
      913 North Market Street
      Eleventh Floor
      P.O. Box 1380
      Wilmington, DE  19899-1380
      Telephone: (302) 777-4200
      Facsimile: (302) 777-4224 (fax)
      Email: jgrey@crosslaw.com

      and

      Jonathan E. Moskin
      Britton Payne
      FOLEY & LARDNER LLP
      90 Park Avenue
      New York, New York 10016
      Telephone:  (212) 682-7474
      Facsimile:  (212) 687-3229
      Email:  jmoskin@foley.com

      Attorneys for Plaintiffs

NYC_795463.1