IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QVC, INC. and QHEALTH, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. No.  10-094-SLR |
| | ) |
| YOUR VITAMINS, INC. d/b/a | ) |
| PROCAPS LABORATORIES | ) |
| and ANDREW LESSMAN, | ) |
| | ) |
| Defendants. | ) |

---

Joseph Grey, Esquire and Sean T. O'Kelly, Esquire of Cross & Simon, Wilmington, Delaware.  Counsel for Plaintiffs.  Of Counsel:  Jonathan E. Moskin, Esquire and Britton Payne, Esquire of Foley & Lardner LLP, New York, New York.

Jack B. Blumenfeld, Esquire and Rodger D. Smith II, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware.  Counsel for Defendants.  Of Counsel:  Jonathan F. Cohn, Esquire, Gordon D. Todd, Esquire and Matthew D. Krueger, Esquire of Sidley Austin LLP, Washington, D.C., and James D. Arden, Esquire of Sidley Austin LLP, New York, New York.

---

**MEMORANDUM OPINION**

Dated:  July 27, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

QVC, Inc. ("QVC") and QHealth, Inc. ("QHealth") (collectively, "plaintiffs") brought claims for false advertising under the Lanham Act, 15 U.S.C. § 1125(a) (hereinafter, "§ 43"), common law false advertising, violation of the Delaware Consumer Fraud Act, 6 Del. C. § 2531 et seq., and violation of the Delaware Uniform Deceptive Trade Practices Act ("DTPA") against defendants Andrew Lessman ("Lessman") and Your Vitamins, Inc. d/b/a ProCaps Laboratories ("ProCaps"). (D.I. 1)  Plaintiffs' claims stem from a series of internet posts (or "blogs") by Lessman relating to his and plaintiffs' respective dietary supplement products.  Four days after filing their complaint, plaintiffs filed a motion for a temporary restraining order ("TRO"), preliminary injunction and expedited discovery seeking that the court compel defendants to withdraw the material at issue.  (D.I. 4)  That motion is presently before the court.  For the reasons that follow, plaintiffs' motion is denied.

## II. BACKGROUND

QVC and QHealth jointly market a line of dietary supplements under the "Nature's Code" trademark over QVC's broadcast cable television network and website. (D.I. 5 at 3)  Among these are plaintiffs' "Resveratrex®" and "Hair, Skin & Nails®" supplements (hereinafter, "Nature's Code Hair").  (*Id.*; D.I. 30 at 4)

Beginning in 1992 Lessman began marketing, on QVC's network, dietary supplements on behalf of his company, ProCaps.  (D.I. 5 at 3; D.I. 30 at 2)  Lessman left QVC in 1997 and began marketing his products with QVC's primary competitor, the Home Shopping Network ("HSN").  (*Id.*)  Several years later, Lessman and ProCaps

(collectively, "defendants") began marketing their "Healthy Hair Skin & Nails®" product (hereinafter, "Healthy Hair").  (D.I. 30 at 2)  That product has generated more than $70 million in revenue for ProCaps.  (D.I. 30 at 2)  Defendants also market "Resveratrol-100®," a product which competes with Reservatrex®.  (D.I. 5 at 7)

In November 2006, Lessman and QVC began negotiating Lessman's return to QVC's network.  (D.I. 30 at 2-3; D.I. 34 at 11)  The negotiations eventually stalled and defendant Lessman remained at HSN.  (D.I. 30 at 3; D.I. 34 at 11-12)  Lessman contends that, during conversations with QVC executives, he disclosed the success of Healthy Hair.  (D.I. 30 at 3)  Plaintiffs began marketing Nature's Code Hair shortly thereafter in January 2010.  (Id.)

Lessman then published several blogs on his website[1] that were critical of plaintiffs' products.  (D.I. 5 at 4; D.I. 30 at 4-5)  On January 14, 2010, Lessman authored a post entitled "QVC's Hair Skin and Nails isn't Healthy . . . it is just sleazy and deceptive."  (D.I. 34, ex. A[2])  Lessman stated that, despite the similarity of QVC's product name ("Hair, Skin and Nails®") to his own ("Healthy Hair, Skin and Nails®"), he has "nothing to do with this product" and that QVC took his "most successful product's name and use[d] it to try and deceive customers."  (Id.)  Lessman stated that QVC

---

[1] *Available at* http://andrew.procapslabs.com/default.aspx; *also available at* http://www.wordsonwellness/default.aspx.  When plaintiffs filed the complaint, Lessman's blog resided at only the first URL.  Sometime thereafter, Lessman created the second address.  Entry of either URL now directs the user's browser to the "words on wellness" site, which hosts the four blog posts at issue.

[2]*Available at* http://www.wordsonwellness.com/post/2010/01/14/QVCe28099s-Hair-Skin-and-Nails-is ne28099t-Healthye280a6it-is-just-sleazy-and-deceptive!.aspx.

2

"create[s] a low quality product" which only exists due to the success of Healthy Hair, and that QVC's "lack of integrity is totally in keeping with the lack of quality of their vitamins." (*Id.*)

On January 19, 2010, Lessman posted "A Quick Follow-up on QVC's Hair, Skin and Nails" ("the follow-up article"), in which Lessman again accused QVC of adopting the near-identical product name with the goal of deceiving and confusing consumers. (*Id.*, ex. B[3]) Lessman also stated that QVC learned of the success of Healthy Hair through himself. (*Id.*)

On January 20, 2010, Lessman posted "QVC's Hair, Skin and Nails . . . Over 99% Additives!" ("the 99% additives article"). (*Id*, ex. C[4]) That blog stated in relevant part:

> Let's begin our review with a look at QVC's Hair Skin and Nails Supplement Facts Panel . . . a quick look at the label reveals numerous additives, including two Artificial Colors/Dyes (FD&C Yellow #5 and FD&C Yellow #6). . . . the four active ingredients are Biotin 3 mgs (3,000 mcg); Hyaluronic Acid 1 mg; Silica 10 mg (actually 4.7 mg Silicon); Lutein 0.6 mg (600 mcg). Adding up their weights . . . the four active ingredients (14.6 mg) comprise about 1% of the tablet making it 99% additives! That's right . . . 99%! But why would QVC do this?! Perhaps a bigger tablet fools you into thinking you're getting more, but who knows? Anyhow, this large tablet is just as deceptive and confusing as their use of my product's name to sell it.
>
> Now let's go over some sobering facts about their choice of "Active" Ingredients:

---

[3]*Available at*
http://www.wordsonwellness.com/post/2010/01/19/A-Quick-Follow-up-on-QVCe28099s-Hair-Skin-and-Nails.aspx.

[4]*Available at*
http://www.wordsonwellness.com/post/2010/01/20/QVCe28099s-Hair-Skin-and-Nailse280a6Over-9925-Additives!.aspx.

3

1. Biotin. 3,000 mcgs of Biotin is a great start, but sadly, it is buried in a mass of tableting additives. . . .

2. Hyaluronic Acid (HA).  I am very familiar with Hyaluronic Acid.  **I have followed the research on HA for over 30 years,** but I have never used it, because there is no science that shows it offers any benefit when taken orally and **there is a significant body of troubling research that connects it to cancer.**  Back in 1979 I first considered using HA, but chose not to, because in my humble opinion, it is totally useless and **potentially unsafe**.  HA is not well absorbed from the GI tract and as a result, can offer no benefits.  **HA does not necessarily "cause" cancer, since it occurs naturally in the body, but credible research points to a relationship and mechanism between HA and cancer, which should preclude its use in vitamins.**  Personally, I would never take HA, so of course, I would never put it in my products.  That is why after 30+ years, you have never seen HA in my products. HA offers no benefits and **its research relating to cancer is alarming to me**. . . . I would never offer HA given my very real concerns about its risks, not to mention its lack of benefits.  In closing, oral HA offers no benefits to the hair, skin or nails and at 1 mg, it is all but meaningless.  **The only benefit to this ultra-low level is that it likely poses no risk.**

3. Silica (from silicon dioxide).  We are all familiar with the more common names for Silica:  sand or glass. . . We also use silica in our Healthy Hair Skin & Nails, but because we recognize its solubility limitations, we include our soluble organic silicon.

4. Lutein.  Lutein is an important carotenoid, best known for its protective benefits to the eye . . . Lutein will NOT improve the growth of your hair, skin and nails.

In closing, QVC's use of my exact product name to sell their Nature's Code's Hair Skin and Nails formula is not just confusing, but as you can tell from the above, downright disparaging to my product.  At 99% additives and only four ingredients, including 1 mg of Hyaluronic Acid, I can't imagine what they had in mind.

(*Id.*) (emphasis added)

Finally, on January 22, 2010 Lessman posted "A Few Words on Resveratrol and QVC's Colorful and Sweet Versions" ("the Resveratrol article").  (*Id.*, ex. D[5])  This blog

---

[5]*Available at* http://www.wordsonwellness.com/post/2010/01/22/A-Few-Words-on-Resveratrol-and-Q

discussed Lessman's Resveratrol-100® product, stating that, because it is harvested from an ultra-high potency source (Japanese knotweed plant), Resveratrol-100® delivers an "ultra-concentrated" dose of the supplement that is "many, many times higher than even the best red wine, grape skin or grape seed extracts." (Id.) With respect to QVC's Resveratrex®, Lessman stated that: (1) it includes three artificial colors; (2) is "almost two-thirds additives;" (3) the active ingredient comes from polygonum cuspidatum (not Japanese knotweed); and (4) "[t]he next group of active ingredients is their Healthy Heart Blend, which is an all but meaningless list of seven different botanicals – NONE of which states a standardization of any kind. You have NO idea how much you get of each[.]" (Id.) With respect to the Resveratrex® drink, Lessman stated that: (1) despite the wine-shaped bottle and "Fruits from the Vine" type, the supplement does not come from wine; (2) there are 4 grams of sugar per serving from "a mystery source;" (3) sugar-rich grape concentrate is included; (4) sugar is the "dominant ingredient;" and (5) there is no standardization of any of the ingredients. (Id.) Lessman commensurately produced three videos that essentially restated the claims from his articles, dated January 22, February 3 and 4, 2010.[6]

Plaintiffs brought suit on February 5, 2010 and moved for a TRO and preliminary injunction on February 9, 2010. (D.I. 1; D.I. 4) Defendants answered on March 1, 2010, and asserted counterclaims alleging "fraudulent, unlawful, misleading and/or

---

VCe28099s-Colorful-and-Sweet-Versions.aspx.

[6]Links to the videos are contained on the blog pages discussed *supra*. A fourth video produced February 11, 2010 ("The QVC Lawsuit is Completely Without Merit") concerns the present litigation generally.

5

trademark-infringing conduct." (D.I. 15)  Oral argument on the TRO/preliminary

injunction motion was held on May 18, 2010.  Plaintiffs filed a first amended complaint

on June 22, 2010 to add breach of contract allegations stemming from Lessman's

departure from QVC in 1997.  (D.I. 47)  Defendants' motion to dismiss that claim is

pending.  (D.I. 48)[7]  The parties have filed additional submissions on the pending

TRO/preliminary injunction motion.  (D.I. 41, 43, 44, 51)  On July 15, 2010, plaintiffs

filed a motion to supplement their TRO/preliminary injunction motion to incorporate

arguments relating to the parties' 1997 agreement.  (D.I. 52)[8]  On July 23, 2010,

plaintiffs filed a motion to strike defendants' post-hearing submissions.  (D.I. 56)

## III. STANDARD

Traditional rules of equity apply to requests for injunctive relief.  *See eBay, Inc. v.*

*MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The moving party for injunctive relief

must establish:  "(1) a likelihood of success on the merits; (2) that it will suffer

irreparable harm if the injunction is denied; (3) that granting preliminary relief will not

result in even greater harm to the nonmoving party; and (4) that the public interest

favors such relief."  *Id.* (citation omitted).  The burden lies with the movant to establish

every element in its favor or the grant of a preliminary injunction is inappropriate.  *See*

*P.C. Yonkers, Inc. v. Celebrations, the Party and Seasonal Superstore, LLC*, 428 F.3d

504, 508 (3d Cir. 2005).  If either or both of the fundamental requirements – likelihood

---

[7]Briefing on that motion was completed on July 26, 2010.

[8]Rather than file their supporting brief under seal, plaintiffs filed a motion for
leave to file their papers under seal.  That motion was subsequently withdrawn; counsel
have represented that the supporting documents will be re-filed at a later time.

6

of success on the merits and probability of irreparable harm if relief is not granted – are

absent, an injunction cannot issue. *See McKeesport Hosp. v. Accreditation Council for*

*Graduate Med. Educ.*, 24 F.3d 519, 523 (3d Cir.1994). The elements also apply to

temporary restraining orders. *See NutriSweet Co. v. Vit-Mar Enterprises., Inc.*, 112

F.3d 689, 693 (3d Cir. 1997).

      "The decision to grant or deny . . . injunctive relief is an act of equitable discretion

by the district court." *Id.* The grant of a preliminary injunction is considered an

"extraordinary remedy" that should be granted only in "limited circumstances." *See Kos*

*Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted).

## IV. DISCUSSION

### A. Statutes at Issue

      Section 43(a) of the Lanham Act provides that:

> [A] person who shall . . . use in connection with any goods or services . . . any
> false description or representation, including words or other symbols tending
> falsely to describe or represent the same . . . shall be liable in a civil action by
> any person . . . who believes that he is or is likely to be damaged by the use of
> such false description or representation.

15 U.S.C. § 1125(a). There are two different theories of recovery for false advertising

under § 43(a): "(1) an advertisement may be false on its face; or (2) the advertisement

may be literally true, but given the merchandising context, it nevertheless is likely to

mislead and confuse consumers." *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d

Cir. 1993). The test for literal falsity is an objective one for the court's determination.

"[I]f a defendant's claim is untrue, it must be deemed literally false" regardless of the

advertisement's impact on the buying public. *Id.* at 943-44. Further, "only an

7

unambiguous message can be literally false," and "[a] literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586-87 (3d Cir.2002) (quoting *Clorox Co. v. Procter & Gamble Commercial Co.*, 228 F.3d 34, 35 (1st Cir.2000)) (internal quotations omitted).  Conversely, "[w]hen the challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction." *Castrol*, 987 F.2d at 943.

The DTPA prohibits conduct that "[d]isparages the goods, services, or business of another by false or misleading representation of fact" or that generally "creates a likelihood of confusion or of misunderstanding."  6 Del. C. §§ 2532 (a)(8) & (a)(12).  "[A] complainant need not prove competition between the parties or actual confusion or misunderstanding" to prevail in an action under the DTPA.  6 Del. C. § 2532(b).  The DCFA prohibits the use of "any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."  6 Del. C. § 2513.

As the foregoing indicates, a primary difference between the DTPA and DCFA and the Lanham Act is that the latter requires evidence of consumer confusion (where there is an implicitly, rather than explicitly, literally false claim).  It is plaintiffs' position

8

that ample evidence of consumer confusion has been provided in the form of

responsive posts to Lessman's blogs by actual consumers.  It is plaintiffs' opinion,

therefore, that the court need not parse defendants' claims into the categories of

literally false, false by necessary implication, or misleading for § 43 purposes, and that

plaintiffs establish a claim under the DTPA and DCFA by meeting the requirements of

their Lanham Act claim.  (D.I. 5 at 11, 16)  Plaintiffs do not specifically discuss their

common law claims.

### B. Challenged Statements

There are four categories of purportedly false statements at issue, which the

court will refer to as:  (1) 99% additives; (2) silica solubility; (3) hyaluronic acid ("HA")

and cancer; and (4) the Resveratrex® claims.  Lessman has also implied that the

coloring agents in plaintiffs' products are unsafe and has denounced the quality control

of plaintiffs' products across-the-board.  (D.I. 5 at 11-13)  Plaintiffs must demonstrate

that the challenged advertisements are literally false to a "likelihood of success"

standard in order to satisfy their preliminary injunction burden.  *See, e.g., Castrol, Inc. v.*

*Quaker State Corp.*, 977 F.2d 57, 62 (1992).

### 1. 99% additives

Plaintiffs assert that Lessman's statements that Nature's Code Hair is 99%

additives is false by necessary implication because, in context, Lessman's statements

(using the words "inferior," "shocking" and the like) imply that the additives are harmful

when, in fact, they are innocuous.[9]  According to plaintiffs, Nature's Code Hair contains

---

[9]Nature's Code Hair is a capsule, rather than a tablet, and, like many capsules, is smaller in size.

9

97.76% inactive ingredients. (D.I. 34 at 6-7) The 99% additives claim is, even by plaintiffs calculations, largely correct.[10] Most importantly, Lessman has not specifically stated that the additives (or fillers) in the tablets are harmful or render Nature's Code Hair inferior. That Lessman has interwoven the concepts of 99% additives with plaintiffs' products "lacking quality," being "inferior" and the like renders customer confusion plausible. While "full blown consumer surveys or market research are not an absolute prerequisite" at the preliminary injunction state, plaintiffs were required to provide "expert testimony or other evidence" to support a finding that these statements were true but misleading. See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002) (quoting United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1183 (8th Cir. 1998)). For reasons discussed infra, the court does not deem plaintiffs' blog evidence sufficient in this regard.

### 2. Silicon dioxide (or "silica")

Plaintiffs argue that scientific studies do not support the claim that silica (as used in Nature's Code Hair) is unabsorbable. The crux of plaintiffs' argument with respect to silica is that Lessman's claims sound as if they have a scientific basis (with respect to solubility), but no such support exists. (D.I. 5 at 14, citing Novartis, 290 F.3d at 590 (a "completely unsubstantiated" claim, or one with no "semblance of support," is false per se)) Defendants have provided a declaration by Robert J. Nicolosi ("Nicolosi") professor in the Department of Clinical Laboratory and Nutritional Sciences at the University of Massachusetts-Lowell and Director of its Center for Health and Disease

---

[10]The court does not base its holding on the closeness of these measurements, which is recounted only to illustrate the narrowness of the dispute.

10

Research, stating that pharmaceutical-grade silicon dioxide (or silica) is "hardly soluble," citing manufacturer specifications. (D.I. 33 at ¶ 16)  Nicolosi also points out that organic silicon is more soluble than silicon dioxide, a point not disputed by plaintiffs.[11] (*Id.* & n.14; D.I. 34 at 8-9)  On this record, the court does not find Lessman's statements "completely unsubstantiated" such as to support a finding of per se falsehood.  Further, Lessman did not specifically state that the silica in Nature's Code Hair is either non-absorbable or non-organic.  The extent to which Lessman has implied as much must be measured by consumer reaction; a preliminary injunction is not warranted at this time.

### 3. Resveratrex® claims

Plaintiffs also take issue with Lessman's characterizations of Resveratrex® as having a "meaningless" blend of anti-oxidants; containing artificial sweetners; and being of "questionable" quality.  Plaintiffs argue that its Healthy Heart Blend of seven botanicals is not, as Lessman stated, "meaningless" or even unstandardized. (D.I. 5 at 7)  Plaintiffs cite a declaration by Michael Bengivenga, Senior Director of Product Development of Celmark International, stating that these ingredients "provide[ ] additional benefits beyond resveratrol from polygonum cuspidatum alone;" the declarant does not state what these benefits are.[12] (D.I. 5, ex. 2 at ¶ 7)  Plaintiffs complain that defendants "imply" that there are unwholesome origins of Reveratrex®'s

_____

[11]Plaintiffs offer a counter-declaration stating that silicon dioxide is absorbable and complain that defendants have (themselves) done no research in this area. (D.I. 34 at 8)

[12]That the "presence of each of these ingredients. . . is supported by . . . defined [ ] oxygen radical absorbance capacity" scores, which tests measure "antioxidant capacities," is not specifically indicative of the benefits (antioxidant or otherwise) of any listed ingredient. (D.I. 5, ex. 2 at ¶ 7)

11

sugar content, that artificial sweeteners are used, and that tablets are inferior to capsules – effectually conceding that consumer reaction must be evaluated. (*Id.* at 7-8) Plaintiffs do not argue that the statement that the "principal source" of Resveratrex® is not "the vine," admitting that there is less ("almost as much") grape extract and grape seed extract in Resveratrex® as there is in polygonum cuspidatum. (*Id.* at 8) Finally, Lessman did not specifically accuse plaintiffs of mislabeling; he stated that "you might actually be fooled into thinking their product comes from red wine, since it comes in a 'wine bottle' and states 'FRUITS FROM THE VINE' in big type on the front of its label." Plaintiffs do not dispute that Resveratrex® is not made from wine.

Lessman's use of the terms "sad," "disturbing," "heart-breaking" and the like cannot themselves be misrepresentations unless specifically related to a property of Nature's Code Hair or Resveratrex®. *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 & n.3 (2d Cir. 1997) (false or misleading misrepresentations must involve an inherent or material quality of a product). The extent to which these terms lead to customer confusion regarding product properties must be measured by consumer reaction.

### 4. HA and Cancer

Lessman's use of "cancer" in his comparative advertising for Natures Code Hair and Healthy Hair supplements is the most serious of the challenges. There are several components to plaintiffs' claims in this regard. First, Lessman states that he is "very familiar with [HA]" because he has "followed the research on HA for over 30 years." (D.I. 34, ex. C) Following this, Lessman states that "there is a significant body of

12

troubling research that connects [HA] to cancer;" that the HA research "relating to cancer is alarming to me;" and he "would never offer HA given my very real concerns about its risks." (*Id.*)  Despite characterizing HA overall as "potentially unsafe," certain mitigating statements are interwoven, for example, that HA is "useless" and offers no benefits when taken orally, and the 1 mg "ultra-low" level in Nature's Code Hair "likely poses no risk." (*Id.*)  In one instance, Lessman pairs a qualification with an insinuation of causation:  "HA does not necessarily 'cause' cancer, since it occurs naturally in the body, but credible research points to a **relationship** and **mechanism** between HA and cancer, which should preclude its use in vitamins." (*Id.*) (emphasis added)

It is defendants' position that Lessman's statements accurately describe the current scientific literature on HA.  At the court's request, defendants have submitted a binder of scientific papers upon which they rely and which were produced in preliminary injunction discovery.[13]  The court has reviewed the literature and concluded that the studies document a **correlation** between cancer and high HA levels in the body; none of the papers iterate a theory of **causation** between HA and cancer.  Because Lessman stated that HA does not necessarily 'cause' cancer, since it occurs naturally in the body," and he has made no specific affirmative statement that HA causes, precedes, or advances cancer, Lessman's statements are not explicitly false (or false by necessary implication) in this regard.

Lessman's statement that he has "followed the research on HA for over 30 years" is also not explicitly false.  Lessman testified that he periodically checked the

---

[13]The contents of the binder, dated April 22, 2010, do not appear to have been docketed.

research on HA but over "the last decade or so," that task was handled by others in his research department. (D.I. 38, ex. L at 28-29) Lessman further testified that he "would have to review over 2000 studies to be able to make [the] assessment" of whether HA causes cancer, and he could not recall any specific research connecting HA to cancer. (*Id.* at 29-30) In essence, Lessman did, to some degree, "follow" HA research. His statement cannot be false by necessary implication insofar as the term "followed" is an imprecise term connoting different things to different people.

However, the court agrees with plaintiffs that, given the context of Lessman's statements, Lessman's blogs (and videos) may likely mislead and confuse consumers into believing that the HA in Nature's Code Hair **causes** cancer. At the very least, Lessman has sent a mixed message by associating HA and cancer and intermixing the concepts of "alarm," "unsafe[ness]," "troubling" and "real concern" with statements that HA is non-beneficial and "likely poses no risk." Undoubtedly, Lessman has sought commercial advantage through the public's fear of cancer. The degree to which consumers were actually misled and confused, however, is not a determination within the court's purview.

## C. Blogs as Evidence of Consumer Confusion

The court is not presented with expert testimony or consumer surveys at this time. To the extent plaintiffs address implied falsity, they offer responsive posts to Lessman's blogs as evidence of actual confusion.[14] (D.I. 34 at 5 ("no one has written to

---

[14]The parties have each submitted statements regarding the traffic on Lessman's blog. At oral argument, defendants confirmed that there is no way to determine the number of lawyer or staff visits to Lessman's site as compared to consumer visits. (D.I. 41 at 2) Notwithstanding, the number of "hits" on a given page are not indicative of

14

express relief that any cancer risk is abated by the small quantities of unabsorbability!"))

There are sixty-seven (67) comments to the 99% additives article[15] and fifty (50)

comments to the Revesterol article.[16]  Though many of these are negative to QVC (as

compared to simply supportive of Lessman), only a few correlate a decision not to buy

Nature's Code Hair with Lessman's particular statements as discussed above.

Only three posts to the 99% article appear to address HA and/or cancer.  One

asks Lessman whether HA poses a risk in creams or lotions.[17]  Another generally

reflects that QVC is "criminal" for posing risks to "people's health."  One reader stated

that "I did read that HA was linked in some cases [to] cancers," but stated that the

"primary reason" for discontinuing the use of Nature's Code Hair was how it made her

feel (edgy and anxious).  Similarly, four reiterate the 99% number or the high

percentage of additives contained in Nature's Code Hair.  Only one appears to address

silica, and it came in the context of a question to Lessman regarding the silica in

Healthy Hair.  None of the comments to the Resveratrol article relate a decision not to

---

actual confusion imparted by the substance of Lessman's messages.  Insofar as the
court does not reach the issue of harms to the respective parties, the court need not
evaluate the evidence further.  Plaintiffs' motion to strike defendants' submissions
regarding website traffic is, therefore, denied as moot.

[15]As of July 20, 2010.  The 99% additives article was posted by Lessman in
January 2010.  All but two comments were posted in January 2010.  One substantive
comment (negative to Lessman) was posted in April 2010.

[16]Certain individuals engaged in online conversations via the blogs and posted
several comments; therefore, there were less than 67 and 50 total responders to each
article, respectively.

[17]Lessman responded to this post that he can see no risk by HA in topical
products.  A later blogger thanked Lessman for this additional HA information.

15

purchase Resveratrex® with the source of resveratrol or sugar content.[18]  The court

finds that plaintiffs have not demonstrated a "likelihood of success" with respect to

implied falsity on this limited record and, therefore, need not evaluate the remaining

preliminary injunction factors.[19]

### D. Motion to Supplement

As noted previously, also pending before the court is plaintiffs' motion to

supplement the preliminary injunction record by reference to the parties' 1997

agreement.  The accompanying papers have not yet been filed and it is not clear to the

court how facts related to a potential breach of Lessman's contract could supply

evidence of actual consumer confusion.  The court does not delay its consideration of

---

[18]Plaintiffs stated at oral argument that the blogs and videos at issue are linked-to on other media, such as Facebook®.  It is unclear on this record the extent of such dissemination, and the court does not have before it any consumer comments from other websites.

[19]The court need not definitively determine, therefore, whether blog posts should be deemed relevant and credible evidence (generally and, in this context, as evidence of consumer confusion) – an issue of first impression for this court.  Blog posts such as those in this case may be more reliable than broad-based surveys, insofar as they represent direct feedback from consumers specifically interested in the product(s) at issue, although concerns regarding such posts' authenticity are not ill-founded.  Courts have reached differing conclusions on the issue.  Compare Blue Bell Creameries, L.P. v. Denali Co., LLC, Civ. No. 99-594, 2008 WL 2965655 at *5 & n.4 (S.D. Tex. July 31, 2008) (declining to admit blog entries as evidence of actual consumer confusion in a trademark infringement case stating that they "lack[ed] sufficient indicia of reliability" and "[n]othing is known about the persons who made the entries, about whether they are related in any way to either party or whether they are describing true events and impressions"); with Volkswagen AG v. Verdier Microbus and Camper, Inc., Civ. No. 09-231, 2009 WL 928130 at *4 (N.D. Cal. Apr. 3, 2009) (allowing internet postings and blogs "suggest[ing] that consumers believe the Verdier vehicle is a [Volkswagen] product" as evidence weighing in favor of actual consumer confusion).  See also, gen., Victaulic Co. v. Tieman, 499 F.3d 227, 236 (3d Cir. 2007) (web pages must be authenticated before they can be admitted pursuant to Federal Rule of Evidence 902).

16

plaintiffs' motion for immediate relief to allow for additional briefing relating to the newly-amended complaint.  Plaintiffs may incorporate their arguments in summary judgment briefing, should the case survive defendants' pending motion to dismiss based on the binding forum selection clause in that contract.

## V. CONCLUSION

For the foregoing reasons, plaintiffs' motion for a TRO, preliminary injunction and for expedited discovery is denied.  Plaintiffs' motion to supplement their TRO/preliminary injunction motion to incorporate arguments relating to their amended complaint is denied.  An appropriate order shall issue.

17